**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

JANE DOE #1, ET AL.                                    CIVIL ACTION

VERSUS                                                        21-564-SDD-SDJ

BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY
AND AGRICULTURAL AND MECHANICAL
COLLEGE, ET AL.


**RULING**

This matter is before the Court on the *Motion to Dismiss*[1] by LSU, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board" & "LSU"), Troy Blanchard ("Blanchard"), Lindsay Madatic ("Madatic"), and Jennifer Normand ("Normand") or (collectively "LSU"). Plaintiffs, Jane Does #1 - #6 ("Plaintiffs") filed an *Opposition* to this motion,[2] to which LSU filed a *Reply*.[3] For the following reasons, the Court finds that LSU's motion must be granted. Also before the Court are the *Motion to Dismiss* by Defendant Jennie Stewart ("Stewart")[4] and the *Motion to Dismiss* by Adelaide Russo ("Russo").[5] These motions shall also be granted.

---

[1] Rec. Doc. No. 17.
[2] Rec. Doc. No. 37.
[3] Rec. Doc. No. 48.
[4] Rec. Doc. No. 16. Plaintiff opposed this motion, Rec. Doc. No. 35; Stewart filed a Reply, Rec. Doc. No. 41.
[5] Rec. Doc. No. 18. Plaintiff opposed this motion, Rec. Doc. No. 34; Russo filed a Reply, Rec. Doc. No. 49.

I.    **FACTUAL & PROCEDURAL BACKGROUND**[6]

**A. Parties**

Plaintiffs are six individuals who identify themselves as Does #1-6. Does #1-5 are current or former students of LSU.[7] Doe #4 and Doe #5 allege that they began graduate programs in the LSU Department of French Studies in August 2017, and they were employed by LSU as graduate or teaching assistants.[8] Doe #6 identifies herself as an Associate Professor in the Department of French Studies at LSU.[9]

Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board" or "LSU") is the governing body of the Louisiana State University system and is a public constitutional corporation organized and existing under the laws of the State of Louisiana to operate, manage, and control the system, including its campus in Baton Rouge.[10]

Defendant Dr. Adelaide Russo ("Russo"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU; since August of 2017, Russo has served as the Chair of LSU's Department of French Studies.[11]

Defendant Troy Blanchard ("Blanchard"), in his official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU; he served as Interim Dean of the College of Humanities and Social Sciences at LSU from May 2018 to November 2019, and thereafter as Dean of the College.[12]

---

[6] The 130-page Complaint in this matter contains 474 individual allegations. Rec. Doc. No. 1.
[7] Rec. Doc. No. 1, ¶ 46.
[8] *Id.* at ¶¶ 6, 67.
[9] *Id.* at ¶ 47.
[10] *Id.* at ¶ 48.
[11] *Id.* at ¶ 50.
[12] *Id.* at ¶ 51.

Defendant Jennifer Normand ("Normand"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU; she has served as Executive Director of Employee Relations at LSU since May of 2002.[13]

Defendant Jennie Stewart ("Stewart"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU; she served as LSU's Title IX Coordinator from 2015 to March 2021.[14]

Defendant Lindsay Madatic ("Madatic"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU; she has served as Associate Director of Employee Relations since June of 2010. During all relevant times, she also served as Deputy Title IX Coordinator for Employees with HRM.[15]

### B.  General Allegations

This case presents disturbing allegations of sexually predatory conduct by an LSU employee and graduate student, Edouard d'Espalungue ("d'Espalungue"). The Plaintiffs, former and current LSU students and an LSU assistant professor, allege that they were victim to d'Espalungue's deviant behavior, in various ways, which they reported to LSU officials and engaged LSU's Title IX process, to no avail. Unfortunately, the Plaintiffs are confronted by Louisiana's one-year statute of limitations, the shortest in the nation.[16] The conduct complained of and reported to LSU primarily occurred more than one year before

---

[13] *Id*. at ¶ 52; Employee Relations is part of the Office of Human Resources Management (HRM) .
[14] *Id*. at ¶ 53.
[15] *Id*. at ¶ 54.
[16] Only Louisiana, Kentucky, and Tennessee have a one-year statute of limitations. The other 47 States have 2, 3, 4, 5 and even 6-year statutes of limitation.

the Plaintiffs filed their suit. If these events had occurred in the neighboring states of Mississippi, which has a 3-year statute of limitations, or Texas, where there is a 2-year status of limitations, most, if not all, of Plaintiffs' claims would be timely. But, because Plaintiffs face Louisiana's one-year statute of limitations, in large part, their claims will not be heard, and LSU will not be held to answer the allegations.

This case arises out the alleged conduct of d'Espalungue a man Plaintiffs describe as a "charming, handsome, and successful serial sexual predator from France" who was a graduate student and employee in LSU's Department of French Studies from August 17, 2017 through November 20, 2020 when  LSU suspended d'Espalungue for the alleged September 6, 2020 rape of Doe #1.[17]  d'Espalungue is not named as a defendant in this lawsuit because he fled the United States in December 2020 and is not likely to return.

On September 30, 2018, d'Espalungue was arrested for sexual battery of a 21-year-old student from the University of Louisiana at Lafayette ("ULL") at a Catholic retreat held in Rapides Parish, Louisiana.[18] He was released on bond and returned to LSU.[19] Plaintiffs allege that various officials at LSU learned of the arrest no later than October 10, 2018, after the arrest had been publicized in local media, including LSU's student newspaper.[20]

The Plaintiffs allege that after d'Espalungue's 2018 rape arrest in Rapides Parish, and continuing into the Spring of 2021, even after he fled to France, d'Espalungue "subjected Does #1-5 and many other female LSU students, both within and outside the

---

[17] *Id.* at ¶ 1.
[18] *Id.* at ¶ 69.
[19] *Id.*
[20] *Id.* at ¶ 74.

Department of French Studies, to unwelcome sexual harassment, including *quid pro quo* harassment, sexual assault, and/or rape that constituted discrimination on the basis of sex."[21]  Plaintiffs allege that LSU officials with authority to address the situation had actual knowledge that d'Espalungue posed a substantial risk of sexual harassment and severe harm to students based on his arrest for sexual battery.[22]  Yet, LSU's "sole response" was to remove d'Espalungue from the French 1001 class he was teaching in the Fall of 2020.[23] LSU did not terminate d'Espalungue's employment, nor did LSU take any actions to prevent him from having access to LSU students.[24]

Plaintiffs allege that after his rape arrest, "Dr. Adelaide Russo ("Russo"), Chair of the Department of French Studies, immediately hired d'Espalungue as her personal research assistant, essentially promoting him to a status of greater influence and prestige within the department. He continued leading French Department activities such as French Table and French Movie Night which brought him in touch with undergrads, including his former students Doe #2 and Doe #3."[25]  d'Espalungue was also in charge of the French Department web page and the LSU French Club, including its social media platforms, which enabled him to interact with LSU undergrads and other students.[26]  In March of 2019, Russo aided d'Espalungue in creating the American Journal of French Studies (AJFS) in connection with the LSU French Department and funded by LSU.[27]

Following d'Espalungue's arrest, Russo met individually with grad students and faculty in the French Department, including Does #4-6, and advised them that

---

[21] *Id.* at ¶ 4.
[22] *Id.* at ¶ 5.
[23] *Id.* at ¶ 6.
[24] *Id.* at ¶ 7.
[25] *Id.* at ¶ 8.
[26] *Id.* at ¶ 9.
[27] *Id.* at ¶ 384. ("Notably, LSU and LSU French Studies are still listed as a 'Institutional Partners.'").

d'Espalungue was "innocent," that he should be supported and his privacy respected, and that any further discussion of his rape arrest would violate the law.[28]  Grad students Does #4 and #5 reported to Russo that they had been sexually harassed by d'Espalungue and had witnessed him sexually harass other students. Russo dismissed these claims and appeared "irritated" by the reports. Russo told Doe #4 she should consider d'Espalungue's verbal harassment "a compliment," foreshadowing what became "a continuing series of comments and behaviors by Russo reinforcing gender stereotypes and dismissing women."[29]

Both grad students reported their complaints to other LSU officials with authority to take action, but no investigation or interim protective measures materialized.[30]  Doe #6, a professor in the French Department, filed multiple urgent complaints with various LSU officials - all of whom had authority to act - beginning in 2018 and continuing until 2021 regarding d'Espalungue's conduct, his access to undergrads, Russo's hostility to reports of harassment by d'Espalungue, and concern for undergrads required to interact with d'Espalungue as a "leader" of French Department activities. Due to her reporting, Doe #6 claims she was subjected to a hostile work environment and a continuing series of retaliatory actions.[31]

On November 7, 2018, Associate Dean Jason Hicks ("Hicks") of the College of Humanities and Social Sciences met with d'Espalungue and Russo, advised them about the complaints, and "made clear" why d'Espalungue had been removed from the classroom. Hicks directly asked if d'Espalungue was "leading anything," and Russo and

---

[28] *Id.* at ¶ 10.
[29] *Id.* at ¶ 11.
[30] *Id.* at ¶ 12.
[31] *Id.* at ¶ 13.

d'Espalungue falsely denied it.[32]  Doe #6 claims that, later that day, she texted Dean Troy Blanchard ("Blanchard") explaining that as long as d'Espalungue was engaging in a variety of French Department activities, students were at risk.[33] Despite this report, no action was taken.[34]  In the following weeks, more complaints were made to LSU officials about d'Espalungue's conduct.[35]  Plaintiffs claim LSU was deliberately indifferent to the complaints, launched no investigation, and implemented no interim protective measures.[36]

On January 24, 2019, Hicks met with Russo again, and Russo denied that d'Espalungue was engaged in any activities that would permit him contact with other students despite her knowledge of numerous reports to the contrary.[37]

For the next two and a half years, more complaints of d'Espalungue's conduct were reported to LSU officials with authority, including the Dean's Office, the Title IX Office, and Human Resources Management.[38]  Although a few Title IX cases were opened, "students were not informed of the outcomes or whether investigations had even been conducted. There is no record that any investigation was launched, or interim measures implemented."[39] In at least one case, the Title IX office found that the complaints of harassment did not rise to a level warranting an investigation even though d'Espalungue was still facing criminal rape charges, and multiple complaints against him for sexual harassment had been lodged.[40]  d'Espalungue's reported behavior included a wide range

---

[32] *Id.* at ¶ 14.
[33] *Id.* at ¶ 15.
[34] *Id.* at ¶ 16.
[35] *Id.* at ¶ 17.
[36] *Id.* at ¶ 18.
[37] *Id.* at ¶¶ 19-20.
[38] *Id.* at ¶ 21.
[39] *Id.* at ¶ 22.
[40] *Id.*

of inappropriate conduct, from: "comments about students' bodies, marital status, weight, sexual history, and physical appearance, to sexualized and improper text messages, to following students to their cars on multiple occasions, to blocking them from LSU French Club social media accounts in retaliation for reporting harassment or declining his advances, to unwelcomed touching, hugs, fondling, sexual assault, sexual battery and rape."[41]

