# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANE DOE #1, *et al* | § | CIVIL ACTION NO. |
| | § | |
| VERSUS | § | 3:21-cv-00564-SDD-SDJ |
| | § | |
| BOARD OF SUPERVISORS OF | § | JUDGE SHELLY D. DICK |
| LOUISIANA STATE UNVERSITY | § | |
| AND AGRICULTURAL AND | § | MAGISTRATE JUDGE SCOTT D. |
| MECHANICAL COLLEGE, *et al.* | § | JOHNSON |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

## INTRODUCTION

1.    Edouard d'Espalungue d'Arros is a charming, handsome, and successful serial sexual predator from France who was a graduate student and employee at LSU's Department of French Studies (DFS) from August 2017 until November 20, 2020, when LSU suspended him for one year for the September 6, 2020, rape[1] of LSU undergraduate student Doe #1. At the time, d'Espalungue was just shy of his 30th birthday and the victim was age 20.

2.    Two years prior to the 2020 rape of Doe #1, also while an LSU employee and graduate student, d'Espalungue was arrested for sexual battery and second-degree (forcible) rape of a

---

[1] A Student Advocacy and Accountability hearing panel found that the complainant, who had only recently met d'Espalungue, asked to be taken back to her apartment but d'Espalungue took her to his apartment instead where they had sex which was non-consensual (i.e. rape). Doe #1 did a rape kit and reported the assault to the Title IX office on September 8, 2020. D'Espalungue was found guilty of sexual misconduct and endangerment. LSU defines "Sexual Misconduct" in PM-73 (see Exhibit A which has been previously filed at ECF 1-2 and is incorporated herein for all purposes.) as "(e.g. sexual assault, stalking, dating violence, domestic violence, sexual exploitation, retaliation, etc.)" PM-73 defines "sexual assault" as "sexual contact or penetration without consent" with three subcategories: 1) Forcible Sex Offenses include "Forcible Rape, Forcible Sodomy, Sexual Assault with an Object, Forcible Fondling;" 2) "Sex Offenses, Non-forcible includes sexual intercourse as a result of incest or statutory rape; and 3) "Sexual Assault also includes sexual battery as defined in La. R. S. 14:43.1."

21-year-old ULL[2] student on September 30, 2018, at a Catholic student retreat being held in Rapides Parish.

3.      D'Espalungue posted $100,000 for two commercial bail bonds, surrendered his passport to the Rapides Parish Sheriff's Department, and returned to LSU.

4.      LSU learned of d'Espalungue's second-degree rape arrest at the very latest when his mugshot and related news stories appeared widely in the media on October 10, 2018.

5.      Rapides Parish Sheriff's Department Detective Cainan Baker was in charge of the investigation of the rape of the ULL student. In October or November of 2018, he obtained search warrants for the cellphone and backpack of d'Espalungue. On the phone, he found text messages showing d'Espalungue was sexually involved with one of his freshmen French students at LSU and had helped her cheat on her final exam.

6.      Detective Baker contacted LSU Police Detective Mark Nehlig in October or November of 2018 to set up an in-person interview of the LSU student. Detective Baker and LSU detective Nehlig interviewed the student at the LSU Police Department on campus in a videotaped session in which she confirmed the relationship and the cheating.

7.      Thus, by fall 2018, LSU had direct knowledge not only of d'Espalungue's arrest for second-degree rape of a ULL student, but also of an ongoing sexual relationship between d'Espalungue — an LSU employee and graduate student — and one of his freshmen French students, demonstrating LSU's actual notice and deliberate indifference to the serious risk he posed to students.

8.      In the period between his 2018 rape arrest and his rape of Doe #1 on September 6, 2020, and continuing through the spring of 2021, d'Espalungue subjected Does #1-5 and many other

---

[2] University of Louisiana at Lafayette.

female LSU students, both within and without the Department of French Studies, to unwelcome sexual harassment, including *quid pro quo* harassment,[3] sexual assault, and/or rape that constituted discrimination on the basis of sex.

9.   LSU officials with authority to rectify the situation had actual knowledge that d'Espalungue posed a substantial risk of sexual harassment and severe harm to students based not only on his arrest for sexual battery of the ULL student, but also on his re-arrest four days later— after a more thorough investigation by Rapides Parish detectives—on a new charge of second-degree (forcible) rape. Within weeks, LSU also knew, from law enforcement and its own videotaped campus interview, that d'Espalungue was sexually involved with one of his freshman French students and had helped her chat on her French exam, providing additional incontrovertible evidence of the substantial risk he posed.

10.  LSU's sole response to the battery and rape arrests, and to learning of his quid pro quo relationship with a freshman student, was to remove d'Espalungue from the French 1001 class which he had begun teaching that fall. His class included several freshmen students, including Doe #2 and Doe #3.

11.  LSU allowed d'Espalungue to remain employed at LSU – in fact he was promoted to a position of greater authority as research assistant to Dr. Adelaide Russo — and took no actions to prevent him from having access to LSU students in leadership or mentoring positions.

---

[3] Under Title IX regulations, *quid pro quo* sexual harassment is defined as follows: "An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct." 34 C.F.R. 106.30 (a). As discussed *infra*, d'Espalungue was an employee of LSU acting in a leadership role within the French Department when he conditioned Doe #3's continued involvement with LSU activities upon her participation in unwelcome sexual conduct.

12.    Immediately after d'Espalungue's 2018 arrests and LSU's receipt of evidence of his sexual involvement with a freshman student, Dr. Adelaide Russo, Chair of the Department of French Studies, hired him as her personal research assistant, essentially promoting him to a status of greater influence and prestige within the department. He continued leading French Department activities such as French Table and French Movie Night which brought him in contact with undergraduates, including his former students Doe #2 and Doe #3.

13.    D'Espalungue was also put in charge of the French Department webpage and the LSU French Club, including its social media platforms, where he energetically engaged with LSU undergraduates and other students.

14.    Soon after d'Espalungue's arrest, Dr. Russo met individually with graduate students and faculty in the French Department, including Does #4-6, told them that d'Espalungue was "innocent," that he should be supported and his privacy respected, and that any further discussion of his rape arrest would violate FERPA.[4]

15.    Graduate students Does #4 and #5 reported to Dr. Russo that they had been sexually harassed by d'Espalungue and had seen him sexually harass other students. Dr. Russo dismissed these claims and made clear she was irritated by the reports. She told Doe #4 she should consider d'Espalungue's verbal harassment "a compliment," an early example of what become a continuing series of comments and behaviors by Russo reinforcing gender stereotypes and dismissing women.

---

[4] FERPA is The Family Educational Rights and Privacy Act which protects the privacy of student records. It does not apply to public news reports of criminal arrests.

16.  Both graduate students Does #4 and 5 reported their complaints to other LSU officials with authority to rectify the situation on multiple occasions, but no investigation was launched, and no interim measures were implemented.

17.  Doe #6, a professor in the French Department, filed multiple and urgent complaints with various LSU officials - all of whom had authority to rectify the situation - beginning in 2018 and continuing through spring 2021 regarding d'Espalungue's conduct, his access to undergraduates which endangered them, and the fact that Russo was hostile to graduate students who had reported harassment by d'Espalungue and/or concern for undergraduates with whom he was interacting as a "leader" of French Department activities.

18.  As a result of her reporting and her participation in this lawsuit, Doe #6 was subjected to a series of discrete retaliatory actions, including repeated and unjustified denials of promotion to full professor over a period of more than three years until an external committee was formed in 2025 to remedy the retaliatory animus within the Department of French Studies.

19.  On November 7, 2018, then-Associate Dean Jason Hicks of the College of Humanities and Social Sciences[5] met with d'Espalungue and Russo, told them there had been complaints, and "made clear" why d'Espalungue had been removed from the classroom. Dean Hicks specifically asked if d'Espalungue was "leading anything" and Russo and d'Espalungue both denied it. They reported that he was "taking classes, helping Dr. Russo w/activities – research, projects."[6]

---

[5] Hicks left LSU in July 2022 to become dean of the College of Liberal Arts at Auburn University.

[6] See 00235918_LM Notes with J Hicks, in Title IX file of Doe #4 (Handwritten notes of Lindsay Madatic, Deputy Title IX Coordinator for Employees, HRM, dated January 17, 2018 which documented a meeting on November 7, 2018 between Associate Dean Jason Hicks, Dr. Russo and d'Espalungue.

20.     Dr. Russo's statements to Dean Hicks were false, and LSU officials with authority to rectify the situation were given actual notice that the statements were false. In fact, later on the same day, Doe #6 sent a text message to then-Dean of the Department of Humanities and Social Studies (HSS) Troy Blanchard[7] stating, "*As long as Edouard is allowed to be a senator, VP of the grad student association, and coordinator of (and attendee at!!) French table and cinema club, the students are not being protected. If the point of removing his teaching assistantship was to protect undergraduates, then he should also be prevented from attending any undergrad events or interacting with that student population.*"

21.     No action was taken in response to this information.

22.     In ensuing weeks, more complaints were lodged with LSU officials with authority to rectify the situation regarding d'Espalungue's activities.

23.     LSU was deliberately indifferent to this information, launched no investigation, and implemented no interim measures to protect students.

24.     Associate Dean Hicks met again with Russo on January 24, 2019, being well aware of complaints that she was protecting d'Espalungue and retaliating against students who reported him.

25.     Russo again denied that d'Espalungue was doing any service which would put him in contact with other students. Again, this was a lie, easily refuted by numerous witnesses who had reported the opposite.

26.     Over the course of two and a half years, more complaints were filed with LSU officials with authority to rectify the situation, including the Dean's Office, the Title IX office and Human Resources Management concerning d'Espalungue's ongoing endangerment of female

---

[7] Dr. Troy Blanchard was Dean of HSS from 2019 through 2025. In July 2025, he was named Interim Executive Vice President and Provost of the entire LSU system.

undergraduates, harassment of graduate students, and the hostile educational and work environment within the DFS.

27.  While a few Title IX case records were opened, students were never told the outcomes or even whether investigations had taken place. The available records show no evidence that any investigation was actually conducted or that interim measures were implemented.

28.  On at least one occasion, the Title IX office expressly concluded that complaints of sexual harassment against d'Espalungue did not warrant an investigation — even though he was still facing forcible rape charges in Rapides Parish. By that time, LSU Police had videotaped a November 2018 interview in which one of his freshman French students admitted that she was sexually involved with him and that he had provided her with the answers to her French exams. In addition, multiple complaints had been lodged against him for sexually harassing other students and for continuing to interact with undergraduates in the role of a teacher and leader of French Department activities, conduct that the Dean of his College (now LSU Provost, Troy Blanchard) had already prohibited.

29.  D'Espalungue's behavior ranged from comments about students' bodies, marital status, weight, sexual history, and physical appearance, to sexualized and improper text messages, to following students to their cars on multiple occasions, to blocking them from LSU French Club social media accounts in retaliation for reporting harassment or declining his advances, to unwelcomed touching, hugs, fondling, sexual assault, sexual battery and rape.

30.  Due to the deliberate indifference of LSU officials, and an official policy of gender discrimination, d'Espalungue – an LSU employee -- eventually raped Doe #2 on January 31, 2019, raped Doe #1 on September 6, 2020, and sexually assaulted Doe #3 on multiple occasions in 2019. Does #1-3 are all approximately 10 years younger than d'Espalungue.

31.    Doe #1 was not a French student and did not meet any of the other Does until approximately December 2020, several months after her rape and report in September 2020.

32.    Does #2 and #3 did not make any reports about d'Espalungue until November 2020 and were not aware of any prior complaints or information LSU had received about him. In particular, they did not know about the complaints by Does #4, #5 or #6 and other graduate students, nor that, in November 2018, LSU police had interviewed one of d'Espalungue's freshman French students who admitted she was sexually involved with him and that he had provided her with the final French exam in advance so she could cheat.

33.    Does #2 and #3 were also unaware that d'Espalungue had been prohibited from leading French Department events; that Dr. Russo was aware of this prohibition but nevertheless allowed him to continue such activities; and that Doe #6 had specifically informed now-Provost Blanchard that d'Espalungue was leading events and undergraduates were not safe.

34.    Prior to October 4, 2020, Does #4–6 knew nothing about d'Espalungue's assaults of Does #1–3, nor about any related complaints.

35.    None of the plaintiffs knew, before their own assaults or harassment, that LSU had already received what HR described as "plural" harassment and misconduct complaints about d'Espalungue from inside and outside the French Department, that LSU Police had in November 2018 interviewed one of his freshman students who admitted to a sexual relationship with him and that he helped her cheat on her French exam; or that he was violating LSU's orders not to lead events with undergraduates.[8]

36.    Does #4 and #5, who were graduate students in the Department of French Studies, and Doe

---

[8] See ¶ 139, quoting LSU HR representative Lindsay Madatic's January 17, 2019 statement that the complaints about d'Espalungue were "so plural that the identity of any particular complainant could well remain private," as documented in Doe #6's contemporaneous email to Does #4 and #5.

#6, a professor, endured a continuing series of hostile and retaliatory actions and conduct from Dr. Russo beginning in October 2018 and continuing through the spring of 2021 in retaliation for their reporting of d'Espalungue's harassment.

37.    The continuing and cumulative series of hostile actions by Russo, combined with the deliberate indifference with which their Title IX reports of sexual harassment and retaliation were treated, created a hostile educational and work environment for Does #4 and #5, which made continuing their educations at LSU as planned unbearable.

38.    Doe #4 gave up her full-time status as a Ph.D. student at the end of the fall semester 2019. She lost her financial aid and employment, lost physical access to the LSU library, and became a part-time online student living as a permanent resident outside the United States.

39.    On December 11, 2020, Doe #4 met in person with LSU's Title IX Coordinator, Jennie Stewart, to report continued concerns about sexualized comments, intimidation, and favoritism toward Edouard d'Espalungue by Department Chair Adelaide Russo, and the resulting climate of fear among graduate students.

40.    On January 12, 2021, Doe #4 had a follow-up Zoom interview with LSU Title IX Investigator Jeffrey Scott, reiterating her experiences of targeted hostility by Russo, the chilling effect on reporting, and the persistence of a department culture that discouraged complaints against d'Espalungue.

41.    LSU took no steps to investigate or remedy the reports by Doe #4 in 2020-2021, leaving in place the same hostile and intimidating environment, which continued to affect Doe #4's access to educational opportunities during her dissertation phase.

42.    As a direct consequence of the hostile environment in the French Department, Doe #5 gave up the pursuit of her Ph.D. altogether after the spring semester 2021, even though she had

completed her Masters' degree and all coursework for her Ph.D. She could no longer endure the mental, emotional and psychological pain caused by the hostile environment in the French Department.

43.    One of the most egregious aspects of this case, and the source of great mental distress to all plaintiffs, was watching LSU's deliberate indifference while Louisiana high school students were potentially being endangered by this serial sexual predator, despite multiple complaints to LSU officials with authority to rectify the situation.

44.    As will be described in more detail below, with the help of Dr. Russo and the LSU DFS, d'Espalungue launched in the spring of 2019 what was billed as an "LSU academic journal"[9] called the American Journal of French Studies ("AJFS" or "the Journal"). The launch was supported by CODOFIL and word quickly spread via social media and emails to other Louisiana French language and cultural organizations. As "executive director," d'Espalungue was permitted by LSU to travel to Louisiana high schools promoting the Journal as part of the LSU Department of French Studies and inviting high school students to submit essays for an annual contest with cash prizes.

45.    D'Espalungue presided over the Journal's first awards ceremony at the French House on the LSU campus on April 25, 2019, immediately following awards ceremonies for the DFS, presided over by Dr. Russo. During the ceremony, d'Espalungue expressed to at least one witness his sexual and romantic interest in one of the high school essay contestants. Within a

---

[9] In a Facebook Post on September 3, 2019, Alliance Francaise of New Orleans disseminated a "flyer" created by AJFS which stated, "Meet and Greet with American Journal of French Studies, September 16, 6pm, 1519 Jackson Ave. Presenting LSU's French academic journal which promotes the French language and culture in the United States." (Original link was at: https://facebook.com/afneworleans/photos/gm.2307876235993884/2792843597413128)

few weeks d'Espalungue had seduced her into a sexual relationship which lasted on and off for at least several months.

46.    In November 2020, five LSU undergraduates filed Title IX complaints about harassment by d'Espalungue and endangerment of other female LSU students and high school students. Three students submitted written statements.

47.    Doe #3's written statement to the Title IX Office described d'Espalungue's extreme charm and relentless sexual pursuit of her and other much younger women, including unwelcome touching, grabbing, and attempts at kissing despite her consistent refusals to engage in a sexual relationship with him; how he used his 10-year age difference and his positions as leader of AJFS and French Club to "groom" her and other young women; how he used an alias to shield his identity.

48.    Doe #3 attached to her statement more than 50 pages of screenshots of d'Espalungue's raunchy and inappropriate texts. Among them were, "You have beautiful boobs;" "U just uncomfortable talking bout sexy stuff;" "u need to chill and grow up;" "I think u have a problem with anything that relates to sex and guys seriously;" "If we kiss it's easier to shut up." He repeatedly asked her to meet him alone. He claimed to be collecting nudes from all over Louisiana, texting, "I want to get my first country nudes," "I still have no nudes from [her Parish]," "Trying to do the entire map of Louisiana." "You know like boardgame." "A flag on every district."

49.    Doe #3 expressed to the Title IX Office fear for young female LSU and high school students:

> He is still, however, the leader of AJFS and the leader of the LSU French Club, which has very young girls in it, and one of which where he has made a freshman his "vice president." Like with us, he offers opportunities to those that do not have the qualifications and makes it so they owe him. I am obviously worried that the same things will happen or is happening to them and that he will groom them like he

did us. I do not think he is fit to be in these positions and I think LSU should look at our accounts and his past history and reevaluate him.

50.     Doe #2, Doe #3 and a third LSU undergraduate participated in a Zoom conference with then-Title IX Coordinator Jennie Stewart on November 16, 2020. Her response with respect to d'Espalungue using AJFS/LSU French Club to meet and groom high school students was, "well, that's not LSU policy," and "he didn't do anything illegal." These statements were shocking and distressing, causing additional emotional and mental pain, anger, and frustration to these young students. They were also a potent example of LSU's culture of indifference to female victims of sexual discrimination, even when it involves power-based harassment.

51.     D'Espalungue left the country on December 14, 2020, and is now a fugitive in connection with the rape charges in Rapides Parish. The court there, with no objection from the District Attorney, granted a motion allowing d'Espalungue to travel to his parents' home in Paris for the Christmas holidays. D'Espalungue has never returned. He was indicted for third-degree rape by a Rapides Parish Grand Jury on February 23, 2021. His bonds were revoked on March 25, 2021 when he failed to appear in court.

52.     Plaintiffs did not know and could not have known until the Husch Blackwell Report[10] was released to the public on March 5, 2021 that LSU had an official policy of and practice of deliberate indifference to gender discrimination which ignored plaintiffs' rights to an

---

[10] LSU retained the Husch Blackwell law firm to conduct the independent review in response to a November 2020 USA Today article by Kenny Jacoby titled LSU mishandled sexual misconduct complaints against students, including top athletes, USA TODAY, November 16, 2020, https://www.usatoday.com/in-depth/sports/ncaaf/2020/11/16/lsu-ignored-campus-sexual assault-allegations-against-derrius-guice-drake-davis-other-students/6056388002/. A copy of the Husch Blackwell Report has been previously filed in this case at ECF 1-3 and is incorporated for all purposes. LSU no longer has a link to the report at its website, but a copy is available online at https://www.theadvocate.com/pdf_b657e612-7dd4-11eb-8b0a-b7159915b29b.html?1614964197484 (accessed August 10, 2025).

educational and work environment free of sexual harassment and misconduct, and that there

was a direct causal connection between this official policy and practice of deliberate

indifference and the sexual harassment, assaults, and/or rapes they experienced.

53.    Plaintiffs did not know and could not have known of the facts surrounding LSU's official

policy and practice of gender discrimination because LSU did not disclose these facts to the

public or to plaintiffs and other female LSU students and faculty until public release of the

Husch Blackwell Report on March 5, 2021.  Indeed, LSU gave the opposite impression in its

marketing.