Plaintiffs claim the deliberate indifference of LSU officials to d'Espalungue's reported conduct created a hostile educational and work environment for Does #4 and #5, causing Doe #4 to give up her full-time status as a Ph.D. student at the end of the fall semester 2019.[42]  Doe #5 "gave up the pursuit of her Ph.D. altogether after the spring semester 2021, even though she had completed her Masters' degree and all coursework for her Ph.D" because "[s]he could no longer endure the mental, emotional and psychological pain caused by the hostile environment in the French Department."[43]

Plaintiffs also claim they suffered great distress due to the multiple activities d'Espalungue was allowed to lead and/or participate in, giving him access to high school students, one of whom he seduced and engaged in a sexual relationship with for several months.[44] In November 2020, five LSU undergrads filed Title IX complaints alleging harassment by d'Espalungue and the endangerment of other female LSU students and high school students.[45] Three students submitted written statements:

32. Doe #3's written statement described d'Espalungue's extreme charm and relentless sexual pursuit of her and other much younger women, including unwelcome touching, grabbing, and attempts at kissing despite

---

[41] *Id.* at ¶ 23.
[42] *Id.* at ¶ 26.
[43] *Id.* at ¶ 27.
[44] *Id.* at ¶¶ 28-30.
[45] *Id.* at ¶ 31.

her consistent refusals to engage in a sexual relationship with him; how he used his 10-year age difference and his positions as leader of [the American Journal of French Studies a/k/a AJFS] and French Club to "groom" her and other young women; how he used an alias to shield his identity.[46]

33. Doe #3 attached more than 50 pages of screenshots of d'Espalungue's raunchy and inappropriate texts. Among them were, "You have beautiful boobs;" "U just uncomfortable talking bout sexy stuff;" "u need to chill and grow up;" "I think u have a problem with anything that relates to sex and guys seriously;" "If we kiss it's easier to shut up." He repeatedly asked her to meet him alone. He claimed to be collecting nudes from all over Louisiana, texting, "I want to get my first country nudes," "I still have no nudes from [her Parish]," "Trying to do the entire map of Louisiana." "You know like boardgame." "A flag on every district."[47]

34. Doe #3 expressed fear for young female LSU and high school students:

He is still, however, the leader of AJFS and the leader of the LSU French Club, which has very young girls in it, and one of which where he has made a freshman his "vice president." Like with us, he offers opportunities to those that do not have the qualifications and makes it so they owe him. I am obviously worried that the same things will happen or is happening to them and that he will groom them like he did us. I do not think he is fit to be in these positions and I think LSU should look at our accounts and his past history and reevaluate him.[48]

Doe #2, Doe #3, and a third LSU undergrad participated in a Zoom conference with Title IX Coordinator Jennie Stewart on November 16, 2020. Plaintiffs allege that and Stewart's response to the complaints that d'Espalungue was "using AJFS/LSU French Club to meet and groom high school students was, 'well, that's not LSU policy,' and 'he didn't do anything illegal.'"[49]  Plaintiffs claim that "LSU officials with authority to rectify the

---

[46] *Id*. at ¶ 32.
[47] *Id*. at ¶ 33.
[48] *Id*. at ¶ 34.
[49] *Id*. at ¶ 35.

situation and who personally were involved and had actual knowledge of Plaintiffs' complaints included:

> • Jennie Stewart, Title IX Coordinator;
> • Jeff Scott, Title IX Lead Investigator;
> • Kimberly Davis, Title IX Graduate Assistant Investigator;
> • Daniel DeLuca, Assistant Director of Student Advocacy & Accountability,
> • Troy Blanchard, Dean of the College of Humanities and Social Sciences (HSS);
> • Jason Hicks, Associate Dean of HSS;
> • Jennifer Normand, Executive Director of Employee Relations with HRM;
> • Lindsay Madatic, Deputy Title IX Coordinator for Employees and Assistant Director of Employee Relations with HRM;
> • Anissa Chenevert, Senior Employee Relations Consultant/Employee Relations Coordinator;
> • Kevin Bongiorni, Director of Undergraduate Studies, and
> • Katharine Jensen, Director of Graduate Studies/French Studies."[50]

Problematic for the Plaintiffs is the fact that the alleged conduct by d'Espalungue and the complaints to LSU administrators occurred more than one year before this suit was filed. The statute of limitations for these claims is one year, as will be discussed more fully below. Plaintiffs claim they did not know, and could not have known, of the causal connection between LSU's official policy and practice of deliberate indifference to discrimination and sexual harassment generally, and as they experienced, until the March 3, 2021 release of the Husch Blackwell Report.[51]  This Report

> describes long-standing policies at LSU of underfunding and under-staffing the Title IX Office, ignoring guidance from the Department of Education, ignoring recommendations of its own Task Force in 2017, and allowing an organizational culture in which complaints of sexual assault and/or harassment were rarely investigated or taken seriously. "Institutional

---

[50] *Id*. at ¶ 136.

[51] *Id*. at ¶ 36.  LSU retained the Husch Blackwell law firm to conduct the independent review in response to a November 2020 USA Today article by Kenny Jacoby titled LSU mishandled sexual misconduct complaints against students, including top athletes, USA TODAY, Nov. 16, 2020, https://www.usatoday.com/in-depth/sports/ncaaf/2020/11/16/lsu-ignored-campus-sexual    assault-allegations-against-derrius-guice-drake-davis-other-students/6056388002/.    A copy of the Report is available online at https://www.lsu.edu/titleix-review/ (accessed Sep. 26, 2021).

policies were unclear, edicts were issued by supervisors that conflicted with policy, employees were overburdened with vast institutional roles and not provided with appropriate resources, calls for additional resources went unheeded, concerns were not responded to, etc."[52]

Plaintiffs claim they have suffered mental, emotional, and financial damages as a result of LSU's Title IX violations and its deliberate indifference to the risks to students and faculty posed by its policies, practices, and custom.[53]

### C. Specific Title IX Complaints

1. Doe #1

In August of 2020, d'Espalungue and Doe #1 met on the LSU campus when he helped her with a flat tire on her bicycle. He gave her his phone number, and she thanked him via text. They began casual communications and made plans to meet. Doe #1 insisted on a public place, so they met for a picnic, during which d'Espalungue began asking about her sexuality and started touching her leg. She told him she wanted to go home, and he offered to drive her; however, instead of driving to her apartment, he drove to his own apartment where he raped her. Doe #1 had a rape kit performed, and the rape was reported to the Title IX Office on September 8, 2020. The Title IX office transferred the case to the Student Advocacy and Accountability Office (SAA) because the rape had occurred off campus. After an investigation, Daniel DeLuca, Assistant Director of SAA, informed the parties on November 9, 2020, that d'Espalungue had been suspended from LSU from November 9, 2020 through December 31, 2021 for Sexual Misconduct, Endangerment, and Disorderly Conduct based on Doe #1's rape.[54]

---

[52] *Id.* at ¶ 37 (quoting Husch Blackwell Report, "Recommendations," p. 137).
[53] *Id.* at ¶¶ 40-45.
[54] *Id.* at ¶ 173.

d'Espalungue appealed and the matter was set for hearing on November 20, 2020, before a University Hearing Panel via Zoom. At the hearing, d'Espalungue was represented by an attorney while Doe #1 was accompanied only by a Lighthouse advisor.[55] The hearing lasted several hours, "during which Doe #1 had to endure questioning and cross-examination by her attacker, and her advisor was not allowed to speak. This procedure violates Title IX regulations adopted August 14, 2020."[56] Doe #1 endured questions about her behavior following the rape, which caused her severe mental and emotional pain.[57] d'Espalungue's suspension was upheld by the University Hearing Panel. He appealed to the Dean of the College of Humanities and Social Sciences. His appeal was denied on December 11, 2020.[58]

In October 2020, after Doe #1 reported her rape but before any action was taken by LSU, Russo emailed faculty and graduate students in the French Department and directed them "to report any Title IX complaints to her and she would decide whether they should be reported to Title IX. She wrote, '[a]ll instances covered by these regulations must be reported to the Department Chair, and I will instruct you to contact the Dean's Office and the Title IX office if you have reason to lodge a complaint.'"[59] Plaintiffs allege this instruction violates LSU's policy and Title IX regulations because, "[i]n no situation is it permissible to instruct students that they are barred from reporting sexual harassment,

---

[55] *Id*. at ¶ 174 (noting "The Lighthouse is a confidential interpersonal violence prevention and advocacy program which offers free services to the LSU campus community See https://lsu.edu/shc/wellness/the-lighthouse-program/index.php").

[56] *Id.* (noting "Effective August 14, 2020, Title IX regulations require postsecondary institutions to hold a live hearing with the opportunity for each party's advisor to conduct cross-examination of parties and witnesses. § 106.45(b)(6)(i)").

[57] *Id*. at ¶ 175.

[58] *Id*. at ¶ 176.

[59] *Id*. at ¶ 177.

sexual assault, or retaliation to the Title IX Coordinator."[60]  Russo's conduct was reported

to LSU officials, but no action was taken against her.[61]

2.  Does #2 and #3

In the fall of 2020, "at least six" female undergraduate students discussed filing

formal Title IX complaints based on d'Espalungue's conduct; five students actually filed,

including Doe #2 and Doe #3.[62]  On November 6, 2020, Doe #3 lodged a formal Title IX

complaint of sexual misconduct against d'Espalungue.  Doe #3 requested that

d'Espalungue be removed from school complaining that:

> she feels he continues to involve more people. . .On November 10, 2020,
> Stewart spoke to Doe #3 by telephone. Doe #3 reported that d'Espalungue
> had created 'journal in the French department – partnership, he's still in
> charge of that and French Club; Doe #3 was no longer affiliated with the
> journal; she refused to meet with him alone, under table touching leg;' 'Texts
> received where he was asking her to come over, saying things appear to be
> inappropriate.' Apparently, Stewart asked a representative of the
> Lighthouse Program to contact Doe #3.[63]

On November 16, 2020, Stewart held a video conference with three undergrads

who had experienced or witnessed d'Espalungue's sexual harassment, including Doe #2

and Doe #3.  During this conference, Doe #3 provided her a own written statement and

the written statements of two other students who were not on the call.  These five students

filed formal Title IX complaints on November 16, 2020.[64]

Stewart's notes, made in Doe #3's complaint file, detail conduct that she believed

might violate multiple federal statutes.[65]  Both Stewart's notes and the students written

---

[60] *Id*. at ¶ 178.
[61] *Id*. at ¶ 179.
[62] *Id*. at ¶ 180.
[63] *Id*. at ¶¶ 181, 182.
[64] *Id*. at ¶ 183.
[65] *Id*. at ¶ 184 (footnote omitted).

statements contain lengthy descriptions of specific instances of d'Espalungue's conduct.[66]  As to the report that d'Espalungue had used the Journal to recruit/groom high school students, and had sex with one of them, Stewart's response was:  "oh, well, that's not LSU policy," and "he didn't do anything illegal."[67]  LSU's Title IX office closed all five complaints without investigation on November 16, 2020, even though d'Espalungue's suspension from LSU technically ended on December 31, 2021.[68]

### 3. Doe # 4

On December 11, 2020, Doe #4 filed a formal Title IX complaint, alleging that she was retaliated against by Russo for reporting d'Espalungue's conduct directly to the Title IX office instead of to Russo.[69]  Stewart conducted a video conference with Doe #4 on December 11, 2020, and Doe #4 recounted Russo's admonition to bring complaints about d'Espalungue directly to her; she also complained that Russo cut Doe #4's pay after she complained about d'Espalungue.  Doe #4 complained that Russo was rude and disrespectful, causing Doe #4 to seek therapy for her continued fear of retaliation as she completed her dissertation.[70]

On December 18, 2020, Title IX Lead Investigator Jeff Scott held a video conference with Doe #4 on January 12, 2021, at which Doe #4 detailed the hostile work and education environment she was enduring based on Russo's treatment.[71]  However, Plaintiffs allege no action was ever taken on Doe #4's complaint.[72]

---

[66] *Id*. at ¶¶ 186, 190-193 (statements of Doe #3 and the 2 other students not on the call with Stewart).
[67] *Id*. at ¶ 194.
[68] *Id*. at ¶ 195.
[69] *Id*. at ¶ 196.
[70] *Id*. at ¶ 197.
[71] *Id*. at ¶¶ 198-199.
[72] *Id*. at ¶ 200.