54.    The Report describes long-standing policies at LSU of underfunding and under-staffing the

Title IX Office, ignoring guidance from the Department of Education, ignoring

recommendations of its own Task Force in 2017, and creating and fostering an organizational

culture in which complaints of sexual assault and/or harassment were rarely investigated or

taken seriously. "Institutional policies were unclear, edicts were issued by supervisors that

conflicted with policy, employees were overburdened with vast institutional roles and not

provided with appropriate resources, calls for additional resources went unheeded, concerns

were not responded to, etc."[11]

55.    LSU officials with authority to rectify the situation had actual knowledge of multiple

instances of sexual harassment, sexual assault, power-based gender discrimination and

endangerment, yet failed to conduct a prompt investigation or take appropriate interim

measures pending investigation of the complaints in violation of Title IX.

56.    LSU had a custom, policy, and practice of failing to properly record, investigate, and process

reports of sexual harassment or assault against women.

---

[11] *Husch Blackwell Report, "Recommendations,"* p. 137.

57.    LSU's policies and practices created a heightened risk of assault for plaintiffs and other female students at LSU by d'Espalungue. As a direct result, d'Espalungue raped Does #1 and #2, sexually assaulted Doe #3 on multiple occasions, and sexually harassed Does #4 and #5.

58.    LSU's official policies and deliberate indifference caused plaintiffs to undergo harassment and assault and/or made them liable or vulnerable to it. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999).

59.    The harassment and assaults were severe, pervasive and objectively offensive and created a hostile educational environment which deprived Does #1-5 of access to the educational opportunities and benefits provided by the school, and subjected Does #4-6 to retaliation for reporting harassment and endangerment of undergraduates.

60.    Plaintiffs seek monetary damages for physical, mental, emotional and career harm as well as for pecuniary losses including tuition and expense for enduring a gender discriminatory education environment in violation of federal law.

## **PARTIES**

61.    Plaintiffs Does #1 - 5 are persons of the age of majority and were current or former students of LSU at the time the original complaint was filed. They were citizens of Louisiana at the time of the events alleged in this complaint. Doe #4 is a citizen and current resident of Canada.

62.    Plaintiff Doe #6 is an Associate Professor in the DFS at LSU and is a citizen of Louisiana.

63.    Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board" or "LSU") is the governing body of the Louisiana State University system, and is a public constitutional corporation organized and existing under the laws of the State of Louisiana to operate, manage, and control the system, including its

campus in Baton Rouge, with its principal place of business located at 3810 West Lakeshore

Drive, Baton Rouge, Louisiana 70808.

64.   LSU is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a) and is

therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

## JURISDICTION & VENUE

65.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331

which grants district courts jurisdiction over all civil actions arising under the Constitution,

laws, and treaties of the United States. The litigation involves claims arising under Title IX

of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

66.   Defendant is subject to the court's personal jurisdiction with respect to this action.

67.   Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2) because the conduct,

events and omissions giving rise to the complaint occurred in this district.

68.   All claims are timely filed. Title IX does not contain a statute of limitation. In *Owens v.

Okure*, the Supreme Court held that federal courts considering §1983 actions should borrow

the general or residual statute for personal injury actions in the state. 488 U.S. 235, 249-50

(1989). The same rule applies to Title IX claims. *King-White v. Humble Indep. Sch. Dist.*,

803 F.3d 754, 759 (5th Cir. 2015). Here, Louisiana's one year statute of limitations for tort

actions applies, subject to equitable tolling principles and the federal discovery rule. For

Plaintiffs' Title IX pre-assault heightened risk claims, Plaintiffs could not have known of the

need to investigate their claims until the release of the Husch Blackwell report on March 5,

2021 and therefore, under the federal discovery rule, that serves as the accrual date for those

claims. Plaintiffs also rely on the continuing violation doctrine. See *Sewell v. Monroe City

Sch. Bd.*, 974 F.3d 577 (5th Cir. 2020). Plaintiffs also allege that at least up to and including

March 5, 2021, LSU had an official policy and practice of deliberate indifference to plaintiffs' right to an educational environment free of sexual harassment as outlined in the Husch Blackwell Report released on that date, evidenced by, among other things, deliberately choosing to under-staff and under-resource its Title IX Office, ignoring guidance from the U. S. Department of Education, ignoring the recommendations of its own Task Force in 2017, and allowing an organizational culture in which complaints of sexual assault and/or harassment were rarely investigated or taken seriously. Finally, plaintiffs also rely upon Executive Order/Emergency Proclamation Number 170 JBE 2021 (dated September 6, 2021) issued in response to Hurricane Ida with respect to the rape of Doe #1.

69.    Plaintiffs desire to proceed under pseudonyms. Does #1-3 were victims of rape and/or sexual assault, and at the time the original complaint was filed, were  students at LSU who wish to avail themselves of their right to confidentiality pursuant to Article I, §25 of the Louisiana Constitution and the Louisiana Crime Victims' Rights Laws, including but not limited to La. R.S. 46:1841 and §1844 (W)(1)(a). All plaintiffs have made reports of sexual harassment, hostile environment, endangerment of students and/or retaliation.

70.    On information and belief, there are additional victims who were sexually harassed, assaulted and/or raped by d'Espalungue who made or attempted to make complaints to LSU, and who will be deterred from reporting similar incidents unless their identities are likewise protected.

71.    Plaintiffs respectfully request that in light of the sensitive and highly personal nature of their claims and the risk that public disclosure of their names would cause further psychological trauma, plaintiffs should be allowed to proceed under pseudonyms.

72.    Defendant is already aware of Plaintiffs' true identities. Accordingly, there will be no prejudice to defendant, which is fully capable of investigating and responding to plaintiffs'

allegations. Allowing these victims to proceed under pseudonyms would best serve the ends of justice.

## **FACTS**

73.    French foreign national Edouard d'Espalungue enrolled on August 21, 2017 as a graduate student in LSU's Department of French Studies. He earned his M.A. in French Studies in May of 2020, and thereafter commenced a Ph.D. program in the same department.

74.    Doe #4 and Doe #5 also began their graduate programs in the same department in August of 2017, Doe #4 studying for her Ph.D. in French Literature and Doe #5 studying for her M.A. in French Studies, with a plan to eventually pursue a Ph.D. at LSU.

75.    At all relevant times, Doe #4, Doe #5, and d'Espalungue were all employed by LSU as graduate or teaching assistants or in other capacities.

76.    On September 30, 2018, d'Espalungue was arrested for sexual battery of a 21-year-old ULL[12] student at a Catholic student retreat being held in Rapides Parish. He was released on a $25,000 bond and returned to LSU.

77.    On October 1, 2018, ULL Police notified LSU officials of d'Espalungue's arrest.

78.    Because d'Espalungue was an LSU employee (a graduate assistant), Lindsay Madatic in Human Resources Management (HRM) took the lead in alerting other officials at LSU. This was consistent with LSU policy that HRM investigates Title IX complaints against employees.[13]

---

[12] University of Louisiana at Lafayette, one of nine public universities in the University of Louisiana System.

[13] *See Husch Blackwell Report*, p. 11: "Investigations of complaints against employees continued to be handled by the University's "Employee Relations" department of Human Resource Management.

79.   Madatic emailed Troy Blanchard, (then Interim Dean of the College of Humanities and Social Studies (HSS); now LSU Provost), as well as Jason Hicks, Associate Dean, attaching a copy of the LSU Police report. Madatic stated, "it is safe to say that he won't be reporting to work for the time being." Dean Hicks responded that he had looked up d'Espalungue on the inmate locator.[14]

80.   Over the following days, Rapides Parish detectives continued their investigation and, on October 4, 2018, re-arrested d'Espalungue on a charge of second-degree (or "forcible") rape.[15] D'Espalungue was re-booked into the Rapides Parish jail, posted an additional $75,000 bond, relinquished his passport, and returned to LSU.

81.   LSU learned of this second, forcible rape arrest no later than October 10, 2018, when news stories and d'Espalungue's mug shot appeared in multiple media outlets, including WBRZ-TV in Baton Rouge, KATC-TV in Lafayette, LSU's publication *The Reveille* and LSU's TigerTV.[16]

82.   Rapides Parish Sheriff's Department Detective Cainan Baker, who was investigating the rape of the ULL student, obtained and executed separate search warrants for d'Espalungue's cell

---

[14] Investigations of complaints against employees were handled either by the Title IX Office or by the University's Employee Relations department of Human Resource Management.

[15] See La. R.S. 14:42.1(C). "For all purposes "forcible rape" and "second degree rape" mean the offense defined by the provisions of this Section, and any reference to the crime of forcible rape is the same as a reference to the crime of second degree rape…"

[16] *See* "LSU grad student arrested for alleged rape in Rapides Parish" published by WBRZ, https://www.wbrz.com/news/lsu-grad-student-arrested-for-alleged-rape-in-rapides-parish/, published October 10, 2018, accessed August 11, 2021. *See also* "LSU SGA senator arrested on rape charge in Rapides" published by KATC News on October 10, 2018, accessed August 11, 2021 at https://www.katc.com/news/covering-louisiana/2018/10/10/lsu-sga-senator-arrested-on- rape-charge-in-rapides/. LSU Reveille published a story on October 10, 2018: https://www.lsureveille.com/edouard-despalungue/image_247b3030-ccdf-11e8-a66c- f77458e587fe.html. The Reveille story was linked to the Tiger TV story published on the same date: https://www.tigertv.tv/news/lsu-grad-student-arrested-for-alleged-rape/article_d5d4eb27- 937c-590d-a804-4898e9bb609b.html

phone and backpack. The backpack contained handwritten writings in French that described his interactions with women, including references to the ULL student victim. On the cellphone, Baker found text messages between d'Espalungue and one of his female freshman French students at LSU showing they were engaged in a sexual relationship and that he had provided her with the final exam in advance so she could cheat.

83. Around October or November 2018, Detective Baker contacted LSU Police Detective Mark Nehlig to arrange an in-person interview with the LSU student. The interview was conducted at the LSU Police Department on LSU's campus, with Detective Nehlig present, and was videotaped. During the interview, the student admitted that d'Espalungue had been her French teacher during her freshman year in 2017-2018, that they had commenced a sexual relationship which was ongoing,, and that he had provided her with a copy of the final French exam in advance. She further admitted that he instructed her not to be the first to turn in her exam in order to conceal the cheating.

84. This LSU Police Department interview, conducted on LSU's own campus with Detective Nehlig present and preserved on videotape, provided LSU with direct and incontrovertible evidence that d'Espalungue was engaged in a sexual relationship with one of his freshman French students and had facilitated her cheating on a final exam. Detective Baker himself observed that this conduct, standing alone, warranted d'Espalungue's removal under LSU's policies. LSU's failure to take action in response demonstrates its actual notice and deliberate indifference to the substantial risk of serious harm d'Espalungue posed to LSU students, particularly his own students, including plaintiffs.

85. Thus, by November 2018, LSU had knowledge not only of d'Espalungue's October 4, 2018 re-arrest for second-degree rape of the ULL student, but also of his sexual involvement with

a freshman LSU student and his facilitation of her cheating on exams. This knowledge was

obtained directly by LSU Police through an on-campus videotaped interview and added to

the mounting evidence that d'Espalungue posed a substantial and obvious risk of harm to

LSU students.

86.     Prior to his 2018 rape arrest, d'Espalungue had been teaching a French 1001 class which

included freshmen Doe #2 and Doe #3.

87.     Upon learning of the rape arrest, LSU Provost Troy Blanchard, (then Interim Dean of the

College of Humanities & Social Sciences), removed d'Espalungue from his job as a graduate

teaching assistant to limit his contact with other students.

88.     Dr. Russo, however, negated this limited response and took affirmative steps to elevate

d'Espalungue within the Department and assure his continued contact with other students,

including undergraduates. Dr. Russo asked d'Espalungue to continue grading and/or

critiquing papers of his former French 1001 class, which included undergraduate students

Doe #2 and Doe #3.

89.     Dr. Russo hired d'Espalungue as her personal Research Assistant, thus at all relevant times,

d'Espalungue remained an employee of LSU.[17] Dr. Russo tasked d'Espalungue with

observing and videotaping classes that other Graduate Assistants (GAs) were teaching in the

fall of 2018, handing out French Department awards to the undergraduates on April 22, 2019,

and posing in photographs with them. Dr Russo gave d'Espalungue the keys to her home and

he ran errands for her as a personal assistant.

---

[17] D'Espalungue worked as an assistant to the language coordinator, then as a teaching assistant, and after
his rape arrest on October 4, 2018, as research assistant to the Chair of the Department of French Studies.

90.     In addition, with full knowledge and support of Dr. Russo, d'Espalungue continued activities which brought him into regular contact with students, including his former students, Doe #2 and Doe #3, who were freshmen. He coordinated and led French Department activities such as the French Table and French Movie Night, was administrator of the French Department website, and ran the social media accounts for the LSU French Club. He registered the LSU French Club with Campus Life on or about August 26, 2019, acted as its president, and maintained control of its social media accounts. Social media posts from 2019 and 2020 show numerous photographs of Dr. Russo with d'Espalungue and undergraduate students at several events for the French Department, the French Club, and/or AJFS.

91.     D'Espalungue was allowed to maintain his positions as Vice President of the Department of French Studies Graduate Student Association and as a Senator in LSU Student Government.

92.     Thus, post-arrest, d'Espalungue had positions which not only gave him continued contact with female undergraduate and graduate students, but also increased prestige and perceived power over other graduate assistants, including Doe #4 and Doe #5.

93.     Shortly after news of the rape arrest, Dr. Russo met individually with department faculty and graduate students, including Does #4-6. She told them that d'Espalungue was "innocent,"[18] that LSU considered him a student in good standing, that his privacy must be protected, and that they were not allowed to discuss the criminal charges due to "FERPA"[19] and "Dean's orders."

94.     Doe #6 relayed the content of these conversations to Dean Blanchard soon after they occurred. He responded that he had not given any such orders and said he would correct the

---

[18] She told one graduate student, "he is innocent for reasons I can't tell you."

[19] See Footnote #4, *supra.*

message, but no corrections were issued by him or by Dr. Russo.

95. During her one-on-one meeting with Dr. Russo around mid-October 2018, GA Doe #4 reported that d'Espalungue had made numerous offensive comments about her body and her marital status. Dr. Russo responded that he was just complimenting her, she should feel flattered, and it was probably due to "cultural differences." This response and other behaviors and comments made Doe #4 afraid to report d'Espalungue to the Title IX office for fear of retaliation.

96. In a meeting with Dr. Russo, Doe #5 stated that d'Espalungue had made offensive comments about her body and her weight in front of other students. Dr. Russo replied it was wrong of him, but she took no action.

97. In a pedagogy class Dr. Russo was teaching to graduate students about this time, Dr. Russo asked the class whether anyone felt "uncomfortable around Ed," but she prefaced it by saying he was not guilty and that "this is a complete misunderstanding." She then asked d'Espalungue to videotape classes that other graduate students were teaching to check their interaction with undergraduates. When Dr. Russo asked Doe #5 if d'Espalungue could videotape her class, Doe #5 responded that she was "not OK with that." Dr. Russo replied, "well, you don't think he did what they're saying he did?"

98. Dr. Russo made it clear to faculty and graduate students within the Department that anyone who complained about d'Espalungue, including complaints of sexual harassment or hostile educational environment, would be immediately out of favor with the Chair.

99. Between October 27 and November 8, 2018, Doe #6 and Dean Troy Blanchard exchanged a long series of text messages in which Doe #6 reported ongoing harassment by d'Espalungue; that four students had complained so far; that d'Espalungue was "very aggressive;" that

written statements had been given to Kate Jensen, Director of Graduate Studies; that students were afraid to openly complain due to Russo's "dismissive treatment;" that one student feared for her degree and her career; that when another student – known by Russo to be a sexual assault survivor - complained to Russo about d'Espalungue attending undergraduate movie night, Russo responded that she "is doing this to herself and needs to get over her trauma;" Russo also told her that d'Espalungue was in good standing, and that Dr. Russo was not going to remove him from department events because "he is innocent."

100. The text messages were as follows:

    a. (October 27, 2018) Doe #6 "I spoke with my student this am. She fears repercussions if she comes forward in a way that is not anonymous. This student knows of at least 2 others who have experienced harassment – and she knows one of them will not come forward."

    b. Dean Blanchard responds that Jennie Stewart with Title IX will reach out to her.

    c. (October 30, 2018) – Doe #6: "Some of our grad students are considering doing a petition to get E removed as Vice President of their student association. Do you know how they might go about that?"

    d. Dean Blanchard asks if they have bylaws and if Jennie Stewart reached out.

    e. Doe #6 responds, no, Stewart had not contacted her, and adds, "I just know there are three for sure. They fear reprisals."

    f. There is no response from Dean Blanchard to this text.

    g. (November 1, 2018) Doe #6: "A third student came to me this afternoon. I also met w Kimberly [Davis] from the Title IX office. The student today mentioned a 4th student from a different program. ***They are all fearful and apparently E is very aggressive.*** And honestly it is appalling that E is still the VP of the grad student association. This is terrible for our dept."

    h. There was no answer to this text.

    i. [Between November 3 and November 5, texts are exchanged trying to set up a phone call between Doe #6 and Dean Blanchard.]

    j. (November 5, 2018) Doe #6: "Hi Troy. * * * I have additional info and was wanting to check in with you about next steps the grad students can envision.

Kate Jensen [Director of Graduate Studies] is also aware of the situation and has copies of the letters students sent me detailing the harassment they experienced and the lack of response from the chair. If you can talk tonight buzz me back and I will call from Atlanta when we land (about 9pm your time)."

k.   Dean Blanchard: "Hi. I met with the title 9 person today. If the students have concerns, they need to reach out to the title 9 office. I can help them make the contact."

l.   Doe #6: "Ok. They definitely do have concerns but they are worried about losing their anonymity and being compromised in the dept. One of them told me she didn't dare speak up against the chair's decisions because she feared for her degree, her future career. Just got off the phone w a student who is having panic attacks. Gloves off let me quote her: "Edouard came to the undergraduate movie night. This student left and called Addie saying it was inappropriate for him to be there in a setting w undergraduates. Addie told the student she "is doing this to herself and needs to get over her trauma." Also that E is in good standing, that Addie is not going to remove him from dept events, and that he is innocent. Then asked the student to accompany her to a meeting w you tomorrow. Student refused. She wants to control the narrative but fears reporting Addie. Plane door closed I have to turn my phone off. . ."

m.   (November 7, 2018): Doe #6 reports that she doesn't know if the grad students will file formal reports to the Title IX office. "They are working through their experiences with this issue and the way it has been handled in Department of French Studies. . ." [Does #4 and #5 eventually did make formal complaints]. "And the way Addie *reprimanding students* for having a reaction to a **totally unacceptable** situation. . . I know their experience is not my own and not my fight. But I am not going to leave students hanging. They deserve representation and support. *They deserve a safe workplace. As long as Edouard is allowed to be a senator, VP of the grad student association, and coordinator of (and attendee at!!) French table and cinema club, the students are not being protected. If the point of removing his teaching assistantship was to protect undergraduates, then he should also be prevented from attending any undergrad events or interacting with that student population.* I wanted to write to you to explain my own involvement and my advocacy for these students who have been put at risk. *They deserve better than the dismissive treatment they are getting, and which is* **creating a hostile workplace.** (emphasis supplied).

n.   (November 8, 2018 @ 6:09 a.m.) – (Dean Blanchard) (*Note: as will be seen infra,* this is one day after Associate Dean Hicks met with Russo and d'Espalungue and was assured d'Espalungue was "not leading anything" and that he was "taking classes, helping Dr. Russo w/activities – research,

projects."[20] Later on November 8th, d'Espalungue sends out an invitation to Does #2 and 3 inviting them to French Movie Night. Dean Blanchard wrote, "Hi, Rosemary. Please ask the students to call me (8-8274) or come to my office. I can walk them over to the Title IX office. I've worked with Title IX a good bit and can connect them to all the available resources."

101.   In the meantime, on November 1, 2018, Doe #6 met with Title IX Graduate Assistant Kimberly Davis ("Davis") and reported that four students had experienced sexual harassment from d'Espalungue, and that his behavior was "*inappropriately sexualized for work and school environments*" and there were "*concerns for female student safety.*" (emphasis added).

102.   Davis' notes of her meeting with Doe #6 include the notation, "Possibility of making report anonymously – ask Jennie/Jeff" and "spoke w/one student who knew of 3 students besides her – I will absolutely not come fwd * Fear of retaliation."[21]

103.   Doe #6 also reported that "although Edouard was removed from teaching classes following his arrests, he continued to lead the French Table and hold positions in the French graduate student organization and LSU student government."[22] She relayed that Dr. Russo had stated that d'Espalungue "was a very fine young man and all of this is probably a misunderstanding."

104.   Davis was also given two anonymous written statements of grad students who had experienced ongoing sexual harassment involving d'Espalungue. The statements were written by Doe #4 and Doe #5, who later made their identities known to LSU officials.