### D.  d'Espalungue's Escape to France/Aftermath

On November 23, 2020, three days after d'Espalungue's one-year suspension was imposed by the University Hearing Panel, d'Espalungue's criminal defense attorney sought, and was granted, permission for d'Espalungue to travel to Paris, France to spend Christmas with his family, even though France is a non-extradition country.[73] D'Espalungue left for France on December 14, 2020 and has never returned.[74] Nevertheless, in February 2021, the Rapides Parish District Attorney finally presented the rape case of the ULL student to a grand jury. The grand jury returned a true bill indicting d'Espalungue for Third Degree Rape.[75]

Plaintiffs allege that, as of February 24, 2021, despite being a fugitive living in France, d'Espalungue " was still in control of the LSU French Club social media accounts, was hosting and planning LSU French Club meetings with undergrads, was moderating their interaction through the GroupMe app and had just received a $1000 grant from the LSU French Department for AJFS."[76]  Plaintiffs allege that through these contacts, d'Espalungue continued to harass students at LSU and that this ongoing harassment  was reported to LSU's Title IX office on multiple occasions.[77]  On February 10, 2021, Doe #4 complained to Jeffrey Scott in the Title IX office that d'Espalungue continued to work for the American Journal of French Studies, partnered with and created by LSU, which provided him access to LSU undergraduates and high school students.[78]  Scott replied advising Doe #4 that the AJFS was no longer affiliated with LSU, to which Doe #4 replied

---

[73] *Id*. at ¶¶ 200-201.
[74] *Id*. at ¶ 203.
[75] *Id*. at ¶ 204.
[76] *Id*. at ¶ 205.
[77] *Id*. at ¶ 206.
[78] *Id*. at ¶ 207.

that the AJFS website still lists LSU as a partner and donor.  Scott never responded.[79]

Doe #4 pressed the issue further and contacted Scott again, advising that d'Espalungue

was still hosting and planning LSU French Club meetings, and he continued to act as the

leader of this group.[80]  Scott responded, advising that he shared the information with

Stewart to review; however, there was never any follow-up response from Scott or

Stewart.[81]

On February 25, 2021, Doe #4 met with Stewart (Title IX) and DeLuca (SAA) and

was advised they had no power to stop d'Espalungue from claiming an affiliation with

LSU.[82]  Also on this date, Doe #6 "urgently" contacted various LSU officials, including

Russo, Hicks, Kevin Bongiorni, Director of Undergraduate Studies, and Kate Jensen,

Director of Graduate Studies, and informed them that d'Espalungue was continuing to run

LSU's French Club via a social media platform purportedly affiliated with LSU, that he had

blocked students who had reported his conduct from the platform, and that he was using

the platform to continue his pattern of harassment and grooming.[83]  Russo responded,

claiming a different student was President of the French Club, but she admitted she was

"'unaware of the French Club's social media presence.'"[84]

On February 25, 2021, Doe #2 checked the French Club's social media platforms,

only to discover that she had been blocked or removed.  She was able to regain access

and observed that d'Espalungue removed her on January 22, 2021.[85]  Doe #2 posted

innocuously about her love of languages. On February 26, 2021, d'Espalungue

---

[79] *Id*. at ¶ 208.
[80] *Id*. at ¶ 211.
[81] *Id*. at ¶ 212.
[82] *Id*. at ¶ 213.
[83] *Id*. at ¶¶ 215-216.
[84] *Id*. at ¶ 217.
[85] *Id*. at ¶ 219.

communicated with her through the French Club app.  When Doe #2's boyfriend posted

on the AJFS Instagram page about d'Espalungue's suspension from LSU, d'Espalungue

then sent multiple texts to Doe #2 threatening to file a criminal complaint against her if

her boyfriend did not stop "harassing" d'Espalungue.[86]

Plaintiffs claim:

221. A series of texts ensued with d'Espalungue stating that his is the
founder and president of the French Club and was helping Dr. Russo who
"needs more students involved" and he was "just trying to put you on a
team." Screenshots of d'Espalungue's texts of February 26, 2021, state:

As far as the group, I am the president and founder of this club so
f*** off with your BS accusations; Hey I am done w this conversation,
this guy only wants problems. I have no academic authority on you
[Doe #2], I was acting like you seems to b very motivated in the group
and Pr. Russo does have a need for more students involve is found
in the project so, forget my offer. I was genuinely trying to put you on
a team, but this is just going too far.[87]

222. Doe #2 forwarded all of the information with screen shots to Stewart in
the Title IX office, which comprise[d] her second Title IX complaint. She
summarized d'Espalungue's harassment and control over LSU clubs and
educational programs as follows:

Bottom line: He acts and says he is president of the LSU French
Club, as well as uses LSU for his journal (American Journal of French
Studies.

• He affiliates LSU with his Journal by noting on his Instagram
that it is "hosted by @LSU" and lists the address as his former
office in Hodges Hall.

• He is admin of the French Club GroupMe and I believe that
he is (still) the admin of the Facebook group for French Club
LSU.

---

[86] *Id*. at ¶ 220.
[87] *Id*. at ¶ 221.

• He claims he is the president of the club and still acts as such (organizing meetings, etc.).

• The groupme for the club is directly linked from French Club LSU page.

• The group is LSU students, mostly female.[88]

On March 1, 2021, Doe #2 asked Stewart how she could protect young women interacting with d'Espalungue via the LSU sites and apps.[89]  Stewart's response was that LSU could do nothing, and she recommended starting new clubs to follow while admitting that those following d'Espalungue's platforms would have to choose to leave.[90] D'Espalungue continued to run these social media platforms under the guise of being affiliated with LSU despite LSU officials being fully apprised of what was going on.[91]

### E.  The Husch Blackwell Report

The Husch Blackwell Report, published on March 3, 2021, concluded that: "The University's Title IX Office has never been appropriately staffed or provided with the independence and resources to carry out Title IX's mandates."[92] Plaintiffs' Complaint reproduces and recounts a plethora of deficiencies identified in the Husch Blackwell Report, excerpted in part, below:[93]

"Institutional reporting policy and training have been unclear for years"[94]

[F]ive reviews in prior years flagged problems with LSU's Title IX processes but LSU leadership implemented few of the recommendations.[95]

---

[88] *Id*. at ¶ 222.
[89] *Id*. at ¶ 223.
[90] *Id*. at ¶ 224.
[91] *Id*. at ¶¶ 226-232.
[92] *Id*. at ¶¶ 233-234 (quoting the Husch Blackwell Report, p. 4)(internal quotation marks omitted).
[93] *Id*. at ¶¶ 235-248
[94] *Id*. at ¶ 235 (quoting the Husch Blackwell Report, p. 4)(internal quotation marks omitted).
[95] *Id*. at ¶ 236 (citing the Husch Blackwell Report, p. 36).

"Institutional policies were unclear, edicts were issued by supervisors that conflicted with policy, employees were overburdened with vast institutional roles and not provided with appropriate resources"[96]

The Husch Blackwell report concluded that LSU failed to appropriately staff its Title IX Office despite many "alarms" sounded by the Title IX office itself.[97]  Plaintiffs allege that, during the time period relevant this lawsuit, LSU "had only one Title IX Coordinator, Jennie Stewart, and one 'lead' investigator for a campus with over 34,000 students."[98] The Complaint sets forth facts that plausibly show that LSU's Title IX office has been understaffed and ill-resourced from 2016 up to and including the times relevant to this lawsuit.

Stewart was hired as LSU's first "full-time" Title IX Coordinator in September 2016.[99] "Stewart realized within her first six months that LSU's 'Title IX staffing was woefully behind peer institutions and that she needed additional resources and staff to avoid a bevy of potential harms including 'litigation, damages, reputation costs, lost enrollment, [unfavorable] media, harm to folks who've chosen LSU.'"[100] In September 2016, Stewart requested $329,000 to properly staff and train the Title IX office, including funds to hire investigators and other assistance.[101]   The only additional assistance provided was a lead investigator, a position it took 19 months to fill.[102]

---

[96] *Id*. at ¶ 237 (quoting the Husch Blackwell Report, p. 137).
[97] *Id*. at ¶ 238 (quoting the Husch Blackwell Report, p. 36).
[98] *Id*. at ¶ 239.
[99] *Id*. at ¶ 240 (quoting U.S. Dep't Ed. Office for Civil Rights, "Dear Colleague Letter: Sexual Violence" (2011). A copy of the 2011 Dear Colleague Letter, which was rescinded by the Department in September 2017, is available at
http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.).
[100] *Id*. at ¶ 241 (quoting the Husch Blackwell Report, p. 36).
[101] *Id*. at ¶ 242 (quoting the Husch Blackwell Report, pp. 42-43).
[102] *Id*. at ¶ 243 (quoting the Husch Blackwell Report, p. 43).

Scott was hired in March 2018 to be the Lead Title IX Investigator for the LSU system, responsible for "investigating all Title IX complaints for LSU students at all nine campuses."

The Husch Blackwell Report also concluded that LSU ignored Department guidelines on staffing and conflicts of interests, one example being that Stewart reported directly to LSU's Office of General Counsel, a reporting hierarchy "'rife with conflict of interest.'"[103]

The Husch Blackwell Report concluded LSU consistently failed to develop policies and procedures to properly investigate claims of sexual harassment, assault, and violence, and it failed to provide policy, procedures or training for staff and students.[104]  It is the Husch Blackwell Report that Plaintiffs rely on to save their claims from being time barred. Plaintiffs contend:

> [LSU] actively concealed its own misconduct by "going through the motions" of commissioning task forces, listening to power point presentations of its Title IX Coordinator, and receiving other reports outlining its many policy failures which resulted in rampant sexual harassment and discrimination within its university system, all the while intentionally deciding to ignore the reports and take no substantive action to address the system-wide failures which were well-documented by at least 2017.[105]

Plaintiffs maintain this information was "intentionally and fraudulently concealed from the public and from Plaintiffs until the release of the Husch Blackwell Report on March 3, 2021."[106]

---

[103] *Id*. at ¶ 247 (quoting the Husch Blackwell Report, p. 141).
[104] *Id*. at ¶ 250.
[105] *Id*. at ¶ 251.
[106] *Id*. at ¶ 252.