105.   The (then anonymous) statement of Doe #4 recounted d'Espalungue's multiple comments about her appearance and marital status, including repeated comments about her "beautiful

---

[20] See 00235918_LM Notes with J Hicks, in Title IX file of Doe #4 (Handwritten notes of Lindsay Madatic, Deputy Title IX Coordinator for Employees, HRM, dated January 17, 2018 which documented a meeting on November 7, 2018 between Associate Dean Jason Hicks, Dr. Russo and d'Espalungue).

[21] Davis' typed report of the meeting does not include a reference to "fear of retaliation" which appears in her handwritten notes.

[22] See Notes of Kim Davis dated November 1, 2018 contained in Title IX file of Doe #4.

feet," and an encounter where he stared in the direction of her lap during a meeting and later complimented her on her "pretty watch" as he winked at her. It continued, "On multiple occasions, he has noted how it's 'unfortunate' that I am married, despite my continual rebuttal that I am happily so. I have heard him make comments about other women's bodies, weight, appearance, and relationship status as well. When the chair of the French Department discussed with me the current charges against him, she asked if I had any concerns that I would like to share. I shared these concerns with her, but she continued to tell me how she had never seen such behavior from him. She concluded that I should simply accept these comments as compliments. As such, I do not feel that the behavior is being addressed at the department level."[23]

106.    Doe #6 also gave to Davis on November 1, 2018 an anonymous email from Doe #5.[24] It recounted an incident in which Doe #5, a graduate student, witnessed d'Espalungue interacting with one of his students (Doe #2, a freshman ten years younger than him) in an alarming and inappropriate manner.

107.    Doe #5 related the following facts: Doe #5 and d'Espalungue were the facilitators for a French Table (Table Française) event in the student union on or about September 22, 2018 (before d'Espalungue's rape arrest). About halfway through the event, one of d'Espalungue's students, freshman Doe #2, showed up. A few minutes later, the only other student participant (a male) left, and the only students present were d'Espalungue, graduate student Doe #5 and freshman Doe #2. D'Espalungue focused all his attention on Doe #2, telling her how comparisons were made in the French language, stating, "for instance, [Doe #2] is more

---

[23] Title IX file of Doe #4, file 00235924_Notes from Kim Davis, p. 2.

[24] *Id.*, p. 3.

beautiful than [Doe #5]" and "[Doe #5] is uglier than [Doe #2]." D'Espalungue then changed

the subject to how men and women interact in the workplace in France, with men often

joking and teasing women about their skirts and/or dresses. At this point it appeared that

d'Espalungue may have touched Doe #2's dress. D'Espalungue also told Doe #2 that the

word "poule" was a pet name male colleagues will often use for female colleagues. Doe #5

stated, "As someone who has lived and worked in France, I cannot attest to this. [25] I felt it

was unnecessary and inappropriate for the conversation and for the student."

108.   Doe #5 concluded her statement, "Perhaps this account is small, but with the student's

naivete, I regretted leaving her alone with Edouard. She was enamored of him, and I felt her

admiration and naivete was being abused. Signed, A concerned female graduate student."

109.   Doe #5 understood clearly that Doe #2 was vulnerable to sexual harassment and/or assault by

d'Espalungue, an employee of LSU in a position of power and authority over Doe #2 as her

teacher, and who, by the time Doe #5 submitted her formal statement, had been charged with

forcible rape of another young student. Doe #5 submitted her Title IX complaint despite

knowing she risked retaliation and reprisals from Russo, which in fact she suffered, and

which caused her to drop out of the LSU Ph.D. program despite having completed all

coursework.

110.   D'Espalungue raped Doe #2 three months later.

111.   On September 27, 2018, only five days after the witnessed encounter between d'Espalungue

and Doe #2, d'Espalungue suddenly and without her consent, kissed Doe #2, who was at the

---

[25] In fact, "ma poule" can be translated as "honey," "babe," "sweetheart," "pussycat," "baby," "my hen,"
and as "a girl or young woman, especially a promiscuous one." See online Reverso Translation:
https://context.reverso.net/translation/french-english/ma+poule and also Lexico, powered by Oxford,
http://forreadingaddicts.co.uk/word-of-the-day/word-of-the-day- poule/35521

time his student. She was 18 and he was 28.[26] Three days later, d'Espalungue was arrested

for sexual battery/rape of the 21-year-old ULL student in Rapides Parish.

112.    D'Espalungue ultimately raped Doe #2 on January 31, 2019, and then persuaded her to have a

continuing relationship for several months until he began dating the recent high school

graduate he had met through his activities with the LSU/AJFS Journal awards ceremony he

hosted.

113.    By November 1, 2018, one month after d'Espalungue's rape arrest in Rapides Parish,

defendant had actual knowledge of the following facts which Doe #6 reported to Dean

Blanchard and to Title IX investigator Kimberly Davis. Davis's report indicates she relayed

the information to Jennie Stewart, the Title IX Coordinator, Dean Troy Blanchard and

Jennifer Normand, Executive Director of Employee Relations in Human Resources

Management (HRM):[27]

a.  D'Espalungue, an LSU employee, had engaged in numerous instances of sexual
    harassment of at least three graduate students in the French Department, and at
    least one student outside of the French Department.

b.  Eight days before his rape arrest he had been seen having an inappropriate and
    disturbing interaction with Doe #2, an LSU freshman who was one of his
    students, at a French Table event he was leading.

c.  There was a discriminatory and hostile educational and work environment for
    female students in the French Department, derision shown toward graduate
    students who complained about d'Espalungue's harassment and/or access to
    undergraduates in a leadership position, and a deep fear of further reprisals and
    retaliation by Dr. Russo.

d.  D'Espalungue's behavior was "inappropriately sexualized for work and school
    environments" and there were "concerns for female student safety" according to
    Doe #6.

e.  Two statements by graduate students (anonymously written by Doe #4 and Doe
    #5) detailed harassment by d'Espalungue and their fear of retaliation by Dr.

---

[26] D'Espalungue was born in 1990 and was 28 at the time of this incident.

[27] See "Kim Davis inquiry" in Title IX file of Doe #4.

Russo if their complaints were made known.

    f. Although Edouard had been removed from teaching classes following his arrests, he continued to lead the French Table, French Movie Night, the LSU French Club, and hold positions in the French graduate student organization and LSU student government.

    g. D'Espalungue was being protected and enabled by Dr. Russo with the full knowledge of numerous LSU officials with authority to rectify the situation. She had met individually with faculty and students to tell them d'Espalungue was "innocent" and in good standing.

114. Separate from the information reported by Doe #6, LSU also had actual knowledge that in November 2018 its own police department interviewed another of d'Espalungue's freshman French students in a videotaped session. In that interview, the student admitted she was having a sexual relationship with him and that, in exchange, he provided her the answers to French exams. This information came directly to LSU through law enforcement channels, independent of Doe #6's reports.

115. The Title IX office declined to launch an investigation.

116. After the November 1, 2018 meeting between Davis and Doe #6, Davis spoke with Jennie Stewart, the Title IX Coordinator, and wrote, "*while we felt that the situation did not rise to the level of requiring an investigation, efforts should be made to prevent the situation from escalating.* Jennie asked Troy Blanchard (HSS) and Jennifer Normand (HRM) to address the professional concerns." (Emphasis supplied).[28]

117. On November 7, 2018, Associate Dean Jason Hicks met with Dr. Russo and d'Espalungue, apparently to address "the professional concerns" as recommended by Jennie Stewart. Handwritten notes indicate that Dean Hicks met first with the Title IX Office and then with

---

[28] See 00235916_Kim Davis Inquiry in Title IX file of Doe #4 (11/1/18 "Meeting with [Doe #6] in her office."

d'Espalungue and Dr. Russo. Dean Hicks told d'Espalungue and Dr. Russo that there had

been additional complaints lodged about d'Espalungue from *outside* the French Department.

He "made clear" to Dr. Russo and d'Espalungue that d'Espalungue "shouldn't be in the

classroom & why." Dean Hicks "notified him of complaint." Dr. Russo and d'Espalungue

told Dean Hicks that d'Espalungue was "not leading anything" that he was "taking classes,

helping Dr. Russo w/activities – research, projects."[29]

118.   Dr. Russo's statement to Dean Hicks that d'Espalungue "was not leading anything" was

false. The truth – that d'Espalungue was actively involved in French Table and French

Cinema events where he had contact with undergraduates and other female students – was

open and obvious and easily discoverable if LSU had conducted a prompt and reasonable

investigation by inquiring of witnesses *other than* d'Espalungue himself and his known

protector, Dr. Russo. No such reasonable steps were taken because of LSU's official policy of

deliberately under-staffing and under-resourcing its Title IX Office as well as other policies

and customs which effectively dismissed complaints of women. LSU was deliberately

indifferent to the alarm bells regarding endangerment of female students and the harassment

by d'Espalungue.

119.   In fact, at 3:16 p.m. on November 7, 2018 -- *the very same day* that Dean Hicks met with

d'Espalungue and Russo and accepted their stories that d'Espalungue "was not leading

anything," d'Espalungue emailed undergraduates Doe #2, Doe #3 and three other students

inviting them to French movie night the following evening, November 8, 2018, stating:

> Dear all,
>
> A new French movie night will take place tomorrow in Prescott Hall 2d floor),

---

[29] *See* 00235918_LM Notes with J Hicks, in Title IX file of Doe #4 (Handwritten notes of Lindsay
Madatic, Deputy Title IX Coordinator for Employees, HRM, dated January 17, 2018 which documented a
meeting on November 7, 2018 between Associate Dean Jason Hicks, Dr. Russo and d'Espalungue.

movie room from 5:30 to 7pm to catch up the last French Movie night (Tuesday). You are all welcome to come. Me and [student] (cc) will guide you to put the movie on screen.

Kind regards,

Edouard

*LSU SG Senator*
*Vice President – French Studies Graduate Student Association*

120.   LSU's failure to investigate promptly and thoroughly and to take remedial action constituted deliberate indifference which was a substantial factor in causing Does #1-3 to undergo sexual assaults and/or rape and Does #1-#5 to suffer a hostile educational environment within the meaning of LSU's Permanent Memorandum 73 (PM-73) which outlines LSU's institutional policies addressing sexual misconduct.[30]

121.   The hostile environment involved not only the individual harassment/assaults suffered by Does #1-5, but also the fact that all plaintiffs and many other female LSU students and faculty in the French Department were required to witness the protection and enabling of a known predator who, because he was a favorite of the Chair of the French Department, was allowed to act with impunity in endangering not only LSU students but also high school students.

122.   As a direct result, Does #1-5 suffered severe emotional and mental distress, trauma, and humiliation which constituted a severe, pervasive and objectively offensive environment.

123.   Dr. Russo's active protection and promotion of d'Espalungue worsened the harassment for

---

[30] See Exhibit A which has been previously filed at ECF 1-2 and is incorporated herein for all purposes.. LSU promulgated the first version of Permanent Memorandum 73 ("PM-73") in June 2014 to implement the mandates in the U. S. Department of Education's 2014 Guidance, and it replaced previous sexual harassment policies PS-73 and PS-95. PM-73 was revised in December 2015, August 2020, and again on July 1, 2021 in response to changes in state and federal laws. PM-73 defines "Hostile Environment Harassment" as "Unwelcome conduct, determined by a reasonable person, to be so severe, pervasive, and objectively offensive, that it effectively denies a person equal access to an education program or activity."

female students, a fact that was repeatedly reported to LSU officials with authority to rectify the situation. Despite actual notice of these facts, LSU continued to be deliberately indifferent, resulting in physical, mental, emotional, and career harm to Does #1-5 and other female LSU students.

124. On December 10, 2018, Title IX GA Investigator Davis again met with Doe #6.  According to Davis' typewritten report,[31] Doe #6 reported that "the situation with Edouard and other graduate assistants *had escalated* since November;" Dr. Russo "had been giving advantages to Edouard and inserting him in situations where he had perceived power over other GAs;" students did not want to speak to Title IX about their concerns because they feared reprisals "that could impact their funding and professional futures;" nothing had changed in the way Russo handled concerns related to Edouard, "and the unequal treatment had gotten worse if anything."

125. Jennie Stewart, Title IX coordinator, joined Kim Davis and Doe #6 for a portion of the December 10 meeting, and Stewart gave Doe #6 a booklet entitled "Tigers are Committed" about the PM-73 (Title IX) process to share with students and "offered to meet with students in an informal or more comfortable environment."[32]

126. In the "Tigers are Committed" booklet, "sexual harassment" includes "unwelcome sexual advances, intimidation, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of. . . academic status, receipt of university services, participation in university activities and programs, or affects the measure of a student's academic

---

[31] See "Kim Davis inquiry" in Title IX file of Doe #4.

[32] [30] *Id.*

performance."

127.    Dr. Russo had clearly communicated to Doe #4 and Doe #5 that they and other graduate

students in the French Department were expected to tolerate d'Espalungue's harassment, or

pretend it didn't exist, or they would lose favor with her, thus jeopardizing their funding and

professional futures.

128.    On December 12, 2018, Kimberly Davis of the Title IX Office met with Doe #4 and Doe #5

at the Starbucks on Nicholson Drive. No Title IX case creation sheet was made documenting

the Title IX complaints. Doe #4 only discovered this when she requested her Title IX records

in the spring of 2021.

129.    Doe #5 reported that she had been uncomfortable around d'Espalungue *before* his rape arrest

after she had witnessed his inappropriate interactions with undergraduate Doe #2 – one of his

students -- at a French Table event. She also related d'Espalungue had made a comment

about Doe #5's weight in front of other students and that Dr. Russo made clear she believes

d'Espalungue was innocent.

130.    At the same meeting with Title IX's Davis on December 12, 2018, Doe #4 reported she "had

seen d'Espalungue forcing a student to hug him when she was visibly uncomfortable." She

had overheard comments d'Espalungue made to other students, including comments about

their weight, race and whether they looked good in an outfit. She avoided d'Espalungue at all

costs, had devised alternate paths from the classroom to her office so d'Espalungue does not

follow her out of class. Her supervisor had helped her adjust her schedule, so they did not

have to work together.

131.    Doe #4 also reported to Davis that she was aware of a person outside of the French

Department who had an office on their floor, and that after d'Espalungue was inappropriate

with her, she stopped coming to her office. She had also learned that Dr. Russo had told other faculty members that she, Doe #4, "takes things too far." She reiterated what Doe #6 had reported: "Dr. Russo has been very clear that coming forward with concerns about Edouard will not end well for students, and there is much fear among the graduate students about their funding and professional opportunities."[33]

132.  Doe #6 emailed Madatic on December 15, 2018 about the meetings Dr. Russo had held with faculty and staff "informing all that he is innocent before asking if we have concerns or issues feeling comfortable." She also advised that there were fears of retaliation: "Obviously, few people have dared to express any discomfort to her; those who have have been swiftly shut down."

133.  Madatic responded on December 17, 2018, "thank you for sending. . .I will consult with my team regarding the appropriate course of action." No action was taken before d'Espalungue returned to France on December 14, 2020 and none has been taken since.

134.  January 17, 2019, Madatic held another meeting with Doe #6 about d'Espalungue's activities and conduct. Anissa Chenevert, Senior Employee Relations Consultant/Coordinator with HRM ("Chenevert") was also present.

135.  Before the January 17, 2019, meeting with Doe #6, Madatic apparently spoke to Assoc. Dean Hicks and her handwritten notes from that conversation suggest that complaints about d'Espalungue had been received from outside the French Department.[34] The names "Dari Green" and "Pitre" are noted. A Google search indicates Dr. Dari Green was an LSU

---

[33] See Doe #4 Title IX case file, 00235924_Notes from Kim Davis.
[34] *See* 00235918_LM Notes with J Hicks, in Title IX file of Doe #4 (Handwritten notes of Lindsay Madatic, Deputy Title IX Coordinator for Employees, HRM, dated January 17, 2018 which documented a meeting on November 7, 2018 between Associate Dean Jason Hicks, Dr. Russo and d'Espalungue.

Assistant Professor of Sociology at the time. Madatic's notes state, in pertinent part:

> Jason Hicks 1.17.2019
> re: French, Dari Green, Pitre
> *got complaints
> *met w/TIX
> *met w/Addie & Edouard 11/7
> *make clear that he shouldn't be in classroom & why
> *notified him of complaint
> *hasn't heard any concerns since then[35]
> *not leading anything – taking classes, helping Dr. Russo w/activities – research, projects
> *touch base with PD
> *check w/Troy – did anything happen after Nov 7 mtg.
> *student Senate

136. The record thus shows that going into the January 17, 2019, meeting with Doe #6, Madatic knew that d'Espalungue should not be "leading anything" in the French Department for the same reason that "he shouldn't be in the classroom," and that Dr. Russo and d'Espalungue had assured Dean Hicks on November 7, 2018 that d'Espalungue was ***not leading anything."***

137. Madatic learned in her meeting with Doe #6 on January 17, 2019, however, not only that d'Espalungue *was in fact leading French Department events and activities which brought him in contact with undergraduate students*, but that at least four graduate students had expressed complaints about sexual harassment and/or concerns about female safety. Madatic's handwritten notes state, in pertinent part:[36]

> * He was removed from teaching but left doing undergrad French Table (weekly mtg. of undergraduates). He was in charge alone w/undergrad & grad students.
> * examples were inappropriate
> * used students' bodies as comparisons

---

[35] In fact, Doe #6 had reported on December 10, 2018 that the situation "had escalated" since November. See "Kim Davis inquiry" in Title IX file of Doe #4.

[36] See file "00235930_AC_[ Doe #6]_notes (1)" in Title IX file of Doe #4.

* He is in charge of movie club. 4 movies last semester
* met 2 times a wk
* undergrad event
* Notes that 2 grad students have reported, 2 other grad students don't want to report.
* One, Dr. Russo told her he was not guilty, the second stopped taking courses. Kim Davis has her info. Dec. 2018
* Concerns: chair; Jennie – didn't want to investigate. His role in dept – VP of Dept of French Grad Student Assoc SGA.
* What (*sic* want) women being harassed being taken seriously

138.    The notes also reflect that Doe #6 reported Dr. Russo had told one graduate student that d'Espalungue is innocent and if she had concerns "they are invalid."[37] She also reported that one graduate student had stopped taking courses due to the harassment and Dr. Russo's protection of d'Espalungue.

139.    During the January 17, 2019, meeting, Madatic revealed to Doe #6 that the complaints about d'Espalungue were ***"so plural*** that the identity of any particular complainant could well remain private." This statement was documented in an email Doe #6 sent to Doe #4 and Doe #5 on the same day. The email also indicates that HRM was coordinating with the Dean and Title IX office to discuss "possibilities for the situation."

> First, let me say that HR seems to be taking the complaints about Edouard seriously.[38] Lindsay cannot divulge what steps will be taken, but she is meeting this afternoon with [Assoc. Dean] Jason Hicks and will discuss possibilities for the situation in our dept. She mentioned a possible meeting with Title IX and Russo.
>
> She also mentioned (when I brought up the widespread fear of reprisals) that even though HR can't promise confidentiality, ***the complaints against E are so plural*** that the identity of any particular complainant could well remain private.
>
> I don't know what will happen next or if there is any kind of justice to be served in taking the process to HR. But Lindsay did mention that it would be incredibly helpful if you could make a statement. (I told her you had both spoken with Title IX back in December, so she is going to try to get those notes.) If you can contact her (lmadat2@lsu.edu) with your account/s, and encourage any other students

---

[37] *Id.*

[38] In fact, no action was taken, consistent with LSU's official policy, customs and procedures, of dismissing or minimizing complaints of sexual harassment and taking no action.

whom you know have been "recipients" of Edouard's unwanted attentions to come forward as well, that would go a long way toward getting this taken as seriously as it can be. I know you have both already done a lot; please know your energies are appreciated and your experiences valued.