### F.  Damages

All Plaintiffs claim they have suffered significant damages due to LSU's actions or inactions, including:    emotional and physical pain and suffering, mental distress, humiliation, medical expenses for mental and physical health treatment, anxiety, physical assault, denials of access to educational benefit, loss of educational benefit including academic work and scholarship opportunities, loss of income, loss of enjoyment of life, economic damages associated with moving, denial of career advancement and equity pay, and other economic or non-economic damages, for which they are entitled to just compensation.[107]

Doe #4 claims she suffered emotional distress due to the "unbearable hostile environment resulting from Russo's ongoing retaliation for Doe #4's Title IX complaints about d'Espalungue's harassment and Russo's reprisals."[108]  Doe # 4 ultimately gave up her status as a full-time LSU student at the end of the fall semester of 2019, and she lost her "graduate assistant positions which had paid for her tuition; she lost lost physical access to the LSU library and continues to suffer stress and anxiety due to the hostile educational environment, even long distance."[109]  She still fears retaliation from Russo.[110]  Doe #4 details what she classifies as "a cumulative, continuing series of hostile acts beginning in 2018 and continued through at least August of 2021."[111]

Doe #5 claims she abandoned her Ph.D program at LSU, even though she had completed her coursework, because "she could no longer endure the hostile educational

---

[107] *Id*. at ¶ 259.
[108] *Id*. at ¶ 265.
[109] *Id*.
[110] *Id*.
[111] *Id*. at ¶ 266.

environment and the retaliation and disrespect from Dr. Russo."[112]  Doe #5 eventually abandoned her Ph.D prospects due to the hostile environment at LSU.[113]

Does #1-5 claim "they were deprived of a normal educational environment and equal access to educational programs and benefits due to LSU's deliberate indifference and official policy of gender discrimination."[114]

Doe #6, an Associate Professor in LSU's French Department, claims that, in retaliation for her advocacy for the students subjected to d'Espalungue's sexual harassment and assaults, Russo caused her to be "the lowest-paid tenured professor in the LSU Department of French Studies, despite having more seniority, a greater number and quality of published articles, and a doctoral degree from Harvard."[115] After Doe #6 reported d'Espalungue's conduct, her equity raise "came to a halt," and she received no salary increase even though she took on additional work responsibilities which should have been accompanied by an increased salary.[116] Finally, Doe #6 claims that, in April 2020, an endowed professorship became available that came with an increased salary, but Russo advised Doe #6 that Doe #6 was ineligible to apply because she already had a named professorship; thus, Doe #6 did not apply.  Russo, however, successfully applied herself despite also already having a named professorship.[117]

### G.  Claims for Relief

In Count I, Does #1-3 claim the LSU Board of Supervisors were deliberately indifferent under Title IX.[118]  In Count II, all Plaintiffs assert a hostile environment claim in

---

[112] *Id*. at ¶ 268.
[113] *Id*.
[114] *Id*. at ¶ 269.
[115] *Id*. at ¶ 270.
[116] *Id*.
[117] *Id*.
[118] *Id*. at ¶¶ 271-286.

violation of Title IX.[119]    In Count III, Doe #3 asserts *Quid Pro Quo* and Clery Act harassment under Title IX.[120]  In Count IV, Does #1-5 assert a heightened risk claim under Title IX.[121] In Count V, Does #4-6 assert retaliation claims under Title IX.[122]

In Count VI, all Plaintiffs assert a denial of equal protection claim under 42 U.S.C. § 1983 and the Fourteenth Amendment.[123]  In Count VII, Does #2-3 assert a denial of procedural due process (state created danger) claim under 42 U.S.C. § 1983 and the Fourteenth Amendment.[124]  In Count VIII, all Plaintiffs assert a Deterrence and Retaliation claim under 42 U.S.C. § 1983 and the First Amendment.[125]  In Count IX, Does #1-5 assert a claim for denial of procedural due process (bodily integrity) under 42 U.S.C. § 1983 and the Fourteenth Amendment.[126]   In Count X, Does #2-5 assert a denial of due process claim under 42 U.S.C. § 1983 and the Fourteenth Amendment.[127]

Plaintiffs also assert claims under Louisiana state law.  In Count XI, all Plaintiffs assert a negligence claim under Louisiana Civil Code Article 2315.[128]  In Count XII, all Plaintiffs assert claims of negligent and intentional infliction of emotional distress under Louisiana Civil Code Article 2315.[129]

Plaintiffs concede dismissal is appropriate for the following claims:  Doe #3's Clery Act Claim,[130] § 1983 claims against the Board and against Blanchard, Madatic, and

---

[119] *Id*. at ¶¶ 287-299.
[120] *Id*. at ¶¶ 300-311.
[121] *Id*. at ¶¶ 312-321.
[122] *Id*. at ¶¶ 322-332.
[123] *Id*. at ¶¶ 333-360.
[124] *Id*. at ¶¶ 361-391.
[125] *Id*. at ¶¶ 392-420.
[126] *Id*. at ¶¶ 421-443.
[127] *Id*. at ¶¶ 444-456.
[128] *Id*. at ¶¶ 457-466.
[129] *Id*. at ¶¶ 467-474.
[130] Rec. Doc. No. 37, p. 19.

Norman in their official capacities,[131] negligence claims asserted by Does #4-6 as barred by the Louisiana Workers' Compensation Act,[132] and claims for punitive damages under Title IX or against the individuals in their official capacities under Section 1983.[133] Accordingly, those claims shall be dismissed with prejudice and will not be addressed below.

## II.    LAW & ANALYSIS

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[134] The court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matter of which a court may take judicial notice."[135] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[136] In *Bell Atlantic Corp. v. Twombley*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss. "While a complaint attached by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[137] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual

---

[131] *Id.* at p. 27.
[132] *Id.* at pp. 53-54.
[133] *Id.* at p. 56.
[134] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).
[135] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).
[136] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205.
[137] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and brackets omitted) [hereinafter *Twombly*].

enhancement.'"[138] However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[139] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has acted unlawfully."[140] "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[141] On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."[142] Rather, the inquiry is whether the allegations in the Complaint plausibly state a claim for relief.

### A.  Title IX Claims

Title IX prohibits discrimination on the basis of sex in federally-funded educational programs.[143]  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[144]  Title IX is enforceable by private right of action for damages.[145] There are two avenues to pursue a claim under Title IX: one based on an institution's official policy of intentional discrimination on the basis of sex and one that seeks to hold an institution

---

[138] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citations omitted) [hereinafter *Iqbal*].
[139] *Twombly*, 550 U.S. at 556.
[140] *Iqbal*, 556 U.S. at 678.
[141]  *Taha v. William Marsh Rice University*, No. 11-2060, 2012 WL 1576099, at *2 (S.D. Tex. May 3, 2012) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).
[142] *Twombly*, 550 U.S. at 556 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).
[143] 20 U.S.C. § 1681(a).
[144] 20 U.S.C. § 1681(a).
[145] *Franklin v. Gwinnett Cty. Public Schs.*, 503 U.S. 60 (1992).

liable for teacher-on-student or student-on-student sexual harassment.[146] Plaintiffs in this case make both claims.[147]

"A plaintiff may obtain damages under Title IX 'where the funding recipient engages in intentional conduct that violates the clear terms of the statute.'"[148] "The Supreme Court has 'consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional discrimination.'"[149] Deliberate indifference to student on student claims is considered an intentional violation of Title IX."[150] Retaliation for making a complaint of sex discrimination also constitutes intentional discrimination in violation of Title IX.[151]

### 1. Prescription/Tolling

LSU argues that Plaintiffs' Title IX claims are "largely prescribed."[152]  "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like."[153] Title IX claims are subject to state statutes of limitations for personal injury actions.[154] Louisiana Civil Code article 3492 provides that the prescriptive period for personal injury actions is one year. "Absent tolling, the limitations period runs from the moment a plaintiff's claim 'accrues,' and while we borrow the limitations period from state

---

[146] *See Pederson v. Louisiana State University*, 213 F.3d 858, 882 (5th Cir. 2000); *see also Doe 1 v. Baylor University*, 240 F.Supp.3d 646, 657 (W.D. Tex. 2017).
[147] Rec. Doc. No. 37, p. 14.
[148] *Klocke v. Univ. of Tex. at Arlington,* 938 F.3d 204, 209-210 (5th Cir. 2019) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)).
[149] *Id.* at 210 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005)).
[150] *Id.* (citing *Davis*, 526 U.S. at 643–46).
[151] *Jackson*, 544 U.S. at 174.
[152] Rec. Doc. No. 17-2, p. 8.
[153] *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 758 (5th Cir. 2015) (quoting *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003)).
[154] *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 583 (5th Cir. 2020); *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d at 759; *Griffin v. Round Rock Indep. Sch. Dist.*, 82 F.3d 414, 1996 WL 166999, at *1 (5th Cir. 1996) (unpublished per curiam).

law, 'the particular accrual date of a federal cause of action is a matter of federal law.'"[155] The Fifth Circuit has held that, under federal law, a claim accrues when a plaintiff knows or has reason to know of the injury giving rise to the claim—that is, the limitations period begins to run the moment a plaintiff becomes aware that she has suffered an injury or otherwise obtains sufficient information to know that she has been injured.[156] "A plaintiff's awareness encompasses two elements: (1) the existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions."[157]  The plaintiff bears the burden of showing that a case presents a rare and exceptional circumstance to which equitable tolling applies.[158]

In *Chappell v. Emco Machine Works Co*., the Fifth Circuit set forth three non-exclusive circumstances which warrant equitable tolling of the limitations period: (1) the pendency of a suit between the same parties in the wrong forum; (2) plaintiff's unawareness of the facts giving rise to the claim because of the defendant's intentional concealment of them; and (3) the EEOC's misleading the plaintiff about the nature of her rights under Title VII.[159] Although the Fifth Circuit has left open the possibility "that there may be other bases that warrant equitable tolling,"[160] the recognized bases provide important guidance.[161]

---

[155] *King-White*, 803 F.3d at 762. (quoting *Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011)).
[156] *Id.*
[157] *Id.* (citations and internal quotation marks omitted).
[158] *Hood v. Sears Roebuck & Co*., 168 F.3d 231, 232 (5th Cir. 1999). *Teemac v. Henderson*, 298 F.3d 452, 457 (5th Cir. 2002) (quoting *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998)).
[159] 601 F.2d 1295, 1302-03 (5th Cir. 1979). *See Blumberg v. HCA Mgmt. Co*., 848 F.2d 642, 644 (5th Cir. 1988)(listing the three potential bases for equitable tolling); *see also Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 880 (5th Cir. 2003)(same); *see also Melgar v. T.B. Butler Publishing Co., Inc*., 931 F.3d 375 (5th Cir. 2019)(same).
[160] *Melgar*, 931 F.3d at 381 (citing *Hood*., 168 F.3d at 232); *Blumberg*, 848 F.2d at 644–645.
[161] *Lewis v. Louisiana State University*, No. 21-198-SM-RLB, 2021 WL 4139138, *6 (M.D. La. Sep. 10, 2021).