140.  Madatic sent an email to Dean Blanchard after her meeting with Doe #6 on January 17, 2019 in which she states that Doe #6 shared two statements "from graduate students who reported that Edouard made them uncomfortable" and that she understood these "are the exact concerns she shared with you all in the fall. And I understand these concerns were appropriately addressed by you and Jason in a meeting on November 7…"[39]

141.  Madatic either failed to report to Dean Blanchard that d'Espalungue was still leading French Department activities with undergraduates, or this information was ignored, despite the fact that Dean Blanchard and Assoc. Dean Hicks had instructed Dr. Russo and d'Espalungue on November 7, 2018 that he *should not be leading anything.*

142.  On January 24, 2019, Associate Dean Jason Hicks met with Dr. Russo to discuss complaints that d'Espalungue still had sanctioned contact with other students in the French Department. Dr. Hicks sent an email the same day to Madatic with a copy to her supervisor, Jennifer Normand, Executive Director of Employee Relations, and Dean Blanchard, which stated,

> Hi Lindsay, I am following up on a request you and Jennifer Normand asked of me in our last face-to-face meeting. I met with Dr. Adelaide Russo today—Chair of French Studies—and she informed me that Edouard d'Espalungue d'Arros *is not performing any sort of service where he may have contact with other students. So, he is neither teaching in the classroom nor doing other activities that will knowingly put him in contact with other students (e.g., staffing the French Table or the LSU Night of French Cinema).* His current graduate assistant duties involve helping Dr. Russo with research activity and making updates to the French Studies Department website. Edouard is working on his Master's thesis and he does plan to enter PhD candidacy if accepted by the department. Finally, Dr. Russo reported not knowing any updates regarding Edouard's legal case.[40]

---

[39] See "00235927_RE_ Concerns in French email with Troy" in Title IX file of Doe #4.
[40] *See* "00235913 E dEspalungue dArros email with Jason Hicks.pdf" in IX file of Doe #4.

143. Dr. Russo's statement that d'Espalungue "was not performing any sort of service where he may have contact with other students" was false. By this time, the record *was replete with complaints about d'Espalungue leading French Table and French Movie Night events with undergraduates on behalf of the French Department.* LSU officials with authority to rectify the situation had actual notice of these activities and that Dr. Russo was protecting d'Espalungue.

144. LSU's failure to launch a prompt and thorough investigation constitutes deliberate indifference in these circumstances. Instead, LSU officials simply inquired of d'Espalungue and his protector, Dr. Russo, and accepted their representations without question, completely ignoring the multiple women who had come forward.

145. With full knowledge of Dr. Russo and other responsible officials at LSU, d'Espalungue continued to organize and direct events for French Table, LSU Night of French Cinema, LSU French Club, and the LSU Department of French Studies throughout 2018, 2019 and 2020. He registered the LSU French Club with Campus Life in September 2019 and maintained control over its social media accounts. Social media posts show photographs of Dr. Russo with d'Espalungue and undergraduates at a number of these events.

146. As executive director of AJFS, president of the LSU French Club, and personal assistant to the Chair of the LSU Department of French Studies, d'Espalungue constantly advertised and promoted these organizations interchangeably, for instance, AJFS and the LSU French Club shared a single booth at "Fall Fest" on October 11, 2019.[41]

---

[41] See AJFS Twitter post, "We are proud to announce that the @AJFS_LA partners with the LSU Department of French Studies for Fall Fest on October 11, 2019!" Accessed on September 11, 2021 at https://twitter.com/AJFS_LA/status/1182460895651254273

147.    D'Espalungue's involvement as the face of the French Department in activities and social
media posts was repeatedly raised in complaints to responsible officials, yet they failed to
act.

148.    On February 28, 2019, Lindsey Madatic emailed Doe #6, with copies to Dean Blanchard and
Associate Dean Hicks, and stated, "You also indicated that Edouard was still a part of the
public face of French Studies even though he was not supposed to be serving in areas where
he may have contact with other students. ***After discussing these concerns with Dr. Hicks
and Dean Blanchard, I was able to confirm that Edouard was (and is still) not performing
any sort of service where he may have contact with other students;*** however, he is still in
the program. Dr. Hicks and Dean Blanchard also informed me that you previously shared the
same student complaints with them, and they addressed those concerns appropriately in the
fall of 2018. As such, our office will not take any further action in those matters."[42]

149.    Once again, this email reflects LSU's official policy of deliberate indifference to reports of
sexual harassment and endangerment of LSU students – in this case by one of their
employees who had been arrested for forcible rape. D'Espalungue was openly and publicly
performing services which brought him into contact with other students, with Dr. Russo's
full support. LSU's refusal to launch an investigation under the circumstances constituted
deliberate indifference to gender discrimination and retaliation.

150.    Three separate LSU departments (Title IX, HHS, and HRM) with authority to rectify the
complained-of conduct and eliminate the hostile environment and threats to the safety of
female students at LSU failed to act. Although they continued to receive reports of sexual
harassment, sex discrimination, hostile environment, concerns that women were not being

---

[42] *See* page 3 of file 00235917_LM email with Chair contained in Title IX folder of Doe #4.

taken seriously, and fears of reprisals in the French Department related to d'Espalungue and the protection Dr. Russo was providing him, they did not so much as launch an investigation.

151.    LSU officials with authority to rectify the situation and who *personally* were involved and had actual knowledge of plaintiffs' complaints included the following (the positions listed are those at the time of the events):

      a.    Jennie Stewart, Title IX Coordinator;

      b.    Jeff Scott, Title IX Lead Investigator;

      c.    Kimberly Davis, Title IX Graduate Assistant Investigator;

      d.    Daniel DeLuca, Assistant Director of Student Advocacy & Accountability,

      e.    Troy Blanchard, Provost of the LSU System, then-Dean of the College of Humanities and Social Sciences (HSS);

      f.    Jason Hicks, Associate Dean of HSS;

      g.    Jennifer Normand, Executive Director of Employee Relations with HRM;

      h.    Lindsay Madatic, Deputy Title IX Coordinator for Employees and Assistant Director of Employee Relations with HRM;

      i.    Anissa Chenevert, Senior Employee Relations Consultant/Employee Relations Coordinator;

      j.    Kevin Bongiorni, Director of Undergraduate Studies, and

      k.    Katharine Jensen, Director of Graduate Studies/French Studies.

152.    This ongoing failure to investigate and lack of action by LSU allowed d'Espalungue to harass and assault with impunity, compromising the safety and rights of female LSU students and resulting in physical, mental, emotional, educational, and career harm to Does #1-5 and many other female LSU students.

**Launch of the American Journal of French Studies – an LSU Program**

153.   In March of 2019, with the help of the LSU Department of French Studies and Dr. Russo, D'Espalungue launched what was billed as an "LSU academic journal"[43] called the American Journal of French Studies (AJFS).

154.   It was no accident that the name "American *Journal of French Studies"* mirrored that of LSU's own ***Department of French Studies***. AJFS, LSU, and the LSU Department of French Studies openly and publicly allied their institutional identities. Innumerable in-person events, flyers, emails, social media posts, and PowerPoint presentations marketed AJFS as an LSU publication and project. LSU professors appeared in photos and videos with d'Espalungue, which he then used to sell AJFS memberships and/or sponsorships.[44]

155.   On March 20, 2019, the Executive Director of CODOFIL sent out an email blast promoting AJFS to high school French teachers across Louisiana. On information and belief, the email was sent at Russo's request. The email claimed that AJFS was to be published by the LSU College of Humanities & Social Studies. The email identifies D'Espalungue as "Ed Darros"

---

[43] See Facebook post by Alliance Francaise of New Orleans dated September 3, 2019, with a "flyer" created by AJFS which states, "Meet and Greet with American Journal of French Studies, September 16, 6pm, 1519 Jackson Ave. Presenting LSU's French academic journal which promotes the French language and culture in the United States."
https://facebook.com/afneworleans/photos/gm.2307876235993884/2792843597413128

[44] For example, an AJFS Facebook post dated July 13, 2020 features a portion of a video including Dr. Adelaide Russo, Chair of the LSU Department of French Studies, Professor Olivier Moreteau, LSU Law School Professor, and retired LSU Professor Alexandre Leupin (who later became an officer of AJFS when it was incorporated as a Louisiana non-profit on October 7, 2020, while d'Espalungue's Title IX case for sexual assault of Doe #1 was pending). The full video can only be seen by joining AJFS and paying a membership fee of $10 per month or $120 per year. Corporate sponsorships range from a $1000 to $5000, with the latter including "visit Paris and French South Atlantic Coast for a week with AFJS Directors, all costs included, for 3 individuals only."
https://www.facebook.com/AmericanJournalofFrenchStudies/videos/583599079008072

– one of several aliases he had begun using after his rape arrest-[45] and the address listed was d'Espalungue's graduate student office at Hodges Hall, LSU.

156.    The CODOFIL letter stated (in French): "American Journal of French Studies. What is that? This is the new journal soon to be published by the College of Humanities & Social Studies. If you write, if you have poems, short stories, or if your students write, we invite you to share it with Ed Darros, copied here. The Call for Short Papers ends next Friday, March 22, 2019. If you want to send your items by mail, the address is as follows: American Journal of French Studies, 4th Floor, R. 449, Hodges Hall, Louisiana State University, College of Humanities & Social Studies, Baton Rouge, LA 70803 or by email, to Ed (edespa2@lsu.edu) or to the newspaper directly (email address). To learn more about this new journal, please read below."

157.    The next part of the email was a message from d'Espalungue which stated, "[t]he AJFS is an academic journal, **hosted and funded by LSU** and aims to be a platform to publish the contributions/poems/short novels of high school and undergraduate students. I am also very pleased to announce that for this Spring 2019 edition the American Journal of French Studies (AJFS) will reward the best author with a prize money of $250. The deadline to send contributions is Friday, March 22nd and they should be between 100 and 1000 words. **By this way, high school students from 8th to 12th grade can participate.** All the contributions accepted will be published (online and printed). It is a great opportunity given to high school and undergraduate students to be published in a peer-reviewed journal. It will also give

---

[45] All posts at the AJFS website are by "Ed Darras." An AJFS Instagram post, dated September 28, 2020, identifies him as "Ed Darras" and states he is "Director, American Journal of French Studies." D'Espalungue used "Edward Daras" in his role as a member of Baton Rouge Mayor Sharon Weston Broome's International Relations Commission, "Ed Daras" in an online interview about his AJFS work: https://www.facebook.com/the821project/posts/2740756039362999 and "Ed Da" for certain social media profiles.

students access to a large community of francophone writers since every contribution accepted will be published on a website. I also think high school teachers would be very proud of them once they see their student's works in such a journal."

158.    D'Espalungue recruited several young LSU female students to help him with the journal, including Doe #2 and Doe #3 who were his former students. Most were 8-10 years younger than d'Espalungue and were impressed by his influential position in the French Department as organizer of French Table and French Movie Night events, leader in the LSU French Club, research assistant to the Chair of the Department, and elected positions in LSU student government organizations.

159.    With the help of his "team," d'Espalungue created an AJFS web page and established numerous social media accounts for AJFS on Instagram, Facebook, Twitter and others, where he regularly posted about AJFS and its "partnership" with LSU and/or the LSU French Department, or simply merged their identities.

160.    D'Espalungue gave the young students titles and important roles with AJFS, and they were initially enthusiastic, especially since it had been launched with the endorsement of the LSU Department of French Studies and CODOFIL and was "partnering" with other important persons and organizations involved in French language and culture in Louisiana and beyond, including Louisiana's Lieutenant Governor.

161.    On April 2, 2019, d'Espalungue texted Doe #3 that she needed to leave the journal, but he needed to meet her in person to explain. When she met him, he began touching her all over against her will. She got up and told him she was going back to her dorm room. He followed her and outside her door began grabbing and kissing her. She repeatedly tried to turn her head

away and break away. She finally was able to break free and went inside, locking herself in her dorm room.

162.    On numerous other occasions, d'Espalungue threatened Doe #3's position on the journal and told her she would be kicked out if she didn't comply with his sexual demands, which constitutes *quid pro quo* sexual harassment.[46]

163.    After CODOFIL's large email blast to all Louisiana high school French teachers, LSU allowed d'Espalungue to go into high schools to promote LSU, the LSU Department of French Studies and AJFS while other LSU clubs were denied this opportunity due to concerns of "legal liability."[47]

On August 29, 2019, d'Espalungue went to three high schools in Lafayette, Louisiana: Lafayette High School, St. Thomas More Catholic High School, and Ascension Episcopal School. In addition, as Director and editor-in-chief of AJFS and president of the LSU French Club, he participated in meetings with elected officials and other influential individuals, posted photos and videos of AJFS activities on multiple social media platforms, and frequently mentioned AJFS's affiliation with LSU and/or the LSU Department of French Studies.

---

[46] "[Q]uid pro quo sexual harassment — i.e., when tangible adverse action results from an underling's refusal to submit to a higher-up's sexual demands — is, by its very nature, intentional unequal treatment based on sex." *Doe v. Mercy Catholic Medical Center*, No. 16- 1247, 2017 WL 894455 (3d Cir. Mar. 7, 2017). Title IX regulations have codified this ruling by making quid pro quo sexual harassment a *per se* instance of sexual harassment which requires no showing that the conduct was "severe, pervasive, and objectively offensive." Title 34 C.F.R. §106.30 *See Mary M. v. North Lawrence Community Sch. Corp*., 131 F.3d 1220, 1226-27 (7th Cir. 1997) (stating that age difference between a harasser and victim creates an assumption of reasonable fear of reprisal if the victim does not submit to the harasser's demands).

[47] An LSU undergraduate who worked on the AJFS journal requested permission to promote an LSU Cajun language club in high schools but was denied permission due to issues of "legal liability."

164.    In these activities, d'Espalungue used various aliases to avoid having media reports about his rape arrest surface. Among his aliases are "Ed Da",[48] "Edward Daras,[49] and "Ed Darras."[50]

165.    LSU's alliance with and support of AJFS provided a high confidence factor for Louisiana high school and middle school teachers who then encouraged their students to submit French essays to the journal. Teachers could have no doubt that AJFS was an LSU program when they read that cash prizes were handed out at "the AJFS Awards Ceremony at the LSU French House, Ogden Honors College."[51]

166.    The AJFS web page from 2019 through at least the spring of 2021 stated, "Through our partnership with Louisiana State University, we organize an Awards Ceremony each year in April at the French House – Ogden Honors College."[52]

167.    The first AJFS awards ceremony was in fact held at LSU on April 25, 2019, immediately following awards ceremonies for the Department of French Studies in the "French House." A

---

[48] "Ed Da" is currently used for d'Espalungue's Facebook profile as of September 24, 2021: https://www.facebook.com/ed.da.123829

[49] D'Espalungue used the alias "Edward Daras" in his role as a member of Baton Rouge Mayor Sharon Weston Broome's International Relations Commission, although his appointment and service with this commission no longer appears in internet searches.

[50] See AJFS web page here https://american-journal-of-french-studies.com/author/ed ("All posts by Ed Darras") accessed September 11, 2021. Also see June 19, 2020 Facebook post by AJFS, "Interview with the Director of AJFS by Jahi Mackey." The post states the interview is with "our Director and Editor-in-Chief, Ed Darras." Accessed September 11, 2021 at https://www.facebook.com/AmericanJournalofFrenchStudies/videos/305729370587235/

[51] Marketing flyer dated May 12, 2019 with "LSU" printed on the left edge in gold over a purple background.

[52] This claim was removed sometime in the spring of 2021, likely as the result of continuing complaints by various plaintiffs to LSU officials. This is evidence that someone at LSU was still in touch with d'Espalungue, who fled to France on December 14, 2020, after his suspension from LSU and in an attempt to escape prosecution for rape in Rapides Parish.

photo of Dr. Russo standing nearby as d'Espalungue stands at the lectern was posted the same day on the AJFS Facebook page.[53]

168.    During and after the awards ceremony, d'Espalungue repeatedly expressed his sexual and romantic interest in one of the high school essay contestants who attended the ceremony, and within a few weeks d'Espalungue had seduced her into a sexual relationship.

169.    The AJFS/LSU program and activities which involved multiple LSU undergraduates and high school students persisted for more than two years, openly, publicly and with public support of LSU employees and officials with authority to rectify the situation, even though d'Espalungue was ostensibly not supposed to be in contact with other LSU students due to his rape arrest and pending charges.

170.    AJFS continues its activities to this day. Its website still carries a Baton Rouge address, and friends and associates of d'Espalungue continue to host social activities in Baton Rouge and Lafayette.

171.    Knowledge that LSU's deliberate indifference was allowing d'Espalungue to contact and endanger not only LSU undergraduates, but high school students - with impunity - contributed to the loss of a normal educational experience for the student plaintiffs.

172.    D'Espalungue still has accesses high school and undergraduate students, including LSU students, through AJFS, a project that was launched, promoted, and financed with the help of LSU and the LSU Department of French Studies, and marketed as a program of LSU.

173.    D'Espalungue, via AJFS, continues to solicit French language essays from high school and university students, offering cash prizes and publication in the Journal of "all the

---

[53] *See* https://facebook.com/AmericanJournalofFrenchStudies/photos/645188492587079, accessed September 11, 2021. Screenshots available if it is removed.

contributions accepted."[54] For the 2021 competition, students were invited to submit essays as well as "personal stories, academic papers, poems, theatre pieces, short novels, etc." Students are invited "to reflect on a persona question: what social issues are you most passionate about?" Among many suggested topics are drug and alcohol abuse, prostitution, emotional and mental health, healthy relationships, social anxiety and childhood obesity.

174.    Applicants are required to provide their name, email address and phone number.[55]

175.    As recently as August 27, 2021, LSU and LSU French Studies were currently listed as Institutional Partners on the website of the American Journal of French Studies.

176.    Other respected and influential organizations, individuals, and schools are also listed as partners of the American Journal of French Studies. Some or all of these entities who have unknowingly allowed a serial sexual predator access to young women are involved with d'Espalungue because of his elevated status at LSU, his promotion by Dr. Russo and the LSU Department of French Studies, and because of the deliberate indifference of LSU to actual notice of systemic sexual harassment, discrimination, and the danger he posed to young women.

177.    In May 2019, d'Espalungue distributed a flyer promoting AJFS. The flyer had a purple edge and "LSU" printed in yellow. It states, "Ed Darros, a LSU graduate Student and assistant of the Chair of the LSU Department of French Studies, founded in March 2019 the American Journal of French Studies (AJFS) with the support of the LSU Student Government." It further listed bullet points of AJFS activities.

---

[54] American Journal of French Studies website, "2021 Call for Short Papers," https://american- journal-of-french-studies.com/concours-d-ecriture-2021, accessed September 22, 2021, screenshots available.

[55] *Id.*

178. On August 25, 2019, d'Espalungue interviewed Lieutenant Governor Nungesser as a representative of LSU and AJFS, using the alias "Ed Darros." Darros/d'Espalungue mentions that "a lot of students" reach out to him to join the French Club and in hopes of being published in the journal and notes that endorsements from high-ranking officials encourage them to recognize it as a good opportunity. The Lieutenant Governor concludes the interview by stating, "Anything I can do to help you or LSU, count me in."

179. On or about August 26, 2019, d'Espalungue registered the French Club with LSU Campus Life and officially became its president, and maintained control of its social media accounts. Social media posts from 2019 and 2020 show numerous photographs of Dr. Russo with d'Espalungue and undergraduate students at a number of events for the French Department, the French Club, and/or AJFS.

180. On September 13, 2019, LSU Campus Life sent out invitations for students to join the LSU French Club which was being led by d'Espalungue.

181. Throughout 2019 and 2020, d'Espalungue continued leading LSU French Department events in direct contact with LSU undergraduate female students including Doe #2 and Doe #3, was regularly using aliases, and representing LSU.

182. On January 2, 2020, the AJFS Twitter account announced, "Remember @LSU is the place where everything started for the @AJFS_LA! A big thank you to all our friends, followers and partners who helped us to publish stories of young francophone writers! We look forward to working with you again in 2020!"

183. On April 3, 2020, an AJFS tweet[56] claimed AJFS won a grant from the Cultural Services of the French Embassy. The tweet read "The @AJFS has been ranked this year in the top 10

---

[56] See https://twitter.com/AJFS_LA/status/1246194089474830337

projects in the nation by the Cultural Services of the French Embassy! We are so proud of the

support we have received from @ltgovbillynungesser and @louisianaltgov who helped us to

promote our "savoir-faire! #LSU" The image used in the tweet read:

> **American Journal of French**
> **Studies French Club * Louisiana**
> **State University, Baton Rouge**
> **(LA)**

184.    The French Embassy's post,[57] however, stated that the LSU French Club was awarded the

grant for a talent show called "LSU's Got French Talent." Once again, the identities of the

LSU French Club and AJFS were merged to financial and personal benefit of d'Espalungue,

all done publicly, in the open, and with LSU's full knowledge and support.

185.    AJFS was promoted by d'Espalungue, Russo, and LSU as an integral program of the LSU

Department of French Studies, often interchangeable with the LSU French Club (a registered

club with Campus Life).[58]

**Fall of 2020 – Title IX case and Multiple other Title IX Reports**

186.    On September 6, 2020, as a direct result of LSU's deliberate indifference to actual notice that

d'Espalungue posed a severe risk of harm to female students and had an ongoing pattern of

sexual harassment, and as a direct result of LSU's official policy of gender discrimination as

described herein, d'Espalungue raped LSU undergraduate student Doe #1.