Plaintiffs' lawsuit was filed on October 4, 2021; thus, LSU contends only claims accruing on or after October 4, 2020 are timely.

Plaintiffs concede that the prescriptive period applicable to their claims is one year. However, Plaintiffs invoke the equitable tolling doctrines of fraudulent concealment, the continuing violation doctrine, and *contra non valentum* to save their claims from being time-barred.[162] The gravamen of the Plaintiff's tolling arguments is that "they did not know and could not have known until the Husch-Blackwell Report was released on March 3, 2021, that LSU had longstanding official policies and practices of deliberate indifference to gender discrimination and that there was a direct causal connection between this official policy and the injuries they experienced."[163]

To find shelter under the doctrine of fraudulent concealment, the Plaintiffs must plead facts which plausibly show that, despite due diligence, they were effectively precluded from discovering the facts that form the basis of their claims because LSU concealed the alleged conduct.[164] Concealment must be accomplished by commission as opposed to omission. "[T]he defendant 'must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry.'"[165] Silence is not enough, and "denial of wrongdoing" is not enough.[166]

"Under the continuing violations doctrine, a plaintiff may complain of otherwise time-barred discriminatory acts if it can be shown that the discrimination manifested itself over time, rather than in a series of discrete acts."[167]

---

[162] Rec. Doc. No. 37, p. 6.
[163] *Id.* at p. 7.
[164] *State of Tex. v. Allan Const. Co., Inc.*, 851 F.2d 1526, 1528 (5th Cir. 1988).
[165] *Id.* at 1528-1529; *accord Rx.com v. Medco Health Solutions*, 322 Fed.Appx. 394, 398 (5th Cir. 2009).
[166] *Id.* at 1532; See also, *In re Pool Products Distribution Market Antitrust Litigation,* 988 F.Supp.2d 696, 723 (E.D. La. 2013).
[167] *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003).

*Contra non valentem* is a state law equitable tolling doctrine, available only in "exceptional circumstances," that "suspends the prescriptive period [when] the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant."[168] Sometimes referred to as the "discovery rule," *contra non valentem* looks to the reasonableness of the tort victim's action or inaction vis-à-vis discovery.[169]

Invoking the fraudulent concealment doctrine, Plaintiffs rely on the decision of the Western District of Texas in *Lozano v. Baylor University*.[170] *Lozano* involved a female student at Baylor University who was verbally and physically assaulted in the spring of 2014 by her boyfriend, a Baylor football player.[171] Although she reported the assaults to the University, no action was taken.[172] However, on May 26, 2016, the Pepper Hamilton law firm published an investigative report on campus sexual assault which had been commissioned by Baylor.[173] Thereafter, in October 2016, the plaintiff filed her first Title IX complaint. Baylor moved to dismiss pursuant to the two-year statute of limitations period applicable to Title IX claim under Texas law. The court denied the motion, finding the plaintiff had plausibly alleged fraudulent concealment by Baylor regarding her Title IX heightened risk claim. The court held:

> Although Lozano was aware of the existence of an injury when Chafin assaulted her in March and April 2014, it is not evident from the complaint that Lozano was aware of facts that would cause a reasonable person to

---

[168] *Renfroe v. State ex rel. Dept. of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002), cited in *Meggs v. Davis Mortuary Serv., Inc.*, 301 So. 3d 1208, 1213 (La. App. 5 Cir. 2020), and *Ellis v. Evonik Corporation*, --- F. Supp.3d ---, 2022 WL 1719196, *3 (E.D. La. 2022).

[169] *Griffin v. Kinberger*, 507 So. 2d 821, 824 n.2 (La. 1987); See also, *Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987)("[A] plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury".)

[170] 408 F.Supp.3d 861 (W.D. Tex. 2019).

[171] *Id.*

[172] *Id.* at 875.

[173] *Id.* at 903.

conclude that there was a causal connection between her assaults and the conduct of Baylor staff and officials, or to seek professional advice on this question. She alleges that at the time of her assaults, "Lozano was unaware of Baylor's pervasive failings ... [in] response to a known issue of sexual misconduct and domestic violence within its football program dating back several years prior to Lozano's assault." (2d Am. Compl., Dkt. 50 ¶ 160). She alleges that she "could not with reasonable diligence, have learned this information independently" until the Pepper Hamilton Findings of Fact were published on May 26, 2016. (*Id.* ¶ 160–61). She also alleges that "Baylor engaged in a practice of failing to address and actively concealing from the public, specific instances of violence and sexual violence committed by its football players." (*Id.* ¶ 53). In other words, the nature of her injury may have been inherently undiscoverable at the time of her assaults, and could not be discovered until the Pepper Hamilton Findings of Fact.[174]

Plaintiffs also rely on another decision from the Western District of Texas in *Doe 1 v. Baylor*,[175] wherein the same court held that it was plausible that, based on the "media reports regarding the rampant nature of sexual assault on Baylor's campus," which first came to light in 2016, liability for plaintiffs' heightened risk claims did not accrue until spring of 2016.[176]

LSU counters that, in both *Lozano* and *Doe 12 v. Baylor*, all "post-reporting" Title IX claims except the heightened risk claim were found to be "conclusively time-barred."[177] LSU argues *Lozano* and *Doe 1 v. Baylor* are inapposite because the Fifth Circuit does not recognize a Title IX heightened risk claim.

First, LSU correctly notes that *Lozano*, *Doe 1*, and *Doe 12* applied equitable tolling based on the investigative report only as to the plaintiffs' Title IX heightened risk claims.

---

[174] *Id.* at 900-901.  Plaintiffs acknowledge this decision is not binding on this Court.  Rec. Doc. No. 37, p. 6, fn 29.
[175] Plaintiffs mistakenly refer and cite to *Doe 12 v. Baylor University,* 336 F. Supp. 3d 763, 784 (W.D. Tex. 2018); however, the language they quote is from *Doe 1 v. Baylor*, 240 F.Supp.3d 646, 663 (W.D. Tex. 2018).
[176] 240 F.Supp.3d at 663.
[177] *Lozano*, 408 F.Supp.3d at 878, n. 3, 5; *Does 12-15*, 336 F.Supp.3d at 784-85.

Equitable tolling doctrines did not save other Title IX claims from dismissal on statute of limitation grounds.[178]

The Court finds that the publication of the Husch Blackwell Report does not support Plaintiffs' allegations of fraudulent concealment by LSU, nor does it support the application of *contra non valentem*. Plaintiffs concede they were aware of their "injuries" at the time they occurred but argue that causation could not be determined until the Report was published.[179]  Under the facts of this Complaint, the Court finds it implausible that Plaintiffs did not know or should not have known of their Title IX claims well before the release of the Husch Blackwell Report.

The paragraphs in the Complaint to which Plaintiffs refer as sufficient allegations of fraudulent concealment are conclusory, only repeatedly stating that LSU's concealment caused Plaintiffs' injuries.  Plaintiffs' allegations do not plausibly allege that LSU engaged in "affirmative acts of concealment," or that that LSU affirmatively lulled Plaintiffs into inaction or perpetrated "some trick or contrivance tending to exclude suspicion and prevent inquiry" such to excuse late filing. Accordingly, Plaintiffs' allegations are insufficient to warrant the application of the tolling principle of fraudulent concealment.

For the same reasons, the *contra non valentum* doctrine does not save the Complaint from dismissal as time barred. The findings of the Husch Blackwell Report do not supply plausible grounds from which to conclude that the Plaintiffs claims were not known or reasonably knowable.

---

[178] Rec. Doc. No. 48, p. 2 (citations omitted).
[179] Rec. Doc. No. 37, p. 5.

The Court will address the applicability of the continuing violations doctrine below in connection with the claims which Plaintiffs argue the doctrine saves.  The Court now turns to the specific Title IX claims alleged in the Complaint.

### 2.    Deliberate Indifference

To support their claim of Title IX deliberate indifference, Plaintiffs assert both a heightened risk claim and a post-reporting claim. The inquiry in a heightened risk claim "revolves around the official policy or custom of the educational institution."[180]  "If a recipient truly has an 'official policy or custom' of permitting sexual assault, surely the recipient can be held liable without the plaintiff having to point to ignorance by any one administrator."[181]

"In a post-report[ing] claim, a plaintiff argues that the funding recipient violated Title IX by failing to adequately respond to the plaintiff's report of sexual harassment committed by another student or teacher.[182] 'The school district, as the recipient of federal funds, is liable for its own lack of corrective action rather than the actions of the offending student.'"[183]

### a.    *No Heightened Risk Claim*

The Parties dispute whether the Fifth Circuit recognizes a Title IX heightened risk claim.  The most recent Fifth Circuit case addressing a heightened risk claim was in *Polonoceno v. Dallas Independent School District*, wherein the court held: "We have never

---

[180] *Doe I on Behalf of Doe II v. Huntington Independent School District*,   2020 WL 10317505 at *5 (E.D. Tex. Oct. 5, 2020)(citing *Doe 1 v. Baylor*, 240 F. Supp. 3d at 661 ("[C]ourts must consider whether the defendant-institution's policy or custom inflicted the injury.")).

[181] *Id.* (citing *Bd. Cty. Comm'rs Bryan Cty.*, 520 U.S. at 403-04 ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.")).

[182] *Id.* (citing *e.g., Davis v. Monroe*, 526 U.S. 629 (1999)).

[183] *Id.* (quoting *Watkins v. La Marque Indep. Sch. Dist.*, 308 Fed. App'x 781, 783 (5th Cir. 2009)(citing *Davis*, 526 U.S. at 641)).

recognized or adopted a Title IX theory of liability based on a general "heightened risk" of

sex discrimination, **and we decline to do so.**"[184]    Despite this unequivocal statement,

Plaintiffs contend that the Fifth Circuit has not foreclosed the claim. Plaintiffs point to the

next sentence in *Poloceno*, wherein the court continued: "Moreover, the cases from our

sister circuits that recognize the "heightened risk" analysis limit this theory of liability to

contexts in which students committed sexual assault on other students, circumstances

not present here."[185]    Plaintiffs cite to other District Courts within the Fifth Circuit which

have recognized a heightened risk claim.[186]    However, nearly all the cases cited predate

*Poloceno*. One exception is found *Roe v. Cypress-Fairbanks Independent School District*,

wherein the Southern District of Texas found:

> [D]efendant cites the Fifth Circuit's recent opinion in *Poloceno v. Dallas
> Independent School District*, 826 F. App'x 359, 363 (5th Cir. 2020), for the
> statement that "[w]e have never recognized or adopted a Title IX theory of
> liability based on a general 'heightened risk' of sex discrimination, and we
> decline to do so." Plaintiff argues that *Poloceno* is inapposite. Because the
> claims at issue in *Poloceno* did not stem from sexual harassment or assault
> but, instead, from excessive physical exercise, and the Fifth
> Circuit explained its decision not to recognize the heightened risk theory in that
> case by stating that "the cases from our sister circuits that recognize the
> 'heightened risk' analysis limit this theory of liability to contexts in which
> students committed sexual assault on other students, circumstances not
> present here," *id.*, the court concludes that the Fifth Circuit has not
> foreclosed the possibility of recognizing the heightened risk theory in an
> appropriate case. But this is not an appropriate case.[187]

---

[184] 826 Fed. App'x 359, 363 (5th Cir. 2020)(emphasis added). In *Aguiluz v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 2021 WL 148057, at *5 (W.D. Tex. Jan. 15, 2021), one district court in Western District of Texas acknowledged this holding in *Poloceno*.
[185] *Id.* (citation omitted).
[186] *See* Rec. Doc. No. 37, pp. 21-22.
[187] *Roe v. Cypress-Fairbanks Independent School District*, 2020 WL 7043944, *8 (S.D. Tex., Dec. 1, 2020). The only other case found post- *Poloceno* is *P.S. by and through Stephenson v. Brownsboro Independent School District*, 2022 WL 3697965, *5 (E.D. Tex. Aug. 25, 2022), wherein an Eastern District of Texas court held likewise.