187.    D'Espalungue and Doe #1 met in late August of 2020 on the LSU campus when he stopped

---

[57] The French Embassy's post about the 2020-2021 project winners is here:
https://frenchhighereducation.org/grants-and-programs/5900-france-campus-awards/selected- projects It
shows that the "LSU French Club" won second prize.

[58] Under Title IX regulations, 34 CFR §106.44, a school's "education program or activity" includes
"locations, events, or circumstances over which the recipient exercised substantial control over both the
respondent and the context in which the harassment occurs" as well as "any building owned or controlled
by a student organization that is officially recognized by a postsecondary institution."

to help her with a flat tire on her bicycle. He gave her his phone number and later she texted

to thank him for the help. They spoke on the phone a few times and made plans to meet. She

insisted on a public place, so they met for a picnic. D'Espalungue began asking about her

sexuality and started touching her leg. She told him she wanted to go home and he offered to

drive her. Instead of driving to her apartment, however, he drove to his own apartment, where

he raped her. Doe #1 did a rape kit and the rape was reported to the Title IX Office on

September 8, 2020. The Title IX office transferred the case to the Student Advocacy and

Accountability Office (SAA) because the rape had occurred off campus. After an

investigation, Daniel DeLuca, Assistant Director of SAA informed the parties on November

9, 2020, that d'Espalungue had been suspended from November 9, 2020, through December

31, 2021 for Sexual Misconduct, Endangerment, and Disorderly Conduct resulting from her

rape.[59]

188.    D'Espalungue appealed and the matter was set for hearing on November 20, 2020, before a

        University Hearing Panel via Zoom. At the hearing, d'Espalungue was represented by an

        attorney while Doe #1 was accompanied only by a Lighthouse advisor.[60] The hearing went on

        for many hours, during which Doe #1 had to endure questioning and cross-examination by

---

[59] LSU defines "Sexual Misconduct" in PM-73 as "(e.g. sexual assault, stalking, dating violence, domestic
violence, sexual exploitation, retaliation, etc.)" It defines "sexual assault" in the same document as
"sexual contact or penetration without consent" with three subcategories: 1) Forcible Sex Offenses
include "Forcible Rape, Forcible Sodomy, Sexual Assault with an Object, Forcible Fondling;" 2) "Sex
Offenses, Non-forcible includes sexual intercourse as a result of incest or statutory rape; and 3) "Sexual
Assault also includes sexual battery as defined in La. R.S. 14:43.1."

[60] The Lighthouse is a confidential interpersonal violence prevention and advocacy program which offers
free services to the LSU campus community See https://lsu.edu/shc/wellness/the- lighthouse-
program/index.php

her attacker, and her advisor was not allowed to speak. This procedure violates Title IX regulations adopted August 14, 2020.[61]

189.    D'Espalungue's attorney raised questions about Doe #1's behavior after the rape and argued that it wasn't consistent with being raped. The hearing was traumatic and caused severe mental, emotional pain to Doe #1.[62]

190.    On November 20, 2020, the University Hearing Panel notified Doe #1 that it had found d'Espalungue guilty of Sexual Misconduct and Endangerment and upheld the suspension through December 31, 2021.  D'Espalungue's appeal to the Dean of the College of Humanities and Social Sciences was denied on December 11, 2020.

191.    In the meantime, on October 5, 2020: Dr. Russo sent an email to faculty and graduate students in the French Department directing them to report any Title IX complaints to her and she would decide whether they should be reported to Title IX. She wrote, "[a]ll instances covered by these regulations must be reported to the Department Chair, and I will instruct you to contact the Dean's Office and the Title IX office _if you have reason to lodge a complaint_." (Emphasis added).[63]

---

[61] Effective August 14, 2020, Title IX regulations require postsecondary institutions to hold a live hearing with the opportunity for each party's advisor to conduct cross-examination of parties and witnesses. § 106.45(b)(6)(i).

[62] The notice of UHP hearing had an attached document entitled "What to Expect." It stated, in part, "You have the right to one advisor and may bring that person with you to the hearing. The advisor (even if an attorney) _may not represent you. The advisor may not be directly involved in the case and may not serve as a material observer._

[63] The Husch Blackwell Report contains a similar instance, p. 134: "One Department reported that a dean had directed faculty and staff to report sexual misconduct to the dean and not the Title IX Office."

192.    This instruction was a violation of LSU's own policy and Title IX regulations. In no situation is it permissible to instruct students that they are barred from reporting sexual harassment, sexual assault, or retaliation to the Title IX Coordinator.

193.    Dr. Russo's instruction was reported to LSU officials with authority to address and/or rectify the situation, but no investigation was launched, and no action was taken.

194.    In the fall of 2020, at least six LSU female undergraduate students conferred about filing formal complaints with the Title IX office regarding d'Espalungue's ongoing pattern of sexual misconduct which they had experienced and/or witnessed. Five students moved forward, including Doe #2 and Doe #3.

195.    On November 6, 2020, Doe #3, called the Title IX office to file a formal PM-73 (Title IX) complaint of sexual misconduct against d'Espalungue. The initial case notes state that d'Espalungue was "abusing position of power to make sexual remarks to female students... unsolicited physical contact; student says she cannot get into clubs because she is uncomfortable with this student as he is involved in clubs as well. She was working for a French journal that he started; student saw that he would do it to other people; she thinks that other PhD students and department knew of his behaviors." The remedy Doe #3 requested was "Removal from school because she feels he continues to involve more people."

196.    On November 10, 2020, Stewart spoke to Doe #3 by telephone. Doe #3 reported that d'Espalungue had created "journal in the French department – partnership, he's still in charge of that and French Club;" Doe #3 was no longer affiliated with the journal; she refused to meet with him alone, under table touching leg;" "Texts received where he was asking her to come over, saying things appear to be inappropriate." Apparently, Stewart asked a representative of the Lighthouse Program to contact Doe #3.

197.   On November 16, 2020, Stewart conducted a Zoom conference with three undergraduates

who had experienced and/or witnessed sexual harassment by d'Espalungue, including Doe #2

and Doe #3. During the Zoom conference, Doe #3 sent her own written statement as well as

statements by two other LSU undergraduates who were not on the Zoom call, with their

permission. Thus, there were five students who filed Title IX complaints on November 16,

2020.

198.   In her written statement, Doe #3 documented in more detail d'Espalungue's *modus*

*operandi* and how he abused his position of power within the LSU French Department in

attempting to seek *quid pro quo* sexual favors from her, and she feared from other female

LSU students, particularly young undergraduates, in return for access to LSU programs

such as the French Club and AJFS, which he controlled. (*See* ¶ 32-34 *supra* for more

details).

199.   Stewart's notes contained in the Title IX file of Doe #3 describe instances of *quid pro quo*

harassment by d'Espalungue, which do not require a showing that the harassment was

"severe, pervasive and objectively offensive."[64]

200.   In particular, Stewart's notes of the Zoom conference with Doe #3 on November 16, 2020

state as follows:

> [Doe #3] - he was an instructor in french, left because he has a case, a few
> months  later he asked her to be on french journal, she got involved because
> she didn't want [Doe #2] involved individually, Ed tried to touch, kiss and ask
> inappropriate questions. [Doe #3] was removed from journal and he said he
> needed to meet her late at night in person to explain why (***assaulted - grabbing***
> ***her rear, kissing her,***), he doesn't want guys on the journal. She tried to not let
> other women be alone with him, she knows the assault has happened to other

---

[64] Under Department of Education regulations, 34 C.F.R. 106.30(a) there are three categories of sexual
harassment. Two of them address serious violations that they are considered harassment *per se* and do not
require a showing that the conduct was "severe" or "pervasive." The first category is *quid pro quo*
harassment in which a teacher or employee conditions "the provision of an aid, benefit, or service of the
recipient on an individual's participation in unwelcome sexual conduct."

women, he would yell at her. ***He kicked her out of French related groups, continuously would ask her to sleep with him and when she declined he would tell her and others she had mental problems.*** She and others feel the french department protects him. When started on french journal said he had connections and would help her.

201.    Forcible Fondling is defined in LSU's PM-73 as "The touching of the private body parts of another person (buttocks, groin, breasts) for the purpose of sexual gratification, forcibly and/or against that person's will (non-consensually) ..."[65]

202.    As noted, any form of *quid pro quo* harassment—that is, an employee conditioning any educational opportunity or benefit on the granting of sexual favors—constitutes a *per se* violation of Title IX, regardless of its severity or pervasiveness.[66] The same is true of sexual harassment that constitutes an offense under the uniform crime reporting system of the FBI.

203.    As noted, d'Espalungue was an LSU employee as research assistant to the Chair, and he also controlled the LSU French Club and AJFS, which was a *de facto* program of LSU through the LSU Department of French Studies and was openly marketed and touted as such.

204.    Doe #3's written statement sent to Stewart on November 16, 2020, relates:

   a.    She met d'Espalungue when she was a freshman LSU student in his French 1001 class and her first impressions were positive. After he "disappeared" she and other students learned of the rape arrest but were unsure whether he could be guilty.

   b.    In the spring of 2019, Doe #3 accompanied her friend, Doe #2, to French Movie Night where d'Espalungue met them. Shortly thereafter, d'Espalungue recruited Doe #2 and #3 to help him get AJFS off the ground, promising they would have good resume material and he would also give them a cut of the money they would make selling the printed journals.

   c.    On March 28, 2019, they created the Instagram account for AJFS (@AJFS_LA)

---

[65] Exhibit A (ECF 1-2), LSU PM-73, p. 8.

[66] *See* Title IX regulations, 34 C.F.R. §106.30(a)(1) which includes within the definition of sexual harassment conduct in which "an employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct."

d. "Our usefulness, though, was not about [French] fluency to him, it was about who we were, and the fact that we were young and willing to listen to him."

e. At some point Doe #2 asked about the rape case "and he told her the girl was just religious and had 'mental issues,' so she assumed the best and continued to agree to work with him."

f. They began to meet but he started asking questions about her romantic interests. "He consistently got too close to me and started to touch me in ways that I did not find appropriate, yet I assumed maybe it was a culture difference."

g. D'Espalungue repeatedly asked Doe #2 and Doe #3 to meet him to "talk about the journal," but when they would meet, he would not bring up the topic.

h. When they would meet, d'Espalungue "would touch and rub my legs underneath the table, when my friend could not see." On another occasion, d'Espalungue reached behind Doe #2 to touch and rub Doe #3's side.

i. D'Espalungue would become angry when Doe #3 expressed her discomfort or exasperation, or alternately state he would never be interested in Doe #3 and/or he meant nothing by it.

j. [*Quid pro quo*]  On April 2, 2019, d'Espalungue texted Doe #3 and told her she "needed to leave the journal" and that he needed to meet with her to explain. Doe #3 "felt very invested in the journal, since I had been there when it was started." When they met in person and she asked why she needed to leave the journal, "he said it was not true; with this he made it clear that he just wanted to meet me. He started touching me all over. I got up and told him I wanted to go back to my dorm before walking away." He followed her and then started pulling her close so she could not get away. He kept trying to kiss her as she repeatedly turned her head away. She finally broke away and went inside. "I remember making sure the doors were locked and trying to make sense of the situation."

k. After this, d'Espalungue began recruiting other young female students to help with AJFS "who were similar to me, young and – even slightly – involved in French or language study."

l. D'Espalungue started telling other AJFS members that Doe #3 was crazy and had "mental issues," and tried to prevent her from discussing his behavior with anyone else.

m. D'Espalungue would berate Doe #3 at various events promoting AJFS "where he would decide I had done something wrong or unacceptable.

n. D'Espalungue would alternate between telling Doe #3 she was "below him" and he was not interested in her and trying to convince her to come to his apartment or give him her address "**even though I repeatedly brought up our almost 10 year age gap and our power difference and how uncomfortable these things**

**made me.**"

o.  [***Quid pro quo***] – On another occasion, d'Espalungue got Doe #3's address from a mutual friend and came over. When she opened the door, "he instantly walked to my bedroom and tried to get me to follow. I refused to be alone with him, however, and texted my roommate at the time [to] stay with us. ***"He threatened my position with the journal when I would not comply, saying it showed I 'was not a good friend,' 'the others would meet him,' he wasn't sure he could trust me, etc.*** even though at that point I had made it more than clear that he was ONLY my boss. Throughout this time when he was persistently continuing to make advances on me, he was engaged in multiple other relationships, but this made no difference to him. I was kicked out of the journal many times when I would bring these things up, yet he hated thinking that I was free from him and able to talk as I wanted, so he would convince me to come back each time. I also did not feel right leaving my friends in the journal alone, as some of them did not know what he was capable of, or even that he had a previous case and they should therefore be wary of him. If I did tell them, it was often the same scenario of shock but disbelief."

p.  Doe #3 eventually cut off all contact with d'Espalungue after a final instance of groping and nonconsensual sexual conduct. According to her written statement submitted to Stewart, the last major event Doe #3 attended before cutting off all contact with d'Espalungue was an LSU performance event she attended with d'Espalungue and a few other graduate students. "When we got there, I sat in between a female grad student and him. He began to continuously touch me and slid his hand ALL the way up my leg right in front of the others. I got up and left for a while. If the others noticed something was off that night, they didn't say anything to me. At the restaurant afterwards, he continued to touch and make advances. I think I hit or shoved him; that happened a few times, but he would always take it as a joke, even though I was clearly exasperated. At that point I had had enough, I told them someone else could drive him home and I left."

q.  Doe #3 also attached more than 50 pages of screenshots of text messages d'Espalungue had sent her with inappropriate, sexualized and predatory language, including his claim to be collecting nudes from all over Louisiana "like a boardgame."

205.  In the Title IX case record of Doe #3, Jennie Stewart's notes document that Doe #3 reported sexual assault by d'Espalungue and also *quid pro quo* sexual harassment. The notes state:

"Doe #3 was removed from journal and he said he needed to meet her late at night in person

56

to explain why (assaulted – grabbing her rear, kissing her)[67] he doesn't want guys on the journal. She tried to not let other women be alone with him, she knows the assault has happened to other women, he would yell at her. He kicked her out of French related groups, continuously would ask her to sleep with him and when she declined he would tell her and others she had mental problems. She and others feel the French department protects him. When started on French journal said he had connections and would help her."

206.    As noted, Doe #3 sent to Stewart during the November 16, 2020 Zoom meeting two additional written statements from female LSU students. One of them recounted multiple instances in which d'Espalungue had sexually harassed and assaulted her ("we were all chatting and, seemingly out of nowhere, he grabbed my face and tried to kiss me.;" "as soon as he shut the door and I had opened a Russian language book, he began to make more sexual comments. He asked me to sit on his lap and continued with comments like, 'I know you want to kiss me', 'how about you kiss me every time I get a word right', along with many unwanted touches regardless of how many times I told him 'no' as this was going on.." "* * * I think his presence and unwillingness to accept no as an answer for unwarranted advances is dangerous to many young women attending the university.").[68]

207.    Thus, during the November 16, 2020 Zoom meeting, Stewart spoke with three female LSU students and received written statements from two others (and a written statement from Doe#3, who was also on the call). Stewart was informed that d'Espalungue had sexually assaulted several of the complainants, had sexually harassed all of them, was recruiting

---

[67] Stewart apparently conflated two different instances reported by Doe #3. Although d'Espalungue did engage in unwelcome sexual conduct the evening they met to "discuss the journal," the instance of d'Espalungue grabbing her buttocks was a different incident.

[68] See Title IX file of Doe #3.

and/or grooming high school students through AJFS (an "LSU partner" on their website at the time), and had slept with at least one high school student who had submitted an essay for an AJFS contest, thus severely impacting their educational opportunities on the basis of sex, and creating a hostile educational environment.

208. With respect to the information regarding d'Espalungue recruiting/grooming high school students through AJFS, touted as an "LSU partner," and having sex with at least one of them, Jennie Stewart responded, "oh, well, that's not LSU policy," and "he didn't do anything illegal." These statements were shocking and traumatizing for Doe #2, Doe #3 and the third LSU undergrad who was on the call.

209. The Title IX office closed all five Title IX complaints filed November 16, 2020 without investigation even though d'Espalungue's suspension ends December 31, 2021, the complaints involved separate incidents of *per se* harassment and sexual assault, and the complainants specifically informed the Title IX office that d'Espalungue continued to meet and potentially groom high school students through the journal which was marketed, advertised and promoted as an LSU project/publication.

210. On December 11, 2020, Doe #4 filed a formal Title IX complaint (PM-73) reporting that she had been retaliated against by Dr. Russo for reporting d'Espalungue for Title IX concerns; that Dr. Russo had instructed her, other GAs and faculty in the French Department that any Title IX concerns should come to Dr. Russo.

211. Title IX Coordinator Jennie Stewart held a Zoom meeting with Doe #4 on December 11, 2020. Doe #4 transmitted the following information to Stewart which described in detail an ongoing, continuing hostile educational environment from 2018 through 2020:

   a. She repeated her earlier experience of being harassed by d'Espalungue and Title IX deciding "behaviors didn't meet threshold and case remained in HR."

b. In a Fall 2019 meeting Russo told Doe #4 in front of Doe #5 that she "didn't need to be causing **drama** that ensued last year. Any reports that are Title IX shall come to me." Russo then dismissed Doe #5 from the meeting on the pretext that the conversation would turn to Doe #4's dissertation. Once they were alone, Dr. Russo began discussing d'Espalungue's rape case in Rapides Parish and stated that the charges were going to be dismissed.

c. Dr. Russo instructed that "if there was any discontent recognized among students toward Edouard that the students should tell Russo.

d. In 2019, Doe #4 was paid only half her salary one month, and when she contacted the administrative assistant, Russo berated her, said she had "no right" to contact her assistant, and that she would not be paid because she was working "on volunteer basis." The Director of Graduate Studies eventually spoke to Russo and the salary was restored.

e. There were many smaller issues; Doe #4 felt targeted by Russo, told she was rude, disrespectful and "didn't need to speak in meetings."

f. "Felt she had to seek therapy and leave her job to complete her degree. Russo is not on her dissertation committee, but Doe #4 is still fearful of retaliation.

212.    On December 18, 2020, Title IX Lead Investigator Jeff Scott contacted Doe #4 to set up a follow-up Zoom call for January 12, 2021. During the call, Doe #4 described an ongoing hostile educational environment comprised of a continuing series of hostile and dismissive remarks, insults, and disrespect shown to Doe #4 by Russo after she complained of d'Espalungue's harassment, making her life a "living hell."

213.    On January 12, 2021, Doe #4 told Scott that she and d'Espalungue both started their respective programs in the French Department in 2017.[69] From the beginning, he made inappropriate remarks to her and other females in the graduate program. When the rape arrest was reported in October of 2018, Dr. Russo spoke to each grad student individually, asking them about any concerns. Doe #4 shared her concerns about inappropriate comments and Dr. Russo responded, "she should take Edouard's comments as compliments and they should be

---

[69] The Title IX record says "2018" but this may have been a typo.

there to support Edouard." Doe #4 filed a complaint with HRM. Afterwards, Dr. Russo

became disrespectful to Doe #4 and would not speak to her. Russo told her that Edouard was

"actually innocent," and she should not cause "any drama" and should support Edouard. On

one occasion, Dr. Russo told Doe #4 to quit being a "know it all" and not to speak so much in

meetings – that Doe #4 did not need to cause any more issues. In carrying out her work

responsibilities, Doe #4 had followed her supervisor's instructions, but Dr. Russo told her she

didn't have authority to do the things requested. Dr. Russo made Doe #4's life "a living hell."

As a result, Doe #4 had to quit her job working for the Assistant Language Coordinator. On

another occasion, Doe #4's paycheck was withheld for one of her graduate assistant jobs in

2019. When she inquired, Dr. Russo told her she was working on a "volunteer" basis,

although Doe #4 had been paid for the same job in 2018.  Doe #4 was forced to make

multiple phone calls to seek assistance. Finally, another professor called Russo and she

apparently reversed her instructions and Doe #4 was paid. In October 2020 Russo sent email

to all grad students and faculty stating that "they needed  to report any Title IX concerns to

the dept. chair (Russo) first before they do anything else." Doe #4 provided a copy of the

email to Scott.