In this Court's view, the Fifth Circuit in *Poloceno* unequivocally communicated that it has "**never** recognized or adopted" a heightened risk claim under Title IX, it "**decline[s] to do so.**"[188]  Thus, the Court finds that Plaintiffs do not have a viable heightened risk claim, and Count IV shall be dismissed with prejudice.

      *b.*    *Post-Reporting Claims*

Plaintiffs argue that the statute of limitations on their post-reporting claims is equitably tolled until the release of the Husch Blackwell Report. LSU points out that the cases upon which Plaintiffs rely expressly reject the argument that equitable tolling applied to the plaintiffs' post-report claims.

The most analogous case is *Doe v. Baylor University*, wherein the plaintiff argued that her post-reporting claims did not accrue until a similar investigative report, the Pepper Hamilton report, was published.[189]  Although *Doe v Baylor* arose in Texas and thus the Texas statute of limitations applied, the accrual date, which is the precise inquiry here, is a matter of federal law.[190] "Under federal law, a claim accrues and 'the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" [191]

The plaintiff in *Doe v Baylor* reported an assault to Baylor and alleged that Baylor did nothing in response. Quoting well established Fifth Circuit law that "a claim accrues ... the moment the plaintiff becomes aware that [s]he has suffered an injury or has sufficient information to know that [s]he has been injured," the court concluded that the

---

[188] 826 Fed. App'x. at 363.
[189] 313 F. Supp. 3d 786, 792 (W.D. Tex. 2018).
[190] *Id.* at 791.
[191] *Id.* (quoting *Spotts v. United States,* 613 F.3d 559, 574 (5th Cir.2010) (quoting *Piotrowski v. City of Houston,* 237 F.3d 567, 576 (5th Cir.2001); *King-White v. Humble Independent School Dist.,* 803 F.3d 754, 762 (C.A.5 (Tex.), 2015)).

Pepper Hamilton report did not toll the limitations period.[192]  The court also rejected the plaintiff's fraudulent concealment argument, finding that the plaintiff had knowledge of the cause of action when "[s]he knew she had been assaulted. She knew she had reported the assaults and that, according to her complaint, Baylor had done nothing in response."[193]

Other cases also compel the same conclusion in this case. In *Lozano*, the court noted that "[t]he heightened risk claim is Lozano's only live Title IX claim—the Court dismissed her post-reporting claim as conclusively time-barred."[194]  In *Doe 12*, the court reached the same conclusion and denied the application of fraudulent concealment or equitable tolling to Doe 13's post-reporting claims, finding that she could not "take advantage of Texas' discovery rule because she [ ] provided no explanation" as to why her injuries were "'inherently undiscoverable.'"[195]  The court continued: "Nor can she take advantage of the equitable tolling doctrines she invoke[s]—fraudulent concealment and equitable estoppel—because, again, Plaintiffs have not alleged any facts from which the Court can reasonably infer that they could not have 'discovered' their post-reporting causes of action in the exercise of due diligence."[196]

The reasoning and analysis from the above cases are easily applicable the post-reporting claims alleged by the instant Plaintiffs.  Generally, Plaintiffs knew the facts behind their reporting claims specific to their experiences well before October 4, 2020. The allegations show that Plaintiffs knew they had reported claims of assault and/or

---

[192] *Id.* (quoting *King–White*, 803 F.3d at 762).
[193] *Id.* at 793.
[194] *Lozano*, 408 F.Supp.3d 861, 878 n. 5.
[195] *Doe 12*, 336 F.Supp.3d at 786 (citing *King-White*, 803 F.3d at 764).
[196] *Id.* (citing *Owen v. King*, 130 Tex. 614, 111 S.W.2d 695, 697 (1938)).

sexual harassment on many occasions, and they believed long before October 4, 2020 that LSU had been outright dismissive,[197] or at least non-responsive, to their complaints.[198]  Doe #2 and Doe #3 made various reports of d'Espalungue's conduct in late 2018 and continuing throughout 2019.   Plaintiffs specifically alleged that, on November 9, 2018, Hicks investigated their complaints, but nothing happened.  Plaintiffs also alleged that, on January 24, 2019, Hicks met with Russo regarding Plaintiffs' claims that she was undermining the Title IX process and defending d'Espalungue; Russo allegedly denied these claims, and no further action was taken.[199] Paragraph 89 of the Plaintiffs' Complaint is replete with allegations of complaints made without corresponding action by LSU in 2018.

The only reports that occurred after October 4, 2020, are the November 2020 complaints about d'Espalungue's *continued* harassing behavior, the November 16, 2020 complaints made via video conference by Doe #2 and Doe #3 regarding d'Espalungue's *continued* use of social media and text messaging to harass women, and Doe #4's formal complaint regarding Russo on December 11, 2020 after Russo instructed students on October 5, 2020 to report Title IX claims within the French Department to her, rather than the proper channels.  However, these were reports of continuing conduct that had already been the subject of prior complaints. These reports came long after Plaintiffs knew or should have known that they had claims against LSU for allegedly taking no action in response to the many preceding complaints about d'Espalungue.  Moreover, the reports about d'Espalungue continuing to use social media and text messaging to sexually harass

---

[197] Rec Doc. 1, ¶ 88.
[198] *Id*. at ¶ 89.
[199] *Id*. at ¶¶ 12-22.

LSU students and female high school students came **after** LSU suspended d'Espalungue, and he escaped to France. Accordingly, Count I is dismissed with prejudice.

### 3. *Quid Pro Quo* Claim

Doe #3's *quid pro quo* claim is also untimely for the reasons set forth above. Count III is dismissed with prejudice.

### 4. Retaliation/"Retaliatory Harassment"

Doe #4, Doe #5, and Doe #6 argue that the continuing violations doctrine interrupts prescription as to their Title IX retaliation claims. Merging the facts underlying their harassment and retaliation claims Does #4, #5 and #6 seek to urge claims of retaliatory harassment. However, the Fifth Circuit does not recognize a claim for "retaliatory harassment." Plaintiffs concede this point but cite cases within the Fifth Circuit wherein courts nevertheless proceed to evaluate such a claim.[200]

On the one hand, Plaintiffs repeatedly rely on Title VII cases in their *Opposition*, yet they argue that Title IX retaliation claims should not be analogized with Title VII retaliation claims because the Supreme Court in *Jackson v. Birmingham Bd. of Educ.* declared them to be "vastly different."[201] However, since *Jackson*, the Fifth Circuit and district courts therein have held repeatedly that Title VII standards apply in evaluating Title IX retaliation claims. For example, in *Collins v. Jackson Public School Dist.*, the Fifth Circuit stated that "[t]he language of the anti-retaliation provision of Title IX and that of Title VII are similar and 'should be accorded a similar interpretation.'"[202] In *Minnis v.*

---

[200] Rec. Doc. No. 37, p. 17, n.72.
[201] 544 U.S. 167, 175 (2005).
[202] 609 F. App'x. 792, 795 (5th Cir. 2015)(quoting *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 252 n. 18 (5th Cir.1997)(citations omitted)).

*Board of Supervisors of Louisiana State University*, another section of this Court noted that "[r]etaliation claims under Title IX are analyzed using the same burden-shifting framework applicable to Title VII retaliation claims."[203]  In *IF v. Lewisville Independent School Dist.*, the court noted that, "as the court has stated in prior orders, Title IX retaliation claims may be judged under the standards of Title VII."[204]

LSU argues that Plaintiffs' Title IX retaliation claims "by definition, must be based upon 'discrete' adverse employment 'events' and that plaintiffs' claims are untimely because many of them occurred before October 4, 2020."[205]  Plaintiffs take issue with LSU's reliance on well-settled Title VII law that "retaliation is, by definition, a discrete act, not a pattern of behavior,"[206] and thus, the "[t]he continuing violation doctrine does not apply to claims based on discrete actions,"[207] "even if those actions are serial."[208] Plaintiffs argue that "Title IX retaliation is not limited to 'adverse employment actions' for obvious reasons: funding recipients covered by Title IX are schools and universities, and thus, victims of discrimination or retaliation under Title IX may be students or employees."[209] The fact that Title IX retaliation is not limited to adverse employment events does not compel the conclusion that the continuing violation doctrine applies to toll the running of

---

[203] 55 F.Supp.3d 864, 884 (M.D. La. 2014)(citing *Lowrey v. Tex. A & M Univ. System*, 11 F.Supp.2d 895, 911 (S.D.Tex.1998); *Pemberton v. W. Feliciana Parish Sch. Bd.*, No. 09–30, 2012 WL 443860 (M.D.La. Feb. 10, 2012)).
[204] No. 4:14-cv-359, 2017 WL 4506804 at *4 (E.D. Tex. June 20, 2017)(citations omitted).
[205] Rec. Doc. No. 37, pp. 23-24.
[206] *Hamic v. Harris Cty. W.C. & I.D. No. 36*, 184 F. App'x 442, 447 (5th Cir. 2006). The Court is unpersuaded by Plaintiffs' argument that *Hamic* is inapposite.
[207] *Rushing v. Yazoo County*, 861 F. App'x. 544, 553 (5th Cir. 2021)(quoting *Gen. Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 319 (5th Cir. 2020) (citing *Doe v. United States*, 853 F.3d 792, 802 (5th Cir. 2017))(internal quotation marks omitted).
[208] *Id.* (emphasis added)(quoting Doe, 853 F.3d at 802)(quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002))).
[209] Rec. Doc. No. 37, p. 25.

prescription. Rather the applicability of the continuing violation doctrine rests on the nature of what constitutes retaliation.

The Fifth Circuit is clear that retaliation is a discrete act; thus, the continuing violations doctrine is unavailable. The Fifth Circuit has explicitly held that the "continuing violations doctrine does not apply to claims of retaliation because retaliation is, by definition, a discrete act, not a pattern of behavior."[210] The unique characteristic of a claim of retaliation as a discrete, "easy to identify" act that "occurs on the day that it happens" renders the continuing violation doctrine inapplicable.[211]

Plaintiffs herein attempt to "lump together" discrete acts committed by Russo on specific dates and times with Russo's alleged rude and disrespectful treatment of them, including making Doe #4's life a "living hell."[212]

Doe #4's allegations demonstrate that the alleged retaliatory events by Russo occurred in 2018 and 2019; thus, they are untimely.[213] While she claims Russo's retaliation continued until August 2021, she fails to allege any retaliatory events that occurred after October 4, 2020.  LSU concedes that Doe #4's removal from the LSU in the French Alps program could form the basis of a timely retaliation claim; however, Doe #4 failed to plead a causal connection between this removal and her protected activity.