214.    Once again, nothing came of this report of Title IX violations.

**D'Espalungue's Escape to France, Indictment, Bond Revocation**

215.    On November 23, 2020, three days after an LSU University Hearing Panel imposed a one-

year suspension on d'Espalungue for sexual assault and endangerment of Doe #1,

d'Espalungue's criminal defense attorney in Alexandria filed a Motion for Permission to

Travel asking that d'Espalungue be allowed to leave the country to spend Christmas in Paris

with his family. The motion cited d'Espalungue's high GPA, his position as Research

Assistant to the Chair of the Department, alleged that he was elected "Programs Chair for the

LSU International Student Association (ISA)," and "Vice President for Programs of the LSU

International Cultural Center (ICC)," [70] and stated that "in November of 2019 he was

appointed by Baton Rouge Mayor Sharon Weston Broome as a member of the Mayor's

International Relations Commission.[71]

216.    The Motion for Permission to Travel was granted allowing d'Espalungue to depart for France

        on December 14, 2020 and return to Louisiana on December 27, 2020 notwithstanding  the

        fact that France is a non-extradition country for its own citizens, and the court originally had

        required d'Espalungue to relinquish his passport as a condition of his $100,000 bond.

217.    On December 14, 2020, d'Espalungue departed for France and has never returned.

218.    On February 23, 2021, twenty-nine months after the rape of the ULL student and two months

        after allowing d'Espalungue to escape to France, the Rapides Parish District Attorney finally

        presented the case to a grand jury. The grand jury issued a true bill indicting d'Espalungue

        for Third Degree Rape.

**D'Espalungue continues AJFS/LSU activities from France, including harassment**

219.    Despite being an indicted fugitive serial rapist suspended from LSU since November 2020

        and living in France, LSU did not terminate d'Espalungue's access to university email until

        at least March 23, 2021.

220.    Further, as of February 24, 2021, d'Espalungue was still in control of the LSU French Club

---

[70] D'Espalungue's name (real or alias) does not appear in the history of the ISA or the ICC. See
https://www.lsu.edu/intlpro/icc/isaiccofficers.php.

[71] In November 2019, d'Espalungue was in fact appointed to Baton Rouge Mayor Sharon Weston
Broome's International Relations Commission under the alias, "Edward Daras." This could be seen on the
website at late as of May 7, 2021 at this URL, however his name has since been removed:
https://www.brla.gov/2162/International-Relations-Commission-IRC

social media accounts, was hosting and planning LSU French Club meetings with undergraduates, was moderating their interaction through the GroupMe app and had just received a $1000 grant from the LSU French Department for AJFS.

221.  In addition, even though d'Espalungue left the country on December 14, 2020, he continued his ongoing pattern of harassment at LSU, all of which has been reported to the LSU Title IX office on multiple occasions.

222.  On February 10, 2021, Doe #4 emailed Jeffrey Scott of the Title IX office.  She wrote, "I have a concern regarding the complaint against Edouard D'Espalungue. I know that he was suspended from the university due to these complaints. However, he continues to work for the American Journal of French Studies, which is a journal partnered with the university and created through the university. I am highly concerned about this because the journal works with undergraduates and high school students. I have observed his inappropriate behavior with the students who participate in activities with this journal. I wanted to share these concerns. I am not sure if this falls under the jurisdiction of the Title IX office."

223.  Jeffrey Scott responded via email on the same date that he had followed up with SAA and was told "even though Edouard created the American Journal of French Studies, it is no longer affiliated with LSU." Doe #4 responded, "The website still lists LSU as a partner and donor." Scott did not answer.

224.  Doe #4 emailed Scott on February 24, 2021: "I have just learned that the Department of French Studies just awarded the journal a $1000 grant – which seems to be an affiliation. This concerns me very much." Scott did not reply.

225.  The award of $1000 grant from the LSU French Department to AJFS serves as additional evidence that AJFS was a "program or activity" of LSU within the meaning of Title IX, and

that d'Espalungue's *quid pro quo* conduct conditioned AJFS involvement on participation in unwelcome sexual conduct involved an "aid, benefit, or service of the recipient" within the meaning of Title IX regulations.

226.    Later on the same day, February 24, 2021, Doe #4 emailed Scott as follows:

> Since this morning, even more information has come to light. I have evidence that Édouard continues to host and plan LSU French Club meetings with undergraduates and moderates their group me [GroupMe]. Though he has officially been removed as the organizer of the organization, he continues to act as if he is the leader of the group. I can send photographic evidence of this. This is highly frustrating for me as it shows how the department continues to skirt Title IX regulations in favor of a predatory student rather than protecting the students at large. Could you please update me on the case regarding the department's handling of the situation?[72]

227.    Scott responded a few minutes later, "Thanks for this information. I have shared it with Jennie Stewart our Title IX Coordinator to review. If you wish, feel free to also contact Jennie directly at jstewart@lsu.edu." There is no follow-up response from Stewart or Scott.

228.    Doe #4 met with Stewart (Title IX) and DeLuca (SAA) on February 25, 2021 and was told they could do nothing to stop d'Espalungue from claiming affiliation with LSU, ***even though he was using his platform to recruit young women and high school aged girls.***

229.    LSU once again took no action, following its official policy of gender discrimination and showing deliberate indifference in the face of actual knowledge of ongoing sexual harassment of LSU students as well as high school students.

230.    On the same day, February 25, 2021, Doe #6 also urgently reached out to various LSU officials with authority to rectify the situation, sending separate emails to Dr. Russo, Associate Dean Jason Hicks and Kevin Bongiorni, Director of Undergraduate Studies, with copies to all of these, as well as Kate Jensen, Director of Graduate Studies. One email stated:

---

[72] February 24, 2021 @ 3:44 p.m. email from Doe #4 to Jeffrey Scott with LSU Title IX office.

I was encouraging my students to sign up for the French club and two of them asked to speak with me after class. They told me the club is still being run by Edouard – who as I understand has been suspended from LSU following legal investigations around sexual harassment – and further that he has \*blocked\* certain female students (who either refused his advances or reported him) from the French club group me, and the Instagram and Facebook pages. If true, this is a \*\*\*very bad\*\*\* position for the dept to be supporting, at a time when LSU is being scrutinized for its handling of sexual predation and misconduct of all types, including various units' responses to reports of these incidents.

231.    Doe #6's email to Dr. Russo stated, in part:

If Edouard is still in charge of these groups, even nominally, or is claiming any association of any French social activity he is doing with our department, we stand to come under disciplinary action, not to mention lose potential majors and minors. (One student told me she dropped the French major last year because of his harassment; and that if we were face-to-face right now she would drop the minor too, so she would not have to see him.)

\* \* \* . . . this is *in our house* and, for some reason, still happening even after he has been removed from the university. Pardon me for being very blunt here, but supporting a sexual offender - never a brilliant option to begin with - is not a good look for our department in the post-USA-Today-article era. We need to support our students and make sure our department is a safe place.

232.    Dr. Russo responded to Doe #6, claiming that a different student was President of the French Club:

. . . she just met with me yesterday about the grant that the French Club received from the French Cultural Services to organize a talent competition. Edouard d'Espalungue is no longer in the country and no longer has any affiliation with the university. He was instructed that he cannot use his former LSU address or email.

Dr. Russo admitted that she was "unaware of the French Club's social media presence" and that the students should "come see me, or better yet, file a Title IX report directly." She copied Jennie Stewart of the Title IX office on her response.

233.    The "grant" from the French Embassy Cultural Services is the same one that d'Espalungue had claimed in a tweet on April 3, 2020, was awarded to AJFS, with an image that merged AJFS identity with that of the LSU French Club. And as will be seen, as late as February 25, 2021, d'Espalungue was still in control of the LSU French Club social media platforms,

claiming to be "founder and president of the LSU French Club," claiming to speak for Dr. Russo, and blocking Doe #2 and other LSU students who were reporting him or who had rejected his advances.

234.     On February 25, 2021, Doe #2 checked to see what was happening in the French Club 2020/2021 GroupMe and was surprised to see she had been removed. She also discovered she had been removed from the French Club LSU Facebook page. After she regained access through another LSU student in the French Department, she scrolled through the messages and saw d'Espalungue had removed her on January 22, 2021.

235.     Rather than say anything about being removed, Doe #2 posted about her love of languages. On February 26, 2021, d'Espalungue sent multiple messages to Doe #2 on WhatsApp about the French Club award and how "motivated" she sounded. She replied she was in class. Doe #2's boyfriend then posted on the AJFS Instagram page about d'Espalungue being suspended from the university. D'Espalungue responded by sending multiple texts to Doe #2 threatening to file a criminal complaint against her if she didn't get her boyfriend to "stop harassing me."

236.     A series of texts ensued with d'Espalungue stating that his is the founder and president of the French Club and was helping Dr. Russo who "needs more students involved" and he was "just trying to put you on a team."  Screenshots of d'Espalungue's texts of February 26, 2021, state:

> As far as the group, I am the president and founder of this club so f*** off with your BS accusations; Hey I am done w this conversation, this guy only wants problems. I have no academic authority on you [Doe #2], I was acting like you seems to b very motivated in the group and Pr. Russo does have a need for more students involve is found in the project so, forget my offer. I was genuinely trying to put you on a team, but this is just going too far.

237.    Doe #2 forwarded all of the information with screen shots to Stewart in the Title IX office,

which comprise her second Title IX complaint. She summarized d'Espalungue's harassment

and control over LSU clubs and educational programs as follows:

> Bottom line: He acts and says he is president of the LSU French Club, as well as
> uses LSU for his journal (American Journal of French Studies.

a.  He affiliates LSU with his Journal by noting on his Instagram that it is "hosted by
@LSU" and lists the address as his former office in Hodges Hall.

b.  He is admin of the French Club GroupMe and I believe that he is (still) the admin
of the Facebook group for French Club LSU.

c.  He claims he is the president of the club and still acts as such (organizing meetings,
etc.).

d.  The groupme for the club is directly linked from French Club LSU page.

e.  The group is LSU students, mostly female.

238.    Doe #2 asked Jennie Stewart on March 1, 2021, how she could protect young women who

were interacting with d'Espalungue on the LSU French Club sites and apps. She asked what

she could legally divulge about d'Espalungue's rape arrest and harassment in an effort to

warn other females. She stated that she felt a *"moral obligation to inform the women*

*members especially, as they cannot make an informed decision in regard to whether to follow*

*him or not."*

239.    Stewart responded that LSU could do nothing, and recommended that a "new" French club be

organized and the "community members on the GroupMe, Facebook, Instagram, etc. have to

decide not to follow Ed. There's no action to be taken by administration but the community

can choose not to follow him, which I hope people will do."

240.    The Title IX office tasked with protecting students and assuring their equal educational

access told victims it was their responsibility to handle harassers themselves, and to protect

each other. Despite the clear distress, educational disruption, and potential danger

d'Espalungue was causing female LSU students, no investigation was launched, no action
was taken.

241.    In fact, d'Espalungue had previously registered "French Club LSU" with Campus Life and
invitations had been sent out to students on September 13, 2019, which stated "Edouard
d'Espalungue d'Arros has invited you to join the organization French Club LSU." From that
point forward, until sometime in mid-2021, d'Espalungue was in charge of the LSU French
Club Facebook account and related accounts. There is still an Instagram account, but it
appears the Facebook account has been removed.[73]

242.    Doe #2 and other students formed "Le Cercle Francais" as an alternative LSU club.

243.    By this time, d'Espalungue had already removed Doe #2 from the French Club GroupMe app,
the WhatsApp and the AJFS_LA Instagram page and she no longer had the ability to try to
move "the community" away from the predator's control.

244.    Notwithstanding the fact that d'Espalungue had been arrested for rape of a young ULL
student in Rapides Parish, was suspended for the rape of a young LSU student, was
physically barred from the LSU campus, was a fugitive from justice, and had been in France
since December 14, 2020, he continued to plan student events at LSU through his control the
social media platforms for the LSU French Club and for AJFS which continued to publicly
hold itself out as a program of LSU.

245.    Up until at least March 23, 2021, LSU officials with authority to rectify the situation had
actual notice that d'Espalungue continued to be in control of and lead activities for the LSU
French Club and LSU's "academic journal" AJFS; and that he was harassing and blocking

___
[73] The last post at the Instagram account was November 12, 2020. It points to the former Facebook page
account which is no longer available: www.facebook.com/groups/FrenchClubLSU/?ref=share.

students who had reported him or had rejected his sexual advances.

246.    The harassment d'Espalungue engaged in was severe, pervasive and objectively offensive and it effectively barred Does #1-5 and other LSU students from educational opportunities and benefits; LSU was deliberately indifferent to the harassment.

247.    To this day, AJFS continues to hold events in Baton Rouge, Lafayette and elsewhere, as well as on Zoom, charging healthy fees, all with the full knowledge and tacit agreement of LSU. Having been launched by LSU and the LSU Department of French Studies with the help of CODOFIL and other French language institutions – upon information and belief at the urging of Dr. Russo and others at LSU – AJFS continues to have access to young high school students and to profit at the same time, through LSU's deliberate indifference and official policy of gender discrimination.

**Husch Blackwell Report – Systematic Failures, Official Policy of Discrimination**

248.    LSU's long-term, systemic institutional failures with respect to Title IX policies and compliance were the subject of an in-depth review published on March 5, 2021, by the Husch Blackwell law firm, entitled "Louisiana State University Title IX Review" (hereinafter "the Report").[74] A copy of the Report has been previously filed at ECF 1-3 and is incorporated herein for all purposes.  .

249.    The Report concluded that: "The University's Title IX Office has never been appropriately staffed or provided with the independence and resources to carry out Title IX's mandates."[75]

250.    The Report also found: "Institutional reporting policy and training have been unclear for

---

[74] *See* Exhibit B (ECF 1-3), Husch Blackwell Report, p. 12, footnote 47 which states, "For those complaints that fall within PM-73 [LSU's policies on sexual misconduct] and involve employees, Stewart notifies the appropriate Human Resources representative to respond to the complaint."

[75] Husch Blackwell Report, p. 4.

years," and that "we found deficiencies in a variety of different matters," not just in the

Athletics Department.[76]

251.    The Report stated five reviews in the past five years had flagged problems with LSU's Title

IX processes, including training, staffing and compliance – three from external consultants,

one from the University's Office of Internal Audit, and one from a university task force. LSU

leadership implemented few of the recommendations.[77]

252.    The "Recommendations" portion of the Report lists numerous policy failings with respect to

sexual harassment which clearly were not oversights or accidental. The previous consulting

reports, audits, and task force recommendations had been ignored, and repeated calls for

additional guidance and resources from within the Title IX Office itself went unheeded:

> Throughout this report, we have stressed that in many ways the employees tasked
> with these important responsibilities were not served well by the leadership of the
> University. Institutional policies were unclear, edicts were issued by supervisors
> that conflicted with policy, employees were overburdened with vast institutional
> roles and not provided with appropriate resources, calls for additional resources
> went unheeded, concerns were not responded to, etc. As part of this review, we
> have interviewed several employees who acknowledged making mistakes and
> emotionally shared that they were trying their absolute best under exceptionally
> difficult circumstances.[78]

253.    A key finding of the Husch Blackwell report is that LSU failed to appropriately staff its Title

IX Office despite many "alarms" by the Title IX office itself.[79]

254.    During all periods relevant to this suit, LSU had only one Title IX Coordinator, Jennie Stewart,

and one "lead" investigator for a campus with over 34,000 students.

---

[76] *Id.*, p. 4.

[77] *Id.*, p. 36. "As discussed below, University leadership's response to these red flags was lackluster."
[78] *Id.*, p. 137.

[79] Husch Blackwell Report, p. 36.

255.    Stewart was hired in September 2016 and was LSU's first "full-time" Title IX Coordinator. This was nearly five years after the U. S. Department of Education ("Department") issued the 2011 "Dear Colleague Letter" stressing the broad responsibilities of the Title IX Coordinator for "identifying and addressing any patterns or systemic problems that arise during the review of Title IX complaints;" and recommending they "not have other job responsibilities that may create a conflict of interest."[80]

256.    Stewart realized within her first six months that LSU's "Title IX staffing was woefully behind peer institutions and that she needed additional resources and staff to avoid a bevy of potential harms including 'litigation, damages, reputation costs, lost enrollment, [unfavorable] media, harm to folks who've chosen LSU.'"[81]

257.    She gave a slide presentation on September 23, 2016, to President Alexander, the general counsel and the CFO requesting at least $329,000 to properly staff and train the Title IX office, including funds to hire a lead investigator, 4-5 other investigators, and at least two graduate assistants. She also sought funds for training and travel. Her slide presentation cited "mental stress and exhaustion (doing more than 1 job)" as well as "emotional toll on our staff." [82]

258.    President Alexander responded to the slide presentation by stating words to the effect of: "We don't disagree with any of this . . . it gives us a good idea of where we need to go." Stewart drafted a job description for a lead investigator, but the position was not filled for 19 months.

---

[80] U.S. Dep't Ed. Office for Civil Rights, "Dear Colleague Letter: Sexual Violence" (2011). A copy of the 2011 Dear Colleague Letter, which was rescinded by the Department in September 2017, is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[81] Husch Blackwell Report, p. 36.

[82] *Id*, p. 42-43.

The Report states, "That appears to be the only additional resource that came from this presentation."[83]

259.    In March 2018 LSU hired Jeff Scott to serve as "Lead Title IX Investigator" for the LSU System, and he assumed responsibility "for investigating *all* Title IX complaints for LSU students at all nine campuses." Scott told Husch Blackwell attorneys that he received assistance from Deputy Coordinators to do "some of the 'legwork' prior to him opening investigations," and that "[i]nvestigations of complaints against employees continued to be handled by the University's Employee Relations department of Human Resource Management."[84]

260.    Stewart and Scott preside over a "Title IX Case Management Team" which meets once a week to discuss the status of pending Title IX cases and is/was composed of representatives from the Title IX Office (Stewart and Scott), The Lighthouse Program, LSUPD, the Office of the Dean of Students (including representatives from Student Advocacy and Accountability and the CARE Team . . .), and Residential Life. University administrators affiliated with the team universally described the Title IX case load as "overwhelming" and the current staffing as "unsustainable."[85]

261.    The Husch Blackwell Report found that "The University's Title IX Office has never been appropriately staffed or provided with the independence and resources to carry out Title IX's mandates. We have identified concerns that the Office has at times not handled those matters

_____

[83] *Id.*, p. 43.

[84] Husch Blackwell Report, p. 11. Under LSU's Policy Statement 73 which addresses sexual harassment by employees such as d'Espalungue, "[a]ll complaints of sexual harassment must be reported to the Office of Human Resource Management."

[85] *Id.*, pp. 12-13.

reported to it appropriately. Again, while the *USA Today* article focused primarily on Athletics, ***we found deficiencies in a variety of different matters.***"[86]

262.  LSU also ignored Department guidelines on staffing and conflicts of interest. At all times relevant to this suit, Stewart reported directly to LSU's Office of General Counsel, a reporting line which is "rife with conflict of interest."[87] This arrangement ignored the Department's guidance that "designating the same employee to serve both as the Title IX Coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest."[88]

263.  Furthermore, under LSU policy governing harassment by its employees - Policy Statement 73,"[89] "[a]ll complaints of sexual harassment [by employees] must be reported to the Office of Human Resource Management." [90] At all relevant times, Madatic served in a dual capacity at HRM as Associate Director of Employee Relations and as Deputy Title IX Coordinator for Employees, roles that were found to present potential conflicts of interest in a 2017 Presidential Task Force report to LSU President F. King Alexander.[91] The Task Force also

---

[86] *Id.*, p. 4.

[87] Husch Blackwell Report., p. 141.

[88] *Id*, p. 9.

[89] See Exhibit C which has been previously filed at ECF 1-4 and is incorporated herein for all purposes.

[90] *See also*, Husch Blackwell Report, p. 12, footnote 47 states, "For those complaints that fall within PM-73 and involve employees, Stewart notifies the appropriate Human Resources representative to respond to the complaint."

[91] President Alexander convened the Task Force "to review our current policies, practices, and procedures as they relate to Title IX and to provide recommendations to the President that reflect campus needs and are informed by nationally-recognized benchmarked practices." The Task Force's recommendations were largely ignored. Husch Blackwell Report, pp. 38-42, describes the Task Force and its recommendations which included the statement, "LSU's website also lists Gaston Reinoso as the Title IX Deputy Coordinator for Employees. It appears, however, that Mr. Reinoso may have other job responsibilities in

noted an unclear "line of command" with respect to the various Title IX Coordinators, stating, "it is not immediately clear from the organizational charts available from the LSU website who the various Title IX coordinators report to. The organizational charts (and any related governing documents) should be revised to make it clear that the various Title IX coordinators do not have conflicting responsibilities."[92]

264.    The Task Force recommendations "went nowhere." Attorneys for Husch Blackwell were "unable to find any documentation memorializing how this Task Force report was assessed or addressed by the leadership of the University."[93]

265.    At all times, LSU failed to develop or adopt policies and procedures regarding proper investigation and response to sexual harassment, assault, and violence, and failed to provide policy, procedures, or training for administrators, employees, and students about sexual harassment and assault.