---

[210] *Hamic v. Harris Cnty*. W.C. & I.D. No. 36, 184 Fed.Appx. 442, 447 (5th Cir. 2006); *see also Heath v. Board of Supervisors Southern University,* 850 F.3d 731, 737 (5th Cir. 2017)(drawing the distinction between hostile work environment claims and retaliation claims: "Claims alleging discrete acts are not subject to the continuing violation doctrine; hostile workplace claims are. Hostile environment claims are "continuing" because they involve repeated conduct, so the "unlawful employment practice" cannot be said to occur on any particular day.").
[211] *National R.R. Passenger Corp. v. Morgan,* 122 S.Ct. 2061, 2070, 536 U.S. 101, 110 (2002).
[212] Rec. Doc. No. 1, ¶¶ 198, 199, 266.
[213] Rec. Doc. No. 1 at ¶¶ 197, 199.

Doe #5 has failed to allege any timely events of retaliation.  While Doe #5 alleges she complained to Madatic about Russo in April of 2021, she fails to identify any specific retaliatory event that occurred.[214]

As for Doe #6, the only timely potential act of retaliation is her failure to apply for a professorship at the alleged deceitful manipulation by Russo, who then applied and received said professorship. LSU argues that "her mere allegation that Russo (a competitor for the position) discouraged her application is hardly an adverse employment action. Further, her allegation that Russo then applied for and received the same professorship suggests Russo's motive was self-interest, not retaliation."[215]  The Court agrees that Doe #6's allegations surrounding this event are lacking; however, the Court finds that Doe #6 should be allowed an opportunity to amend this claim.

Accordingly, the Court will dismiss Count V, Does #4-6's retaliation claims, without prejudice and allow Plaintiffs leave to amend  to plead, if they can, discrete acts of alleged retaliation occurring after October 4, 2020.

5.  Hostile Educational and/or Work Environment

LSU argues that Plaintiffs' Title IX hostile educational and hostile work environment claims are prescribed, and they fail to state a claim against the Board.  At times relevant to the Complaint, Does # 1-5 were LSU French Department students and Doe #6 was an LSU French Department employee.  As to Does #1-3, who allege that they were assaulted by d'Espalungue, LSU contends that any liability on the part of the Board ended on

---

[214] Rec. Doc. No. 1 at ¶ 268.
[215] Rec. Doc. No. 17-2, p. 12.

November 9, 2020, when d'Espalungue was suspended from LSU.[216] Thus, LSU argues only conduct alleged between October 4, 2020 and November 9, 2020 could be timely.

As to Does #4-6, LSU argues that, having not been assaulted by d'Espalungue, their hostile education or work environment claims "stem from their alleged Title IX retaliation claims," which LSU argues are prescribed.[217] LSU also argues that Doe #6, a non-student employee, cannot bring a Title IX hostile environment claim and that Title VII is Doe #6's exclusive remedy for a hostile work environment claim.

### a.    Does # 1 -3

Countering LSU's argument that, once suspended, LSU's liability for d'Espalungue's conduct ceased, Plaintiffs argue that their Title IX hostile education environment claims are based on LSU's conduct, not d'Espalungue's.  Plaintiffs' hostile environment claims are based upon LSU's deliberate indifference to multiple Title IX reports over a period of years regarding d'Espalungue's conduct.[218]

### b.    Does # 4 – 6

Plaintiffs contend Does #4-6 were subjected to hostile educational and work environments based on Dr. Russo's conduct and LSU's deliberate indifference to the multiple reports made about both d'Espalungue and Russo.  On December 18, 2020, Doe #4 reported to Scott that Russo was making her life a "living hell" ever since Doe #4 made a formal Title IX complaint to HRM about d'Espalungue. Doe #4 claims after this report, Russo conduct included "public insults, dismissive remarks, a successful effort to get Doe

---

[216] *Id*. at p. 9 (citing Rec. Doc. No. 1, ¶ 173).

[217] *Id*.

[218] Rec. Doc. No. 37, p. 14.  Plaintiffs also contend their hostile education/work environment claims are based upon LSU's official policies as documented by the Husch Blackwell Report, but the Court has dismissed the official policy "heightened risk" claim.

#4 removed from the LSU … French Alps program, denial of salary, and general hostility and disrespect."[219]

With respect to hostile education environment claims by Does# 4 and 5, Plaintiffs contend the Fifth Circuit allows for the application of the continuing violation doctrine to encompass the cumulative effect of individual acts.  According to the Supreme Court in *Davis v. Monroe County Board of Education*,[220] to prevail on a student-to-student[221] harassment claim, the plaintiff must prove: (1) the school acted with deliberate indifference to sexual harassment of which it had (2) actual knowledge, and (3) the harassment must be so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school.[222]  Liability for deliberate indifference is limited to circumstances where the recipient of federal funds exercises substantial control over both the harasser and the context in which the known harassment occurs.[223]

In *Heath v. Board of Supervisors Southern University*,[224] the Fifth Circuit acknowledged that the continuing violations doctrine is applicable to claims of hostile work environment:

> As one circuit has helpfully described *Morgan*'s reasoning, a plaintiff's hostile environment claim "is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant," so "the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement." *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006).[225]

---

[219] *Id*. at p. 15 (citing Rec. Doc. No. 1, ¶¶ 198, 199, 266).
[220] 526 U.S. 629 (1999).
[221] The Court recognizes that d'Espalungue was both a student and a teacher at all relevant times.
[222] *Davis,* 526 U.S. at 650.
[223] *Id*. at 645.
[224] 850 F.3d 731 (5th Cir. 2017).
[225] *Id*. at 737.

While the continuing violations doctrine may be applied to hostile education environment claims, the Court finds there are two issues with Plaintiffs' allegations regarding same. First, Plaintiffs have not sufficiently pled that LSU maintained substantial control over d'Espalungue after he left the country for France on December 14, 2020. Substantial control over the alleged harasser is required to support a finding of deliberate indifference to student-on-student harassment. LSU claims Plaintiffs' harassment "ceased" when d'Espalungue absconded to France.[226] However, Plaintiffs allege that he continued to harass them from France via text messages and his ability to block Plaintiffs from activities allegedly sanctioned by LSU through its French Department. Plaintiffs make the conclusory allegation that d'Espalungue was working for Russo during this time, he was never released from LSU's employment, and the social media platforms he controlled advertised his "partnership" with LSU. On the other hand, Plaintiffs' allegations also acknowledge that LSU officials advised them that LSU no longer had control over d'Espalungue and could not control or shut down social media platforms he initiated.[227] The Plaintiff's Complaint fails to plausibly plead LSU's substantial control over d'Espalungue after he absconded to France.

The second issue involves the hostile environment claims asserted by Does #4 and #5. These allegations merge general facts about the harassment they endured with discrete acts of retaliation. the Court has held that retaliatory harassment is not recognized by the Fifth Circuit. The allegations are unclear as to what conduct Doe's 4 and 5  claim constitutes a hostile environment.

---

[226] Rec. Doc. No. 48, p. 3.
[227] *See* Rec. Doc. No. 1, ¶¶ 173, 194, 213, 223-225.

c.    *Doe #6*

It is undisputed that Doe #6 may assert a Title IX retaliation claim. However, as pled, the Court reads Doe #6's allegations as a retaliatory hostile work environment claim – namely, a claim that her work environment was hostile based on retaliatory events. Because the discrete retaliatory events pled in the Complaint are prescribed, Doe #6's claim survives dismissal only by invoking the continuing violations doctrine available in hostile work environment claims. The question before the Court is whether a non-student, like Doe #6, can bring a hostile work environment claim under Title IX.  This issue was addressed in *Lewis v Louisiana State University*, where the plaintiff, a non-student, argued that the retaliation she suffered for reporting complaints of the sexual harassment of students was so severe it created a hostile environment.[228] The *Lewis* court's rationale is applicable here. Like the plaintiff in *Lewis*, Doe #6's hostile work environment claim is "based on retaliatory events."[229]  The court stated:

> Title IX is meant to protect students, not school employees, from sexual harassment. Plaintiff argues she was subjected to a hostile environment for reporting coaches' and football players' acts of sexual misconduct toward students. In all reported Fifth Circuit Title IX sexual harassment cases, the plaintiff was a student, not an employee complaining of harassment of a student.[230] A non-student plaintiff such as the Plaintiff in this case does not have a private right of action under Title IX to bring claims of sex-based employment discrimination, including hostile environment claims.[231]

After reviewing the plaintiff's allegations, the court stated that,

---

[228] No. 21-198-SM-RLB, 2021 WL 5752239, *19 (M.D. La. Dec. 2, 2021). The *Lewis* court went on to say that the plaintiff "may have a claim for a retaliatory hostile work environment under Title VII." *Id.* For reasons set forth herein, this Court disagrees.

[229] *Id.*; Rec. Doc. No. 1, ¶¶ 13, 25.

[230] *Id.* at *18 (*Compare Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)) with *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 356 (5th Cir. 2020) (citing *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 277, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)).

[231] *Id.*

it indisputable that Plaintiff's "hostile environment" claim in her proposed second amended complaint is based on retaliatory events. For example, Plaintiff expressly alleges she experienced a hostile environment in retaliation for reporting Title IX complaints and other sexual misconduct by coaches and star football players. Plaintiff alleges she hid under a desk because the retaliation was so bad. Additionally, Plaintiff alleges Ausberry told her she would never be promoted because she filed Title IX complaints, which sounds in retaliation. The Court finds to the extent Plaintiff's hostile environment claim is premised on retaliation in violation of Title IX, the amendment should be denied because Plaintiff already has a claim for Title IX retaliation[.][232]

The *Lewis* court discussed the case law that has developed on this issue, noting that, "in *Lakoski v. James*, the Fifth Circuit held there is no private right of action for employment discrimination under Title IX because such a claim falls within the exclusive purview of, and is preempted by, Title VII."[233]  The plaintiff relied on *Lowery v. Texas A & M Univ. System*[234] and *Jackson v. Birmingham Board of Educ.*,[235] arguing that "these cases recognize a private right of action under Title IX for sex discrimination, which encompasses a hostile work environment claim."[236]  In *Lowery*, the Fifth Circuit found that Title IX provides a private right of action for retaliation against employees who report Title IX violations.[237] In *Jackson*, the Supreme Court resolved a circuit split and, consistent with *Lowery*, held that "the private right of action implied by Title IX includes claims for retaliation against students or employees who report or complain of sexual discrimination."[238]  The court found that the plaintiff's reliance on *Lowery* to support her argument "ignores the explicit statement in *Lowrey* that 'Title IX does not afford a private right of action for employment discrimination on the basis of sex in federally funded

---

[232] *Id.*
[233] *Id.* at *19 (citing *Lakoski v. James*, 66 F.3d 751, 754 (5th Cir. 1995)).
[234] 117 F.3d 242 (5th Cir. 1997).
[235] 544 U.S. 167.
[236] *Lewis* at *19.
[237] *Lowery*, 117 F.3d at 249.
[238] *Lewis* at *19 (citing Jackson, 544 U.S. at 178).

educational institutions.'"[239]    Rejecting the plaintiff's argument that she could bring a

hostile work environment claim under Title IX, the court found:

> *Jackson* and *Lowrey* provide no support for the existence of a private right
> of action for employment discrimination under Title IX. The Court concludes
> *Lakoski* remains good law within the Fifth Circuit, and, in the Fifth Circuit,
> "Title VII is the exclusive remedial scheme for employment discrimination
> claims, including hostile work environment claims."[240] Accordingly, Plaintiff's
> Title IX hostile environment claim is preempted by Title VII.[241]

Under the same rationale, the Court concludes that Doe #6 cannot assert a hostile

work environment claim under Title IX, as such a claim is preempted by Title VII. However,

as set forth above, the Court will give leave for Doe #6 to amend her retaliation claim to

expand allegations of timely, discrete, adverse employment actions taken against her for

reporting Title IX complaints.