266.    LSU actively concealed its own misconduct by "going through the motions" of commissioning task forces, listening to power point presentations of its Title IX Coordinator, and receiving other reports outlining its many policy failures which resulted in rampant sexual harassment and discrimination within its university system, all the while intentionally deciding to ignore the reports and take no substantive action to address the system-wide failures which were well-documented by at least 2017. The record shows that the staffing and training of the Title IX Office - and its concomitant response to gender harassment and

---

the office of Human Resources Management that might conflict with his duty as Title IX coordinator." *Id.* p. 42. Madatic replaced Reinoso in 2017. She has the same dual job responsibilities in HR.

[92] Husch Blackwell Report, p. 41.

[93] *Id.*, p. 42.

discrimination - could have been substantially improved for the paltry sum of $329,000 in 2016, when Stewart presented a request to the LSU President, general counsel and CFO.

267. All of this information was not disclosed to the public or to plaintiffs until the release of the Husch Blackwell Report on March 5, 2021.

The systemic investigative failures identified by the Husch Blackwell Report were not merely procedural oversights; they actively fostered and exacerbated the hostile educational environment experienced by the Plaintiffs. The Report concluded that LSU's Title IX Office was 'never been appropriately staffed or provided with the independence and resources to carry out Title IX's mandates'. This fundamental lack of institutional capacity and commitment directly translated into LSU's consistent failure to conduct reasonable investigations, collect essential evidence, and respond adequately to reports of sexual misconduct and retaliation. This environment of institutional indifference and investigative inadequacy left Plaintiffs vulnerable and without effective recourse, allowing the hostile conditions to persist and escalate.

**Who's On First**

268. D'Espalungue was both an employee and a student at LSU. While various individuals and LSU departments were involved in responding to the multiple complaints about endangerment and harassment, there was a "who's on first" quality to these engagements as a direct result of LSU's failure to adopt and implement effective Title IX policies even after it received specific recommendations from a Task Force in 2017 to do so and had constant requests from the Title IX Office for more staff, resources and infrastructure.[94]

---

[94] "Shocked at the lack of infrastructure and resources devoted to Title IX" is how Mari Fuentes Martin described it when she arrived in 2016 as the new Dean of Students and Deputy Title IX Coordinator for students. Husch Blackwell Report, p. 10, fn. #30.

269.    Prior to the rapes and/or sexual assaults of Does # 1-3, Does #4-6 made numerous complaints about d'Espalungue's harassment and endangerment of undergraduates, as well as retaliation and the ongoing hostile environment in the Department of French Studies created by Russo. Doe #2, Doe #3, and three other students also made complaints in November 2020 concerning sexual assaults, harassment, and *quid pro quo* sexual harassment.

270.    LSU officials from four different departments became involved in these complaints about d'Espalungue between 2018 and 2021. Each official was an "LSU official with authority to rectify" the complained-of conduct, and each was deliberately indifferent to the risks, harassment, and hostile environment complaints.

271.    Different complaints were variously addressed by 1) HRM (Madatic, Deputy Title IX Coordinator for Employees); 2) Dean Troy Blanchard and Associate Dean Jason Hicks of the College of Humanities and Social Sciences; 3) the Title IX Office, including Jennie Stewart, the Title IX Coordinator, Jeff Scott, Lead Investigator, and Kimberly Davis, graduate assistant Investigator; and 4) the Student Advocacy and Accountability Office (with respect to the rape of Doe #1).

272.    No legitimate investigation was launched, no interim measures or support services were offered, and no outcomes were reported with the exception of the five Title IX complaints (including those of Does #2 and #3) which were summarily closed in December 2020, after d'Espalungue's one-year suspension had been made final. The closing of these cases further constituted deliberate indifference to gender discrimination at LSU.

273.    Such inaction does not comply with Title IX as outlined in its regulations and guidance issued by the U.S. Department of Education, Office for Civil Rights ("OCR").

**DAMAGES: Defendant's Actions/Inactions and LSU's Official Policy of Discrimination**

274.  As a direct and proximate result of defendant's actions and inactions, and LSU's official policies of gender discrimination, plaintiffs have suffered actual damages including, but not limited to, emotional and physical pain and suffering, mental distress, humiliation, medical expenses for mental and physical health treatment, anxiety, physical assault, denials of access to educational benefit, loss of educational benefit including academic work and scholarship opportunities, loss of income, loss of enjoyment of life, economic damages associated with moving, denial of career advancement and equity pay, and other economic or non-economic damages, for which they are entitled to just compensation.

275.  Does #1-#3 each suffered sexual assault and/or rape which caused severe mental, physical and emotional pain and anguish, anxiety, humiliation, and distress.

276.  Doe #1 endured not only rape, but also a long adjudication process requiring her to repeat details of her rape numerous times and be subjected to hours of cross-examination by d'Espalungue and his attorney at a panel hearing. This was in violation of Title IX regulations adopted August 14, 2020 which require the parties to be represented by advisors who conduct the questioning.

277.  Doe #2's rape by d'Espalungue on January 31, 2019, filled her with shame and confusion. She was a freshman. He had been her teacher. He was ten years older and a prestigious and prominent figure in the French Department. He was also her "boss" with respect to her work on the Journal, which had become important to her. D'Espalungue had started grooming her in September of 2018, and his inappropriate attentions at a French Table event on September 20, 2018, were noted and documented in a Title IX report of Doe #5 later that fall, after d'Espalungue had been arrested for rape of the ULL student. After her own rape,

d'Espalungue convinced Doe #2 to continue their relationship for several months, and then broke it off after he became involved with the high school AJFS essay contestant in the summer of 2019. It was only later that Doe #2 understood that d'Espalungue was a serial sexual predator, and not the charming Frenchman that he passed himself off to be. Despite her own stress, pain, humiliation and anxiety, Doe #2 has spent a considerable amount of time and effort to warn other young women, making multiple reports to the Title IX office, all to no avail. Doe #2 has been deprived of equal access to education and has suffered physical and mental pain, humiliation,  and trauma as a direct result of defendant's actions and inactions, as well as LSU's official  policy of ignoring and abetting sexual harassment of female students.

278.    Doe #3 was the victim of multiple instances of groping, unwanted touching, and *quid pro quo* harassment. Doe #3, like her friend Doe #2, was a freshman student and d'Espalungue had been her first French teacher. She suffered confusion, shame, stress, anxiety, physical and mental pain, and was deprived of a normal educational experience. D'Espalungue was her boss, and she felt the work of the journal was important and exciting in the first months. Later, she would attend events so that other young women would not be alone with d'Espalungue, all in a vain effort to protect them from a skillful and experienced predator. D'Espalungue took advantage of her youth, trust, and inexperience as he did with Does #1 and #2, and many other female LSU students.

279.    Does #2 and #3 also spent significant time and effort trying to get LSU to act. They spoke with other victims, obtained written statements, and coordinated a group Zoom meeting with Stewart on November 16, 2020, in which five Title IX complainants stepped forward. Their efforts continued into 2021 regarding d'Espalungue's continued control of LSU French Club

websites, his claims that AJFS was affiliated with LSU, and the risk he posed to high school

students. All of these efforts came to nothing. In the meantime, Doe #2 and Doe #3 lost many

hours and much physical, mental and emotional effort that should have been spent on their

college educational experience.

280.    Doe #4 sought counseling in October 2019 due to the unbearable hostile environment

resulting from Russo's ongoing retaliation for Doe #4's Title IX complaints about

d'Espalungue's harassment and Russo's reprisals. She ultimately gave up her status as a full-

time LSU student at the end of the fall semester of 2019. While on campus, the stress caused

her to have insomnia and a decreased appetite. For a time, she awoke every hour at night. She

suffered anxiety due to Russo's constant criticism and disrespect, and eventually began

taking an anti- depressant. She completed her Ph.D. in 2022 as a part-time student living

outside the United States. Because of these changes, Doe #4 lost her graduate assistant

positions which had paid for her tuition; lost physical access to the LSU library and suffered

stress and anxiety due to the hostile educational environment, even long distance.

281.    The hostile environment Doe #4 experienced involves a cumulative, continuing series of

hostile acts beginning in 2018 and continued  through at least August of 2021 when Dr.

Russo began a sabbatical leave. A few examples of retaliatory acts are:

    a.    When Doe #4 first reported sexual harassment by d'Espalungue in October 2018,
       Russo was dismissive, telling her she should accept the harassment as
       "compliments."

    b.    Doe #4 was advised by a professor to file a Title IX complaint about
       d'Espalungue's harassment, but Doe #4 was afraid of retaliation.

    c.    Throughout 2018, 2019 and 2020, Russo verbally told graduate students to report
       all Title IX concerns to her.

    d.    On August 1, 2019, after Doe #4 was elected to a leadership position with the
       Department of French Studies Graduate Student Association (GSA), she emailed
       the Director of Graduate Studies about scheduling a GSA meeting during

orientation week, but not wanting to conflict with his plans. He suggested a date and time to have a joint meeting. Russo later reprimanded Doe #4 and told her she had "no authority to schedule such meetings."

e.  On  August 9, 2019, Doe #4 and Doe #5 were called to a meeting with Russo purportedly to discuss GSA business. After a short discussion, Russo switched subjects and expressed her concerns about "the drama from last year." She stated she did not want any of that happening and that if they heard any graduate students complain, they were to report them directly to Russo and not "go behind my back." Essentially, Russo asked Does #4 and #5 to spy on other graduate students.

f.  At the same meeting on August 9, 2019, Russo told Doe #5 to leave so she could speak with Doe #4 alone about her prospectus. When Doe #5 was gone, Russo told Doe #4 she actually wanted to discuss her "conduct" and that Doe #4 had been a "know-it-all" in a meeting a week prior, when Doe #4 had been asked by the language coordinator to take the lead on explaining to Russo course syllabi changes they had made. Russo then stated she did not expect "any more drama" from Doe #4 that year. She began to explain that d'Espalungue was innocent, that the victim in that case had "changed her mind after the fact," and that d'Espalungue was planning a "countersuit for slander" against her. Russo then added that d'Espalungue "brought lots of money into the department" and his involvement "was important."

g.  At no time during this conversation had Doe #4 brought up d'Espalungue, Title IX or his case.

h.  Later the same day, August 9, 2019, Doe #4 completed work on a substitute teacher list that she had been asked to do during a previous meeting with Russo and the two language coordinators. Doe #4 emailed the draft to everyone. Russo did not respond. The language coordinators made suggestions which Doe #4 implemented. Doe #4 sent the new version to everyone. Ten days later, Russo emailed back that she and one of the language coordinators "did not think it advisable for first year graduate students to teach upper-level classes." This had never come up in any of the meetings. Russo directed Doe #4 to redo all the forms.

i.  On August 22, 2019, Doe #4 attended a meeting of graduate assistant instructors on how to use the online meeting software. At the end of the meeting, as assistant to the language coordinator, Doe #4 said, "Hey y'all, if you have any questions later, please let me know." Russo quickly responded, loudly and publicly, "That was very disrespectful, [Doe #4]. Do not call me that." Doe #4 was very confused. Russo walked by a minute later and Doe #4 told her she didn't know what she heard, but Doe #4 was not trying to be disrespectful". Russo replied, "yes, you were. You know what you said."  Doe #4 was very embarrassed. The stress from the week in conjunction with this embarrassing moment led Doe #4 to break  down in the bathroom. A language coordinator later told Doe #4 that

Russo insisted that Doe #4 had called her "Addie," which is her nickname, and she thought it was "highly inappropriate." Russo refused to change her opinion, even after being told that's not what was said.

j.   On September 1, 2019, Doe #4 received only part of her salary. Doe #4 made inquiries with the department administrative assistant. Three days later, Russo called Doe #4 into her office, angry that Doe #4 had contacted the assistant. Russo told her that the non-payment of salary was not an error – that Doe #4's work as assistant to the language coordinator was "on a volunteer basis" and she could list it on her CV. Doe #4 objected and said she had held the same position in the fall of 2018 and had been paid for it, and she had completed almost all work for the 2019 semester. Russo responded that all positions and discussions of roles should go through her (which had never been the case – Doe #4 received work through her direct supervisors, the language coordinators). Doe #4 explained she was not working voluntarily. Russo responded that Doe #4 was "overreacting" and that it was "not a big deal." Doe #4 said she disagreed. Russo replied, "we will have to agree to disagree" and asked Doe #4 to leave.

k.   Doe #4 reached out to the graduate advisor and others for advice. Ultimately, her salary was restored, but the hostility and abuse from Russo continued.

l.   After this point, Russo substantially stopped speaking with Doe #4, and blocked her from receiving information that she normally would have received.

m.   On September 12, 2019, Russo told another graduate student she didn't want to talk to Doe #4 in connection with DFSGSA matters (Doe #4 was president) and asked the other student to send an email to graduate students.

n.   On September 16, 2019, Russo asked another graduate student to ask Doe #4 for some dates.

o.   On September 24, 2019, Russo reprimanded Doe #4 by email for following instructions from one of the language coordinators to obtain an exam draft. "Please in future, contact me directly."

p.   Russo continued blocking Doe #4 from emails and treating her with hostility and disrespect, undermining all of her efforts to carry out her leadership and employment roles.

q.   On February 4, 2020, Russo called Doe #4 to tell her she was no longer working on the LSU in the French Alps program. Doe #4 learned from others that Russo had worked to get Doe #4 removed.

r.   On October 5, 2020, Russo sent a departmental email stating, "All instances covered by these regulations must be reported to the Department Chair, and I will instruct you to contact the Dean's Office and the Title IX office if you have reason to lodge a complaint." This echoed what she had been telling graduate students verbally for two years.

s.  Doe #4 met with Title IX Coordinator Stewart on December 11, 2020, and with Investigator Jeffrey Scott on January 12, 2021. Doe #4 discovered from Scott that there was no record of her December 2018 Title IX meeting with Kim Davis.[95]

282.  Doe #4 reported to Scott that her "biggest concern is that the remaining students feel safe and if they have a concern that they should feel comfortable reporting it without any ramifications from Russo."

283.  Doe #5 abandoned her Ph.D. program at LSU after the spring semester of 2021, even though she had completed all her coursework. Like Doe #4, she could no longer endure the hostile educational environment and the retaliation and disrespect from Dr. Russo. As noted above, Doe #5 was one of the first students to file a Title IX report, submitted on November 1, 2018, describing the danger d'Espalungue posed to undergraduates. Her report, like all others, was ignored. The student she was trying to protect, Doe #2, was raped less than three months later. Russo retaliated against Doe #5 in ways similar to her retaliation against Doe #4, and for the same reason: they had both filed Title IX complaints about d'Espalungue's harassment and endangerment of undergraduates, and also complained about the reprisals and retaliation from Russo herself. On April 5, 2021, Doe #5 spoke to Madatic, the Deputy Title IX Coordinator for Employees, and reported that the ongoing retaliation and hostility in the French Department was making her consider not returning to LSU. Madatic responded they couldn't do anything about the situation other than giving Russo "additional training." Doe #5 could not bear to return to the hostile environment and has abandoned her dream to obtain a Ph.D. from LSU.

284.  Does #1-5 were deprived of a normal educational environment and equal access to

---

[95] When Doe #4 received her Title IX records on April 19, 2021, she discovered Kim Davis' notes from the December 2018 meeting were included, but there was no case creation sheet for 2018.

educational programs and benefits due to LSU's deliberate indifference and official policy of gender discrimination.

285.    As the record reflects, Doe #6 was one of the most active and vocal advocates for gender equity and campus safety for female LSU students placed at heightened risk by d'Espalungue's continued involvement in leadership roles after his rape arrest, his harassment and assaults, and by the reprisals Russo directed toward anyone who complained. As a result, Doe #6 has suffered—and continues to suffer—retaliation for reporting Title IX violations and for serving as a named Plaintiff in this lawsuit.

286.    After raising alarms about d'Espalungue's danger and harassment, and assisting grad students who had experienced harassment by him, discussions about granting Doe #6 an equity raise came to a halt. She received no salary increase despite assuming additional work responsibilities that, in the past, had been accompanied by increased pay. In April 2020, when an endowed professorship came available which would have increased Doe #6's salary, Russo informed Doe #6 by email and also in a personal conversation, that Doe #6 was ineligible to apply because she already had a named professorship. When the professorship came up in 2021, Doe #6 did not apply based upon Russo's instructions. Instead, Russo successfully applied for it herself, despite the fact that she, too, has a named professorship.

287.    Doe #6 has applied for promotion three times —in Fall 2021, Fall 2022, and Fall 2023—and each time, her application was denied. Indeed, she was denied even the opportunity to be considered for a promotion. In 2022, despite the current department chair, Gregory Stone, describing her work as "extremely erudite" and "comparable to an edition and translation of a classic of Chinese literature that earned an associate professor's promotion to full a couple years ago," the promotion opportunity was still denied.

288. Upon information and belief, these promotion denials were in retaliation for Doe #6's Title IX reporting and her participation in the instant litigation.

289. During this same period, LSU repeatedly delayed resolution of Doe #6's Title IX complaints, reassigning them to three different investigators, with the retaliation matter still unresolved.

290. In a June 22, 2024 email to Dean (now Provost) Troy Blanchard regarding Doe #6's appeal of her promotion decision, Chair Gregory Stone wrote: "I was 99 percent sure, after speaking with Addie, that the lawsuit was packed with lies. Now I'm 100 percent sure." On July 17, 2024, he wrote: "I think you're right that it's best that I do not share [Doe #6's] complaint with the others. I'll informally communicate my concerns with Blake Howe or whoever is serving as chair of the Faculty Adjudication Committee when the fall semester starts."

291. After multiple levels of appeal from the 2023 promotion denial, an LSU dean from outside the department recommended that Doe #6's promotion be re-reviewed. Based on this recommendation, Vice-Provost Jane Cassidy agreed that the process had been flawed and convened a cross-campus committee to secure external reviewers from outside the Department of French Studies.

292. Professors within the Department objected to this decision, protesting to then-Dean Blanchard (now Provost) and stating they were recusing themselves from any committee involving Doe #6's promotion — yet still insisting on their right to vote on the case. Upon information and belief, this conduct was further retaliation for Doe #6's Title IX complaints.

293. The outside committee voted unanimously in favor of Doe #6's promotion to Professor, as did LSU's Promotion and Tenure Committee.

294.    On July 29, 2025, Matt Lee, Interim President of Louisiana State University, notified Doe #6

that "the recommendation for your promotions to the rank of Professor has been approved

and will become effective January 5, 2026."

295.    The delay in promotion has meant more than three years without the additional salary and

rank at LSU, causing Doe #6 severe financial hardship, including the near-loss of her home

in summer 2025 and substantial depletion of her IRA savings.

296.    Even when the promotion to full Professorship is effective in January 2026, Doe #6 will

receive only a modest salary increase and will remain the lowest-paid professor at her rank.

297.    Doe #6 suffers, and will continue to suffer, severe anxiety and financial hardship as a result of

this repeated retaliation to the detriment of both her work—including contributing to medical

leave in Spring 2025—and personal health.

## CLAIMS FOR RELIEF

### COUNT I
**Official Policy and Deliberate Indifference:**
**Pre-Reporting Heightened Risk and Post-Reporting**
**(Does #1-3) (LSU Board of Supervisors)**
**Title IX 20 U.S.C. § 1681,** *et seq.*

298.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

299.    LSU had actual knowledge as of October 10, 2018 that d'Espalungue posed a risk of

substantial harm to LSU female students based upon his two arrests, four days apart, for

sexual battery and forcible rape of a 21-year-old ULL student on September 30, 2018.

300.    LSU removed d'Espalungue from the classroom but allowed him to remain an employee in a

status of increased prestige and power within the LSU Department of French Studies as

Research Assistant to the Chair; retain his positions in LSU student government; host French

Table and French Cinema events with undergraduates in attendance; and manage social media for the Department and the LSU French Club.