Accordingly, the Court will dismiss Count II without prejudice and allow Does #1-5

leave to amend to address the issues raised by the Court regarding their hostile education

environment claims. Doe #6's hostile work environment claim is dismissed with prejudice.

## B.  Section 1983 Claims

Plaintiffs assert the following constitutional claims pursuant to Section 1983 and

the First and/or Fourteenth Amendments:  1) denial of equal protection; 2) denial of due

process (state created danger) claim; 3) First Amendment deterrence and retaliation; 4)

denial of procedural due process (bodily integrity); 5) and denial of due process. Plaintiffs

sue Blanchard, Madatic, Normand, Stewart, and Russo in their individual capacities under

---

[239] *Id.* (quoting *Lowery*, 117 F.3d at 247).
[240] *Id.* (quoting *Normore v. Dallas Indep. Sch. Dist.*, No. 3:18-CV-2506-N, 2019 WL 2189258, at *3 (N.D. Tex. May 21, 2019)(citing *Lakoski*, 66 F.3d at 754)).
[241] *Id.*

Section 1983.  The Court finds that these claims asserted against individual LSU officials must be dismissed.

In *Fitzgerald v. Barnstable School Committee*, the plaintiff sued both the school committee and its superintendent.[242]   The plaintiff alleged Section 1983 claims for violations of both Title IX and the Equal Protection Clause of the Fourteenth Amendment, and the district court dismissed the Section 1983 claims.[243] The Supreme Court granted certiorari to address whether Title IX precludes the use of Section 1983 to redress unconstitutional gender discrimination in schools.[244] After analyzing the purpose and scope of both statutes, the Court held that Title IX did not preclude use of Section 1983 to redress unconstitutional gender discrimination in schools: "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights."[245]

In *Wilkerson v. University of North Texas*,[246] the plaintiff, relying on *Fitzgerald*, argued that he could assert a Section 1983 claim against an individual based on a violation of Title IX.[247]  The court disagreed, finding that

> the issue that the Supreme Court resolved in *Fitzgerald* is different than the argument Plaintiff makes here. The Supreme Court's holding did not deal with the specific issue of whether a plaintiff could base his § 1983 claim on a violation of Title IX. Rather, the Supreme Court analyzed whether Congress's enactment of Title IX inferred that § 1983 claims based on violations of the Equal Protection Clause were wiped out by Title IX. In determining whether such intent could be inferred, the Supreme Court compared the rights and protections of each statute and those existing under the Constitution[248]   … while the Supreme Court recognized the varying schemes available under Title IX and § 1983, it ultimately held that

---

[242] 555 U.S. 246, 250 (2009).
[243] *Id.*
[244] *Id.*
[245] *Id.* at 258.
[246] 223 F.Supp.3d 592 (E.D. Tex. 2016).
[247] *Id.* at 608.
[248] *Id.* (citing *Fitzgerald*, 555 U.S. at 252).

"parallel or concurrent § 1983 claims" would not allow access to new remedies.[249]

Based on the holding in *Fitzgerald*, the court held that the plaintiff could not state a claim under Section 1983 "based on an underlying violation of Title IX.[250] Title IX does not allow suit against individuals."[251]   The court found that the plaintiff sought "to avoid this restriction by nesting a Title IX claim into a § 1983 claim and claiming that Title IX is the substantive right violated. The Court reasoned that this would conflict with *Fitzgerald* by giving Plaintiff rights that would be unavailable under Title IX."[252]   Thus, the court dismissed the plaintiff's Section 1983 claim under Rule 12(b)(6).

The district court for the Northern District of California reached this conclusion as well in *Doe v. Napa Valley Unified School District*.[253]   The plaintiff in *Napa Valley* asserted Section 1983 claims against individual district defendants for alleged violations of Title IX. The court analyzed the analysis in *Fitzgerald* and concluded that it did not "provide support for Plaintiff to bring a Section 1983 claim against the individual Defendants based on alleged violations of Title IX."[254]   The court cited support from several cases, stating:

> Because a plaintiff can only bring a Title IX claim against institutions and programs that receive federal funds, and Section 1983 claims can be brought against individuals, **"providing a § 1983 claim against individuals for Title IX liability 'would permit an end run around Title IX's explicit language limiting liability to funding recipients**.'"[255]

---

[249] *Id* (quoting *Fitzgerald*, 555 U.S. at 256).

[250] *Id.* (citing *Cox v. Sugg*, 484 F.3d 1062, 1067 (8th Cir. 2007); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282 (11th Cir. 2007); *Seamons v. Snow*, 84 F.3d 1226, 1234 n.8 (10th Cir. 1996).

[251] *Id.* (citing *Fitzgerald*, 555 U.S. at 257).

[252] *Id.* (citing *Fitzgerald*, 555 U.S. at 256).

[253] 2018 WL 4589978 (N.D. Cal. Apr. 24, 2018).

[254] *Id.* at *4

[255] *Id.* (quoting *Doe v. Town of Stoughton*, 917 F. Supp. 2d at 66 (quoting *Doe v. School Bd. of Broward County, Fla.*, 604 F.3d 1248, 1266 n. 12 (11th Cir. 2010)); *see also Wilkerson v. Univ. of N. Texas*, 223 F. Supp. 3d 592, 608 (E.D. Tex. 2016) (finding that the plaintiff could not state a claim under § 1983 based on an underlying violation of Title IX because Title IX does not allow suit against individuals)).

A plain reading of the Complaint herein compels the conclusion that the Plaintiffs have sued certain LSU officials in their individual capacities under Section 1983, based on underlying Title IX violations, in a seeming "end run around Title IX's explicit language limiting liability to funding recipients."  For the same reasoning and analysis discussed above, the Section 1983 claims brought against Blanchard, Madatic, Normand, Stewart, and Russo are dismissed with prejudice.

Alternatively, the Court finds that the Section 1983 claims asserted are prescribed. As with Title IX, "[c]ourts considering claims under § 1983 must borrow the relevant state's statute of limitations for personal injury actions."[256] "The statute of limitations for Section 1983 claims is the forum state's personal-injury limitations period, which in Louisiana is one year."[257] Federal law, however, governs when a § 1983 claim accrues.[258] "The limitations period begins to run when the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured."[259]  Further, "[a] plaintiff need not realize that a legal cause of action exists; [she] need only know the facts that would support a claim."[260] For the same reasons set forth by the Court regarding Title IX claims, the Court finds Plaintiffs' Section 1983 claims are prescribed.

The Court also rejects application of the continuing violations doctrine to the Section 1983 claims in this case.  While the continuing violation doctrine may apply to Section 1983 claims, "[t]he Supreme Court has stressed that the equitable version of the continuing violation doctrine is to be invoked only sparingly."[261] Indeed, "[t]he Fifth Circuit

---

[256] *Redburn v. City of Victoria*, 898 F.3d 486, 496 (5th Cir. 2018)(citations omitted).
[257] *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 421 (5th Cir. 2016)(cleaned up).
[258] *Redburn*, 898 F.3d at 496 (citing *Piotrowski v. City of Houston*, 51 F.3d 512, 516 n.10 (5th Cir. 1995)).
[259] *Id.* (cleaned up).
[260] *Piotrowski*, 51 F.3d at 516 (citation omitted).
[261] *Lehman v. Guinn*, No. 2:20-cv-736, 2021 WL 935887 at *4 (W.D. La.  Feb. 9, 2021)(citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

has noted that 'courts, including this one, are wary to use the continuing violation doctrine to save claims outside the area of Title VII discrimination cases.'"[262]  Moreover, "a plaintiff 'cannot use the continuing violation theory "to resurrect claims about [civil rights violations] concluded in the past, even though [their] effects persist."'"[263]

The allegations that form the basis for Plaintiffs' Section 1983 claims refer only to conduct that took place before October 4, 2020.  They are, thus, prescribed.

### C.  State Tort Claims

Plaintiffs argue their state law tort claims are viable because "they are all subject to the same equitable tolling principles of accrual, continuing violation doctrine, fraudulent concealment and …*contra non valentem*,"[264] a claim the Court has rejected for the many reasons set forth above.  Accordingly, the Court finds that Plaintiffs' state law tort claims are likewise prescribed, and they are dismissed with prejudice.

## III.    CONCLUSION

For the foregoing reasons, the *Motion to Dismiss*[265] by LSU, the *Motion to Dismiss* by Stewart,[266] and the *Motion to Dismiss* Russo are GRANTED.[267]

Upon Plaintiffs' concession, the following claims are dismissed with prejudice: Doe #3's Clery Act Claim; Section 1983 claims against the Board and against Blanchard, Madatic, and Norman in their official capacities; negligence claims asserted by Does #4-6 as barred by the Louisiana Workers' Compensation Act; and claims for punitive

---

[262] *Id.* (quoting *McGregor v. Louisiana State Univ. Bd. Of Sup'rs*, 3 F.3d 850, 866 n. 27 (5th Cir. 1993)).
[263] *Id.* (quoting *McGregor*, 3 F.3d at 866 n. 27 (quoting *Berry v. Bd. of Sup'rs of L.S.U.*, 715 F.2d 971, 979 (5th Cir. 1983))).
[264] Rec. Doc. No. 37, p. 46.
[265] Rec. Doc. No. 17.
[266] Rec. Doc. No. 16.
[267] Rec. Doc. No. 18.

damages under Title IX or against the individuals in their official capacities under Section 1983.

Count I is dismissed with prejudice.

Count II is dismissed without prejudice as to Does #1-5, and they are allowed leave to amend these claims.  Count II is dismissed with prejudice as to the claim of Doe #6.

Count III is dismissed with prejudice.

Count IV is dismissed with prejudice.

Count V is dismissed without prejudice; Plaintiffs will have leave to amend these claims.

Counts VI-XII are dismissed with prejudice.

The leave to amend granted to Plaintiffs as to Counts II and V is limited to those claims only.  Plaintiffs do not have leave to allege new causes of action, new legal theories, or any claims inconsistent with the Court's findings herein.  The Amended Complaint must be filed on or before December 2, 2022.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 3rd day of November, 2022.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**