301.    At least as of November 2018,[96] LSU officials with authority to rectify the situation had received multiple and specific reports about d'Espalungue's danger and predatory behavior *in addition to knowledge of his two 2018 rape arrests.* Through the videotaped interview conducted at the LSU Police Department with Detective Nehlig present, LSU Police learned directly that d'Espalungue had been sexually involved with one of his freshman French students, had provided her with the final exam in advance, and had instructed her on how to cheat without detection. Other reports showed that he was harassing additional female LSU students, that his behavior was described as "aggressive," that some students feared reprisals from Russo if they came forward, that d'Espalungue was in fact leading French Table and French Cinema events despite denials by d'Espalungue and Russo, and that he had regular contact with undergraduates at these events, including his former students (Does #2 and #3). Doe #5 also witnessed his behavior with Doe #2 (ten years his junior) and found it alarming and inappropriate.

302.    LSU officials with authority to rectify the situation had actual knowledge of the risk, the harassment, and the vulnerability of young students and were deliberately indifferent. No meaningful action was taken, no investigation was opened, and no interim measures were adopted. LSU's actions and inactions were clearly unreasonable in light of the known circumstances.

---

[96] In addition to the direct knowledge LSU Police gained in November 2018 from an in-person, videotaped interview conducted at the LSU Police Department with one of d'Espalungue's freshman French students — in which she admitted that d'Espalungue had been her teacher, that they were sexually involved, and that he had provided her with the final exam in advance and instructed her on how to conceal her cheating — on information and belief, there were also Title IX complaints about d'Espalungue earlier in 2018 and possibly in 2017.

303.   By failing to respond to the serious threat of sexual threat of female students posed by

d'Espalungie, LSU acted with deliberate indifference and subjected Does #1-3 to an

unreasonable heightened risk of sexual assault. *See Roe v. Cypress-Fairbanks Ind. Sch. Dist.*,

53 F. 4th 334 (5th Cir. 2022); *see also Doe v. Board of Supervisors of Univ. of Louisiana Sys.*,

650 F.Supp.3d 452 (M.D.La.2023).

304.   LSU's deliberate indifference caused Does #1-3 to undergo harassment, assault, and/or rape,

and also made them liable or vulnerable to it. *Davis Next Friend LaShonda D. v. Monroe*

*Cnty. Bd. of Educ.*, 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).

305.   As a direct result of LSU's deliberate indifference, d'Espalungue raped Doe #2 on January

31, 2019, raped Doe #1 on September 6, 2020, and sexually assaulted Doe #3 on multiple

occasions, some of which fell within the definitions of *quid pro quo* harassment.

306.   D'Espalungue was, at all times, an employee of LSU and Does #1-3 were undergraduate

students. LSU violated its obligation under Title IX to provide Does #1-3 with an educational

environment free of sexual harassment. Appropriate officials received actual notice of

harassment and were deliberately indifferent, which resulted in a hostile environment which

denied Does #1-3 the ability to participate or benefit from LSU's programs. Does #1-3 are

therefore entitled to damages as set forth below under "Damages."[97]

307.   Even assuming the harassment and assaults involved student-on-student conduct and not

employee-on-student (which is denied), they were severe, pervasive and objectively

offensive and created a hostile educational environment which deprived Does #1-3 of access

to the educational opportunities and benefits provided by the LSU.

308.   Considering the "constellation of surrounding circumstances, expectations, and

---

[97] *Gebser v. Lago Vista Independent School District,* 424 U.S. 274 (1998).

relationships," including the "ages of the harasser and the victim and the number of individuals involved," the conduct in question meets the requisite level of severity.[98]

309.    LSU caused further damage and emotional distress by its deliberate indifference to their Title IX reports, with respect to d'Espalungue's sexual assaults, *quid pro quo* sexual harassment, and the grooming and endangerment of high school students. LSU's response – to close the files of Does #2-3 without investigation – was clearly unreasonable in light of the known circumstances and contributed to the hostile educational environment. Likewise, LSU's treatment of Doe #1 during the November 20, 2020 hearing in response to her Title IX complaint—in violation of Title IX regulations—subjected her to traumatic questioning without the ability to have an advisor participate in the hearing.

310.    Plaintiffs further allege that LSU's deliberate indifference to d'Espalungue's repeated misconduct and their failure to respond appropriately to Plaintiffs' Title IX complaints was not aberrant. Rather, it was part and parcel of LSU's official policies and customs of gender discrimination and permitting sexual assault. . *Doe v. Baylor Univ.*, 240 F.Supp.3d 656, 661 (W.D.Tex.2017) (*citing Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 ).[98]

311.    Plaintiffs' pre-assault heightened risk claims are timely. They did not know and could not have known until the Husch Blackwell Report was released to the public on March 5, 2021, that 1) LSU had an official policy and practice of deliberate indifference to gender discrimination; and 2) that there was a direct causal connection between the official policy and the harassment they experienced. Therefore, they had no knowledge of the heightened risk LSU's policies and practices placed them under nor did they have any reason to investigate these claims until the release of the Husch Blackwell Report.

---

[98] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

312.    The Husch Blackwell Report was released to the public on March 5, 2021, just a few months before this action was originally filed on October 4, 2021.

313.    Plaintiffs' post-reporting claims are also timely filed. Doe #1's rape was on September 6, 2020 and she filed her complaint on September 8, 2020. The tolling period was suspended from August 26 to September 24, 2021, by Executive Order/Emergency Proclamation Number 170 JBE 2021 in response to Hurricane Ida, and Doe #1 has timely filed this complaint within the one-year period.

314.    Doe #1's hearing at which LSU violated Title IX regulations and subjected her to traumatic questioning occurred on November 20, 2020, less than one year before this action was originally filed.

315.    Does #2-3 filed their Title IX reports on November 6, 2020 and were closed by LSU without any investigation on November 16, 2020. Both of those events occurred less than one year before this action was originally filed.

316.    As a direct, natural, and proximate result of LSU's deliberate indifference and official policies, Does #1-3 have suffered actual damages as outlined in the "Damages" section, for which they are entitled to just compensation.

**COUNT II**
**Violation of Title IX - Hostile Educational Environment**
**(Does #1-5)(LSU Board of Supervisors)**
**20 U.S.C. §§ 1681, *et seq.***

317.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

318.    Title IX of the Education Amendments of 1972 provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681

319.   LSU is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a) and is

therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

320.   Does #1-5 allege a Title IX violation against LSU for the creation, cultivation and

perpetuation of a hostile educational environment due to gender discrimination.

321.   As outlined above, Does #1-5 were subjected to "multiple and varied incidents of offensive

conduct which had the cumulative effect" of creating a hostile educational environment

which deprived Does #1-5 of the ability to fully and equally participate in or benefit from

LSU's programs and activities.[99]

322.   The harassment, discrimination, assaults, and other offensive conduct were severe, pervasive

and objectively offensive, and constituted a continuous pattern of gender harassment which

did not abate until after March 2021, as indicated by the multiple Title IX reports of

harassment by d'Espalungue lodged continuously up to that point.

323.   While Defendant claims LSU no longer had control over d'Espalungue after he was

suspended at the end of 2020 as a result of the rape of Doe #1, the facts demonstrate that

LSU did retain control over d'Espalungue's access to its students and was deliberately

indifferent to protecting its students from his conduct.

324.   Despite a policy of terminating all email access for suspended students, d'Espalungue

retained and used his LSU email address through March 23, 2021, months after his

suspension and despite repeated complaints about d'Espalungue's continued inappropriate

interactions with LSU students. LSU's failure to take this basic precaution of terminating

d'Espalungue's university email access demonstrates continued deliberate indifference to his

---

[99] *See Rabidue v. Osceola Refining Co*., 805 F.2d 611, 620 (6th Cir. 1986); *Bustamento v. Tucker*, 607 So.2d 532, 538-539 (La. 1992).

danger to students and a continued policy of permitting sexual harassment.

325.  Despite repeated complaints, LSU also took no action to separate itself from d'Espalungue's social media accounts claiming a continued LSU affiliation (including for the French Club LSU, which had been registered with LSU) or communicate to students that d'Espalungue's accounts were no longer affiliated with the university.

326.  Upon information and belief, at all relevant times, LSU did not make any attempts to contact the relevant social media companies to seek the removal of these accounts for unauthorized assertions of affiliation with the university Further, LSU did not communicate with the French Department students to establish the change in affiliation of these accounts from affiliated university accounts to personal accounts outside their control. Given that d'Espalungue was given authority to create accounts affiliated with LSU, LSU had a responsibility to take *some* action to unaffiliate itself with these accounts.

327.  Further, LSU took no action to ensure d'Espalungue no longer had control over access to French Department events or the French Club. Given the demonstrated history of the French Department Chair deliberately concealing d'Espalungue's involvement and authority within the Department, LSU had actual notice that they needed to take affirmative steps to remove d'Espalungue from the Department's activities and communicate the termination of any affiliation with d'Espalungue. It failed to do so.

328.  It is not plausible that LSU had no control over d'Espalungue's continued virtual participation in French Department affiliated activities, particularly given LSU's failure to take even the most basic precaution of eliminating his email access.

329.  On December 11, 2020, and again on January 12, 2021, Doe #4 met with LSU's Title IX Coordinator and Investigator to report ongoing sexualized comments, intimidation, and

favoritism toward Edouard d'Espalungue by Department Chair Adelaide Russo, and to describe the resulting climate of fear that discouraged complaints within the department. Despite these reports, LSU took no steps to investigate or address the conduct, allowing the hostile and intimidating environment to persist and continue to impair Doe #4's access to educational opportunities during her dissertation phase.

330. Because of LSU's actions, Does #1-5 were forced to endure a hostile environment of gender discrimination that continued through at least March 2021, when LSU finally took measures to sever d'Espalungue's access to its students.

331. Does # 1-5 were, cumulatively, subject to *years* of continuing sexual harassment and assault at the hands of d'Espalungue (ranging from rape for Does #1-2, assault for Doe #3, and repeated verbal harassment of Does #4-5) despite LSU's knowledge of his arrest for second-degree rape on October 4, 2018, his sexual relationship with one of his young students (revealed at the LSU Police Department about November of 2018), and other serial sexual misconduct.

332. Further, Does #1-5 each had to endure an educational environment in which their repeated reports of sexual harassment (as early as 2018 by Does #4 and 5) were ignored and the perpetrator was permitted to continue his harassment of them and their peers until March 2021.

333. LSU—by placing Does #1-5 in an environment where serial sexual predation was permitted to continue unabated in the face of many official reports—subjected Does #1-5 to a hostile educational environment.

334. The hostile educational environment deprived plaintiffs of the ability to fully and equally participate in or benefit from LSU's programs, activities and/or jobs.

335.    LSU had actual knowledge of the sex-based discrimination and was deliberately indifferent to it.

336.    LSU's failures and the resulting hostile environment were the result of official policy and custom as outlined above and in the Husch Blackwell Report released to the public on March 5, 2021.

337.    LSU repeatedly failed to initiate or conduct reasonable investigations or offer appropriate interim measures to remedy the ongoing hostile environment.

338.    As Doe #6 told Madatic on January 17, 2019, when relaying yet another report about d'Espalungue endangering young women and harassing grad students, women "just want to be taken seriously."

339.    Plaintiffs Doe #1-5's hostile educational environment claim is timely. They did not know and could not have known until the Husch Blackwell Report was released to the public on March 5, 2021 that 1) LSU had an official policy and/or practice of deliberate indifference to gender discrimination; or 2) that there was a direct causal connection between the official policy and the hostile environment they experienced. They could not know, because LSU was concealing it, that the institution itself was discriminating against them because of their gender. Therefore, they had no reason to investigate these claims until the release of the Husch Blackwell Report. The Husch Blackwell Report was filed less than one year before this action was originally filed on October 4, 2021.

340.    Moreover, aside from the harms they suffered by exposure to and continued exposure to d'Espalungue and aside from the harms they suffered by their various interactions with LSU about these harms, Doe #1-5 were deprived of a non-discriminatory education environment in all respects as a result of the intentional policies of LSU. "In the instant case, it is the

institution itself that is discriminating.     The proper test is not whether it knew of or is responsible for the actions of others, but is whether Appellees intended to treat women differently on the basis of their sex by providing them unequal [ ] opportunity." *See Pederson v. Louisiana State Univ.*, 213 F.3d 858, 880-881 (5th Cir. 2000).  Plaintiffs hereby plead this claim for intentional policy as described by the *Pederson* case.  Plaintiffs could not have known about these intentional policies until the Husch Blackwell Report; indeed LSU's branding gave the impression the university was welcoming to female students and provided them equal treatment.  Doe #1-5 are entitled to recover the lost value of attending a non-discriminatory education environment, separate and apart from the harms related to d'Espalungue.

341.  As a direct, natural, and proximate result of LSU's official policies, practices, and deliberate indifference, Does #1-5 have suffered actual damages as outlined in the "Damages" section, for which they are entitled to just compensation.

**COUNT III**
**Violation of Title IX - Heightened Risk**
**(Does #1-5) (LSU Board of Supervisors)**
**20 U.S.C. §§ 1681, *et seq.***

342.  Plaintiffs adopt and incorporate by reference all previous paragraphs.

343.  LSU's official policies, adopted by LSU's top leadership, resulted in a widespread pattern of discriminatory responses to female students which created a heightened risk of sexual assault and harassment for Does #1-5 and other female LSU students.

344.  As a direct result, d'Espalungue raped Does #1 and #2, sexually assaulted Doe #3, and harassed Does #4 and #5.

345.  The Husch Blackwell report documents innumerable policy choices (both action and inaction) by which LSU's leadership chose to treat its female student body as second-class

citizens. The paltry $329,000 request for additional staff and training submitted by Title IX Coordinator Stewart in 2016 would have been a start to remedying what apparently was "Title IX Theater" rather than a system which intended to comply with Title IX. Instead, LSU decided it was too much to invest to protect women and other victims of gender harassment and sexual assault.

346.    LSU knew of and permitted a campus rife with harassment and assault. Its Title IX system was designed to fail through intentional policy choices of its leadership. The Title IX office was critically under-staffed, under-resourced and under-trained. Conflicts of interest were built into the system, and even a task force could not determine the organizational chart and reporting structure. LSU mishandled investigations, adjudications, record-keeping. The long history of failing victims created a culture which discouraged reporting, even as victims had no idea why the system was failing.

347.    These policy failures were not abstract. LSU's deliberate choice to ignore d'Espalungue's October 4, 2018 arrest for forcible rape and the November 2018 videotaped LSU Police interview of a freshman student admitting to sex with him and cheating on exams ensured he remained in positions of trust and authority. Those official decisions preserved his access to undergraduates and made the risk of further assaults known and obvious. 336. That risk materialized in the particular harms suffered by plaintiffs: Does #2 and #3, his former students, were subjected to continued grooming and harassment, leading to Doe #2's January 2019 rape and the multiple sexual assaults of Doe #3. LSU's policy of deliberate under-resourcing of Title IX, coupled with Russo's unchecked retaliation against reporters, left Does #4 and #5 vulnerable to escalating harassment. Doe #1 was raped in September 2020 in an environment LSU had cultivated through years of deliberate indifference

348.   Thus, LSU's official policies and practices created a heightened and obvious risk of

sexual assault and harassment that foreseeably materialized in the particularized harms

suffered by each plaintiff.

349.   It wasn't until publication of the Husch Blackwell Report on March 5, 2021 that plaintiffs knew

or had reason to suspect that they had a heightened risk claim based upon official LSU policies,

and that there was a causal relationship between the harassment and assaults they

experienced and LSU's policies.

350.   The Report documents the many ways LSU leadership intentionally and deliberately adopted

policies which violated the spirit and letter of Title IX. As outlined above, actual notice and

deliberate indifference need not be shown where a funding recipient intentionally violates the

statute. *Davis v. Monroe Cty. Bd. Educ.*, 526 U.S. 629, 642 (1999). *See also Doe v. Baylor*

*Univ.,* 240 F.Supp.3d 656, 661 (W.D.Tex.2017)

351.   Plaintiffs' claim is timely. Plaintiffs did not know and could not have known until the Report

was released to the public on  March 5, 2021 that 1) LSU had an official policy and practice

of deliberate indifference to  gender discrimination; or 2) that there was a direct causal

connection between the official policy  and the heightened risk claim. Therefore, they had no

knowledge of the heightened risk LSU's official policies and practices placed them under nor

did they have any reason to investigate these claims until the release of the Husch Blackwell

Report. The Husch Blackwell Report was filed less than one year before this action was

originally filed on October 4, 2021..As a direct, natural, and proximate result of LSU's

official policy of discrimination and deliberate indifference, plaintiffs have suffered actual

damages as outlined in the "Damages" section, for which they are entitled to just

compensation.

## COUNT IV
### Violation of Title IX - Retaliation
### (Does #4-6) (LSU Board of Supervisors)
### 20 U.S.C. §§ 1681, *et seq.*

352. Title IX and its regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

353. Does #4-6 engaged in protected activity by reporting incidents of sex-based harassment and discrimination they experienced, witnessed, or became aware of by d'Espalungue, an LSU employee and student.

354. Plaintiffs also reported that d'Espalungue, who had been removed from the classroom, purportedly to protect female students from a risk of substantial harm after his arrest for sexual battery and forcible rape, was finding other ways to interact with young, vulnerable and naïve students, and that his interactions were sexualized and inappropriate.

355. As outlined above, Doe #4-6 filed multiple reports of harassment and endangerment with the Title IX office and other LSU officials with authority to rectify the situation, which are a protected activity.

356. Plaintiffs were thereafter subjected to retaliatory actions which were a direct and proximate result of her Title IX reporting. These actions include several discrete acts of retaliation within a year of the initial filing of this action (on or after October 4, 2020).

357. Doe #6 sought and was denied promotions—or even the opportunity to be considered for a promotion—on three occasions since 2021. Upon information and belief, those promotions were denied in retaliation for her Title IX complaints and participation in this lawsuit. The current chair of the Department even mentioned this lawsuit—and his belief that it was "packed with lies"—in an email concerning Doe #6's appeal of the denial of her promotion.

358.    This retaliation has continued. For over three years, LSU denied Doe #6's promotion to full Professor. Her promotion has now been approved to take effect January 5, 2026, but with only a modest salary increase.

359.    Plaintiff also reported the retaliation she experienced to LSU officials with authority to rectify it, and LSU failed to investigate or take any remedial action. LSU took the position that nothing could be done but to provide Russo with "additional training."[100]

360.    LSU officials with authority to rectify the situation received actual notice that Dr. Russo retaliated against students and faculty who complained about sexual harassment by d'Espalungue, or the fact that he was in contact with undergraduates via multiple leadership roles in the French Department.

361.    LSU was deliberately indifferent to the retaliation and took no action to remedy it.

362.    Plaintiff's claim is timely because she experienced discrete acts of retaliation within the statute of limitations.

363.    As a direct, natural, and proximate result of the retaliation and LSU's failure to investigate or address it along with the hostile environment which resulted, Doe #6 has suffered actual damages as outlined in the "Damages" section, for which she is entitled to just compensation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College for the following relief:

A.    That judgment be entered against Defendant for general and special compensatory damages in amounts which shall be shown to be reasonable and just by the evidence and

---

[100] See ¶ 276, *supra*.

in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests and

costs;

B.      That judgment be entered against Defendant for nominal damages as allowed by

law;

C.      That Plaintiffs be awarded all court costs, case expenses, litigation costs, expert

witness fees and attorneys' fees under 42 U. S. C. § 1988 and other applicable statutes.

D.      That judgment be entered against Defendant for pre and post-judgment interest as

allowed by law;

E.      That an order of protection in favor of Plaintiffs as victims of sex offenses be

issued and that all parties and attorneys associated with this matter be required to ensure

their anonymity;

F.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs are entitled to and hereby demand trial by jury of all issues properly triable

by jury in this action.

Dated: August 22, 2025

Respectfully submitted,

**MILDRED E. METHVIN, LLC**

By: /s/ *Mildred E. Methvin*
Mildred E. Methvin (#14619)
201 Rue Beauregard #202
Lafayette, LA 70508-3251(*Service Address*)

1240 S. 2nd St. Unit 1128
Minneapolis, MN 55415 (*Physical address*)
T: 337-501-1055
F: 888-298-0566
Email: memethvin@gmail.com

**BRAZIL & DUNN, L.L.P.**

Chad W. Dunn
K. Scott Brazil
1900 Pearl Street
Austin, Texas 78705
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com
scott@brazilanddunn.com

AND

**DUNNAM & DUNNAM, L.L.P.**

Jim Dunnam
Eleeza Johnson
4125 West Waco Drive
Waco, Texas 76710
Telephone: (254) 753-6437
Facsimile: (254) 753-7434
jimdunnam@dunnamlaw.com
eleezajohnson@dunnamlaw.com

**ATTORNEYS FOR PLAINTIFFS
JANE DOES #1-6**